UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04  11667 RGS

T. ROWE PRICE TAX-FREE HIGH YIELD
FUND, INC., SMITH BARNEY INCOME
FUNDS/SMITH BARNEY MUNICIPAL HIGH
INCOME FUND, DRYDEN NATIONAL
MUNICIPALS FUND, INC. AND LOIS AND
JOHN MOORE

Plaintiffs,

v.

KAREN M. SUGHRUE, GARRY L. CRAGO,
JEAN W. CHILDS, PAULA EDWARDS
COCHRAN, G. STEVENS DAVIS, JR., JULIA B.
DEMOSS, WILLIAM R. DILL, LESLIE A.
FERLAZZO, JOYCE SHAFFER FLEMING, ERIC
W. HAYDEN, CATHERINE CHAPIN
KOBACKER, ANNE MARCUS, CELESTE REID,
RICHARD J. SHEEHAN, JR., JOSEPH SHORT,
GREGORY E. THOMAS, SUSAN K. TURBEN,
DONALD W. KISZKA and ADVEST, INC.,

Defendants.

Civil Action No.

ATE JUDGE Cohen

PLAINTIFFS DEMAND A JURY TRIAL
ON ALL COUNTS

| | |
|---|---|
| RECEIPT # | |
| AMOUNT $ | 150 |
| SUMMONS ISSUED | yes |
| LOCAL RULE 4.1 | |
| WAIVER FORM | |
| MCF ISSUED | |
| BY DPTY. CLK. | YO.M |
| DATE | 1-27-04 |

## COMPLAINT

Plaintiffs T. Rowe Price Tax-Free High Yield Fund, Inc., Smith Barney Income

Funds/Smith Barney Municipal High Income Fund, Dryden National Municipals Fund, Inc.

and Lois and John Moore (collectively, "the Bondholders") by their undersigned attorneys,

bring this action for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934

and Section 12(a)(2) of the Securities Act of 1933 and allege as follows:

## SUMMARY OF THE ACTION

1.      This is an action brought by purchasers of Massachusetts Industrial Finance Agency Revenue Bonds, Bradford College Issue, Series 1998 (the "Bonds") and their successors. The Defendants in this action are the trustees of Bradford College (the "College"), its past President and Chief Financial Officer, and the underwriter of the Bonds.

2.      The issuance of the Bonds more than doubled the outstanding debt of the College. As municipal bonds issued by an instrumentality of the Commonwealth of Massachusetts for the benefit of a non-profit institution, the Bonds were exempt from the various registration requirements of the Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq.*, and those of the Massachusetts Securities Act, Mass. G.L. c. 110A. Rather, the Bonds were offered by means of an official offering statement dated May 1, 1998 (the "Official Statement") prepared by the sole underwriter of the offering, Defendant Advest, Inc. ("Advest"). This Official Statement contained numerous inaccurate and misleading statements, as alleged below.

3.      The Official Statement misleadingly failed to disclose that the College was mired in an ongoing fiscal, financial, and operational crisis. As set forth in detail below, this crisis resulted from, *inter alia*, an abysmal 40% student retention rate, huge (and increasing) reductions to tuition revenue in the form of financial aid awards, and the complete absence of a viable strategic plan to address these and other problems. In fact, the Defendants' own analysis, which was not disclosed, concluded that the College had sufficient resources to survive, at most, another 2 to 5 years. In view of the College's dismal prospects for survival, the Defendants were constrained to resort to misrepresentations, omissions, and half-truths in

the Official Statement in order to raise almost $18 million in debt financing that the College could not hope to repay. The Defendants knew material facts were omitted from the Official Statement or recklessly disregarded their obligation to include them.

4.      In particular, the Official Statement failed to make even the barest mention of the College's "severe and long-standing" student attrition crisis, and the enrollment figures presented in the Official Statement were accordingly misleading. Similarly, the financial aid projections set forth in the Official Statement had no reasonable basis in reality; indeed, those projections were belied by the College's financial statements and by budgets prepared contemporaneously with the bond offering.    And contrary to the Official Statement's references to Bradford's "strategic plan" and ongoing "strategic initiatives," the College was in truth bereft of any plan to balance its budget and to staunch its operating losses. Finally, the Official Statement misrepresented that the College had committed to contribute its own funds toward the construction project financed by the Bonds, when in reality the Defendants had determined to cut corners on the project in order to place only the funds of the Plaintiffs at risk.

5.      The College's assumption of this bond debt accelerated and exacerbated its financial crisis. Even when low enrollment in September 1998 precipitated yet another fiscal emergency, the College's trustees nevertheless unnecessarily continued to expend funds on new dormitories and thereby recklessly depleted the Bondholder's collateral. Such reckless actions and omissions by the trustees, occurring at a time when the College was either insolvent or in the zone of insolvency, constituted a breach of their fiduciary duties to the Bondholders as creditors of the College.    Inevitably — and predictably — the College

determined to shut down. The Plaintiffs bring this action to recover their damages incurred as a result of the Defendants' violations and breaches.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction of the subject matter of this action pursuant to § 27 of the Securities Exchange Act of 1934, 15 U.S.C.§§ 78a, *et seq.* (the "Exchange Act") and 28 U.S.C. § 1331. The claims asserted herein arise under §§ 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1(a), § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities Exchange Commission (the "SEC"). This Court has personal jurisdiction of each of the Defendants pursuant to § 27 of the Exchange Act.

7.    Venue is proper in this district pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c), because many of the Defendants' acts and transactions complained of herein occurred in this District. In connection with the acts and conduct alleged herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including interstate telephone communications and the United States mails.

## PARTIES

### *Plaintiffs*

8.    Bondholder Plaintiff T. Rowe Price Tax-Free High Yield Fund, Inc. ("T. Rowe"), is a tax-free high yield fixed-income investment fund incorporated in and having a principal place of business in the State of Maryland, and managed by T. Rowe Price Associates, Inc. T. Rowe holds Bonds in the principal amount of $6,000,000

9.   Bondholder Plaintiff Smith Barney Income Funds/ Smith Barney Municipal High Income Fund ("Smith Barney") is a municipal high yield fixed-income investment fund organized in the Commonwealth of Massachusetts and having a principal place of business in the State of New York, and is managed by SSB Citi Fund Management Group. Smith Barney hold Bonds in the principal amount of $ 2,345,000

10.   Bondholder Plaintiff Dryden National Municipals Fund, Inc. ("Dryden"), formerly known as Prudential Municipal Series Fund, Inc. is a Maryland corporation with a principal place of business in New Jersey. Dryden holds Bonds in the principal amount of $1,000,000.

11.   Bondholder Plaintiffs Lois and John Moore are individuals with a principal place of residence in Ipswich, Massachusetts. Mr. and Mrs. Moore hold Bonds in the principal amount of $20,000.

*Defendants*

12.   Defendant Advest is an investment banking firm that specializes, among other things, in underwriting offerings of securities. Advest served as the sole underwriter of the College's May 1, 1998 bond offering. As the sole underwriter, Advest was responsible for the preparation of the Official Statement for the sale of the Bonds, and received substantial fees out of the money raised in the bond offering. Advest engaged and/or participated in the unlawful conduct alleged herein in order to, among other things, profit through its participation in the College's issuance of the Bonds. Advest is a Delaware corporation with a principal place of business in Hartford, Connecticut.

13. Defendant Karen M. Sughrue is, upon information and belief, a resident of the State of New York. At all times relevant to this complaint, Defendant Sughrue was a trustee of the College. As of February 6, 1998, Defendant Sughrue was the Chair of the Board of Trustees, a member of the Executive Committee of the Board of Trustees, an *ex officio* member of all other committees of the Board of Trustees, and an officer of the College.

14. Defendant Garry L. Crago is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Crago was a trustee of the College. As of February 6, 1998, Defendant Crago was the Vice-Chair of the Board of Trustees, the Chair of the Enrollment Management Committee of the Board of Trustees, the Vice-Chair of the Buildings and Grounds Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

15. Defendant Jean W. Childs is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Childs was a trustee of the College. As of February 6, 1998, Defendant Childs was the Vice-Chair of the Institutional Advancement Committee of the Board of Trustees, and a member of the Enrollment Management Committee and the Buildings and Grounds Committee of the Board of Trustees.

16. Defendant Paula Edwards Cochran is, upon information and belief, a resident of the State of Florida. At all times relevant to this complaint, Defendant Cochran was a trustee of the College. As of February 6, 1998, Defendant Cochran was the Chair of the Membership and Trustee Development Committee of the Board of Trustees, and a member of the

-6-

Executive, Buildings and Grounds, and Institutional Advancement Committees of the Board of Trustees.

17.    Defendant G. Stevens Davis, Jr. is, upon information and belief, a resident of the State of New Hampshire.  At all times relevant to this complaint, Defendant Davis was a trustee of the College.  As of February 6, 1998, Defendant Davis was the Chair of the Buildings and Grounds Committee of the Board of Trustees, and a member of the Executive, Enrollment Management, and Finance Committees of the Board of Trustees.

18.    Defendant Julia B. DeMoss is, upon information and belief, a resident of the Commonwealth of Pennsylvania.  Defendant DeMoss has been a trustee of the College since February 4, 1998.

19.    Defendant William R. Dill, Ph.D., is, upon information and belief, a resident of the State of Maine.  At all times relevant to this complaint, Defendant Dill was a trustee of the College.  As of February 6, 1998, Defendant Dill was the Chair of the Academic Affairs Committee of the Board of Trustees, and a member of the Executive, Finance, and Membership and Trustee Development Committees of the Board of Trustees.

20.    Defendant Leslie A. Ferlazzo is, upon information and belief, a resident of the Commonwealth of Massachusetts.  At all times relevant to this complaint, Defendant Ferlazzo was a trustee of the College.  As of February 1997, Defendant Ferlazzo was the Chair of the Board of Trustees, an *ex officio* member of all of the committees of the Board of Trustees, and an officer of the College.  As of February 6, 1998, Defendant Ferlazzo was the Vice-Chair of the Finance Committee of the Board of Trustees, and a member of the Institutional

Advancement and Membership and Trustee Development Committees of the Board of Trustees.

21.    Defendant Joyce Shaffer Fleming is, upon information and belief, a resident of the State of Michigan. Defendant Fleming has been a trustee of the College since February 4, 1998.

22.    Defendant Eric W. Hayden is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Hayden was a trustee of the College. As of February 6, 1998, Defendant Hayden was the Chair of the Finance Committee of the Board of Trustees, the Vice-Chair of the Student Affairs Committee of the Board of Trustees, and a member of the Executive and Academic Affairs Committees of the Board of Trustees.

23.    Defendant Catherine Chapin Kobacker is, upon information and belief, a resident of the State of Ohio. At all times relevant to this complaint, Defendant Kobacker was a trustee of the College. As of February 6, 1998, Defendant Kobacker was the Vice-Chair of the Membership and Trustee Development Committee of the Board of Trustees, and a member of the Institutional Advancement and Student Affairs Committees of the Board of Trustees.

24.    Defendant Anne Marcus is, upon information and belief, a resident of the State of Connecticut. At all times relevant to this complaint, Defendant Marcus was a trustee of the College. As of February 6, 1998, Defendant Marcus was the Chair of the Student Affairs Committee of the Board of Trustees, the Vice-Chair of the Enrollment Management Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

-8-

25.    Defendant Celeste Reid, a/k/a Celeste Reid Lee, is, upon information and belief, a resident of the Commonwealth of Massachusetts. Defendant Reid has been a trustee of the College since February 4, 1998.

26.    Defendant Richard J. Sheehan, Jr., is, upon information and belief, a resident of the Commonwealth of Massachusetts. Defendant Sheehan has been a trustee of the College since February 4, 1998.

27.    Defendant Gregory E. Thomas is, upon information and belief, a resident of the Commonwealth of Massachusetts. At all times relevant to this complaint, Defendant Thomas was a trustee of the College. As of February 6, 1998, Defendant Thomas was a member of the Academic Affairs, Enrollment Management, and Student Affairs Committees of the Board of Trustees.

28.    Defendant Susan K. Turben, Ph.D., is, upon information and belief, a resident of the State of Ohio. At all times relevant to this complaint, Defendant Turben was a trustee of the College. As of February 6, 1998, Defendant Turben was the Chair of the Institutional Advancement Committee of the Board of Trustees, the Vice-Chair of the Academic Affairs Committee of the Board of Trustees, and a member of the Executive and Finance Committees of the Board of Trustees.

29.    Defendant Joseph Short is, upon information and belief, a resident of the Commonwealth of Massachusetts. From 1989 until about July 1998, Defendant Short was both a trustee and the President of the College, and an *ex officio* member of each of the committees of the Board of Trustees.

30.    Defendants Sughrue, Crago, Childs, Cochran, Davis, DeMoss, Dill, Ferlazzo,

Fleming, Hayden, Kobacker, Marcus, Reid, Sheehan, Thomas, Turben and Short are collectively referred to as the "Trustee Defendants."

31.     Defendant Donald W. Kiszka is, upon information and belief, a resident of the Commonwealth of Massachusetts. From 1989 until about August 1999, Defendant Kiszka was the Vice President for Administration and Finance, as well as the Treasurer, of the College. Defendant Kiszka was also an officer of the Board of Trustees of the College. Defendants Kiszka and Short are sometimes collectively referred to as the "Officer Defendants."

32.     As officers, trustees and/or controlling persons of an entity which is governed by certain provisions of the federal and state securities laws, and in connection with the sale of the Bonds, along with Defendant Advest, the Officer and Trustee Defendants had a duty timely to disseminate accurate and truthful information with respect to the College's operations, finances, administration, and performance; to correct any previously issued statements from any source that have become materially misleading or untrue; and to disclose any trends or developments that would have materially affected the College's ability to meet its obligations under the Bonds. The Defendants' representations, acts and omissions violated these specific requirements and obligations.

33.     Defendants Short and Kiszka participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature. Because of their Board membership and/or executive and administrative positions with the College, and their attendance at and participation in Board meetings, Defendants Short and Kiszka each had access to the adverse non-public information about the

-10-

College's operational and financial condition, as particularized herein, and knew that those adverse facts rendered the positive statements made by and about the College and its operational and financial condition materially false and misleading.

34.    The Trustee Defendants participated in the drafting, preparation and/or approval of the Official Statement and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature. Because of their membership on the Board of Trustees of the College, and their attendance at and participation in Board meetings, the Trustee Defendants had access to the adverse non-public information about the College's operational and financial condition, as particularized herein, and knew that those adverse facts rendered the positive statements made by and about the College and its operational and financial condition materially false and misleading.

35.    Each of the Officer and Trustee Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. To discharge their duties, the Officer and Trustee Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning the operations and financial reporting of the College. Defendants Short and Kiszka, by virtue of their high level positions with the College, directly participated in the administration of the College, were directly involved in the day-to-day operations of the College at the highest levels and were privy to confidential proprietary information concerning the College and its operating and financial condition as alleged herein. These Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, were aware

-11-

that the false and misleading statements were being issued regarding the College and approved or ratified these statements, in violation of federal and state securities laws.

36.    By reason of their management positions and/or membership on the College's Board of Trustees, the Officer and Trustee Defendants were "controlling persons" within the meaning of § 20(a) of the Exchange Act, and had the power and influence to direct the management and activities of the College and its employees, and to cause the College to engage in the unlawful conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS

37.    The College is a private institution that operated continuously since its founding in 1803 until about June 2000, when it closed as the result of insolvency brought on by deficit spending, operating losses, negative cash flow, and the lack of a viable business plan.

38.    At all times during the relevant period, the College was governed by a Board of Trustees (the "Board"). The Board met three times per year. The Officer Defendants administered the day-to-day operations of the College.

39.    The College's primary source of operating revenue was tuition and fees paid by students enrolled at the College. The greater the number of enrolled students, the more revenue the College should have expected to collect to fund its operations.

40.    On February 6, 1998, Defendants Short, Kiszka and Advest recommended, and the Trustee Defendants voted to approve, a project of construction and renovation of dormitories on the campus of the College. The Trustee Defendants, on the recommendation of the Officer Defendants and Advest, further voted to authorize the issuance of bonds to finance the project, and to approve Defendant Advest as the underwriter for the bond offering.

-12-

41.    The bonds authorized by the Trustee Defendants were intended to finance not only renovations to existing residence halls and construction of new residential facilities at the College, but also (i) the refunding of the College's then-outstanding 1995 bond debt of approximately $5.2 million; (ii) the establishment of a Debt Service Reserve Fund, out of which the College could make payments in service of the debt obligation created by means of the Bonds themselves; and (iii) the payment of $341,370 in costs of issuance of the bonds, including payment to Defendant Advest of fees in the amount of, upon information and belief, no less than $161,370.  All told, the total amount to be financed by means of the bonds was $17.93 million.

42.    The Bonds were secured by a lien on the College's tuition receipts, which in turn were dependent upon the College's level of enrollment.  The proceeds from the sale of the Bonds, after certain distributions, were deposited into a "Construction Fund" out of which the construction and renovation project costs were to be paid.  For so long as funds remained in it, the Construction Fund was available as collateral against the College's debt under the Bonds in the event that the College defaulted on a repayment obligation.  Thus, the more money that the College spent on the project, the less there was available to redeem the Bonds in the event of default.

43.    Defendant Advest determined that the $17.93 million financed under the Bonds represented the maximum bonding capability of the College.  This sum amounted to more than double the level of the College's total outstanding debt at that time.  The portion of the bond financing earmarked for the dormitory construction and renovation project, almost $11 million, was insufficient to cover the entire cost of that project.

-13-

*Defendants' False and Misleading Statements and Omissions*

44.    The Bonds were issued on May 1, 1998, pursuant to the Official Statement prepared by Defendants Kiszka and Short in cooperation with Defendant Advest. (A true and correct copy of the Official Statement is attached hereto as Exhibit A.) Although at the time of the offering the College was mired in a financial and operational crisis, with little to no prospect of recovery, the Official Statement prepared by these Defendants recklessly and intentionally omitted any reference to such problems. Rather, the Official Statement portrayed the financial and operational condition of the College as both stable and improving. In particular, the Official Statement offered the following affirmative misrepresentations, misleading statements, and half-truths:

- "A portion of the proceeds of the Series 1998 Bonds, together with an equity contribution by the Institution [identified in table form as $1 million], will be used by the Institution for the construction or alteration of buildings . . . ." (p. 10)

- "One of the goals of the Institution's strategic plan is to increase enrollment to at least 725 full-time students by the fall of 2000." (p. 11)

- The Official Statement contains a table showing "Bradford College Fall Semester Enrollment Statistics" for the years 1993 through 1997, showing a growth in full-time equivalent enrollment from 484 to 584 students over that period. (p. A-8)

- Another table in the Official Statement reports "Admissions Trends" over the same 1993-1997 period, showing new enrollment growth from 186 incoming freshman and transfer students in 1993 to 234 such students in 1997. (p. A-8)

- "[D]uring the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. . . . The College's financial plan currently calls for a further reduction of financial

aid spending for 1998-1999 academic year to 28.8% of student income." (p. A-13)

- "To attain the final goal of a balanced budget . . . the College is planning to increase enrollment to the level of at least 725 full-time students by fall 2000, with approximately 80% of those students living in campus facilities." (p. A-13)

- "Based on this [18%] increase in applications [over 1997], historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College believes that it can reach its goal of enrolling 225 new students for the fall of 1998 while increasing the quality of it students and reducing slightly the average amount of financial aid awards to such students from College funds." (p. A-13)

- "The strategic initiatives of the College for the past two years and for the next three years [include]: . . . To increase net tuition revenues by close management of three variables: increased enrollment, prudent use of financial aid and setting of tuition and fee levels to attract students." (A-17)

45.     The affirmative representations and statements made about the College by the Defendants in the Official Statement were each known to be, or were recklessly disregarded by the Defendants as being, false and misleading when made. As set forth more fully below, the true facts, which the Defendants knew but intentionally or recklessly concealed — and disclosure of which was necessary to make the affirmative statements not misleading — were that the College suffered from an abysmal student retention rate that was wholly ignored in the Defendants' enrollment projections and was blatantly omitted from any mention in the Official Statement; that the amount of College-funded financial aid had grown year after year, with no reasonable basis to represent that it might be reduced; that, as a result, even without regard to its obligation to repay the Bonds, the College's cash flow position — as confirmed by its own

internal, but undisclosed, assessment in this time period -- was such that the College could survive, at best, another 2-5 years; and that, notwithstanding the Official Statement's references to "financial plans" or "strategic initiatives," the College lacked at that (or any) time a viable strategic plan to achieve any of its stated goals.

46. Financial Instability. The Official Statement contained no reference to the fiscal disasters that had plagued the College since Defendants Short and Kiszka took over in 1989, and that continued to plague the College through the issuance of the Bonds. In particular, the Official Statement failed to disclose that the Trustee Defendants and Defendants Short and Kiszka had expressly identified the College's persistent negative cash flow situation as a critical problem that the College needed to resolve in order simply to survive. The Official Statement omitted to discuss the assessment of the Trustee Defendants and the College's administration regarding the impact of this cash flow situation. This matter was discussed at length at a meeting of the Board on February 6, 1997, only a year before the Trustee Defendants approved the bond offering. This meeting was attended by Trustee Defendants Ferlazzo, Sughrue, Childs, Crago, Davis, Dill, Hayden, King, Marcus, Thomas, Turban, and Short, and by Defendant Kiszka. Defendant Ferlazzo, at that time the Chair of the Board, stated:

> [T]he cash flow model indicates that the College may be able to survive for five more years. To stem cash bleeding, however, which would occur in that period would be devastating to the faculty and staff in terms of no salary increases and other cost cutting measures.

However, even this view was overly optimistic according to the College's longtime chief financial officer, Defendant Kiszka:

-16-

Vice President and Chief Financial Officer Don Kiszka, when asked about the financial "breathing room for the College," said that there is a possibility of the College surviving five years assuming more layoffs and no salary increases, but felt that it would be more like two or three years. Looking at the bigger picture, layoffs and cutbacks would be very disruptive and send a bad message.

As events confirmed, this assessment by Defendant Kiszka of the current financial condition of the College and its prospects for survival -- in contrast to the misrepresentations of the Official Statement, signed by Defendant Kiszka one year later — was entirely accurate.

47.    Thus, in 1997 the Trustee and Officer Defendants recognized that because of its cash flow problems the College could hope to survive, at the most, through the year 2001, assuming drastic and demoralizing cost-cutting measures were implemented.    Yet approximately one year later, having implemented no such widespread cost-cutting measures, and during the College's tenth consecutive year of budget deficits, these Defendants recommended and approved the issuance of the Bonds, thereby obligating the College to incur an additional cash flow drain of about $1.25 million annually through the year 2028.    This additional cash obligation was to be funded by tuition proceeds that were, in turn, dependent primarily upon two factors: the College's level of student enrollment, and the degree to which the College discounted its tuition revenues by funding financial aid awards to students.    Each of these factors was the subject of further misrepresentations and omissions in the Official Statement.

48.    Enrollment Attrition.    While the Official Statement presented extensive data on new student enrollment at the College, there was no reference whatsoever to the College's severe, long-standing problem with student attrition.    In fact, since 1989, the College's approximate student attrition rate had been an extraordinary 60% -- meaning that substantially

fewer than half of all entering freshmen remained enrolled at the College through their senior year.

49. The Defendants, moreover, were well aware of the College's enrollment and retention problem, and of that problem's financial import. When the College's Board initially voted in 1996 to approve the construction project to build new dormitories, one of the College's trustees at the time, William J. Nofsker, resigned in the middle of his second term because he concluded that Bradford did not have the enrollment to justify its expansion plan and opposed pursuing any such project. As reported in the press on November 30, 1999, Mr. Nofsker stated, in part, that: "I didn't think [the College] had enough of a student body to support the expansion."

50. In addition, the College's inadequate enrollment was the topic of extended discussion during the Board's pivotal February 6, 1997 meeting, described above, at which the College's ability to survive was addressed. Specifically, the Chair, Defendant Ferlazzo, announced that "[b]ecause of the enrollment shortfall, the College is at financial risk. If enrollment trends continue for 1997-98, and changes are not made in the operations of the College, there is the very real potential of a $300,000-400,000 deficit in FY 1998." At this same meeting in February, 1997, Defendant Thomas, a member of the Enrollment Management Committee of the Board, stated that the College faced "insufficient enrollment to assure the financial well-being of the College."

51. The longstanding enrollment and attrition crisis persisted into 1998, existed at the time of the bond offering in May of that year, and continued apace thereafter. Growing out of its on-site decennial evaluation of the College in November 1998, the New England

-18-

Association of Schools & Colleges, Inc. (the "NEASC"), the College's accrediting body, noted:

> Enrollment management (with related financial issues) is a fully recognized problem at Bradford. In fact, it is a crisis. A small private college that graduates only 40% of its entering classes has scant hope of being able to fulfill aspirations much higher than survival. . . . Attrition is of course a pre-eminent financial fact . . . .

The NEASC also noted in its evaluation, *inter alia*, that a broad awareness by insiders at the College "of financial instability, like that of the attrition which is the major cause of it, is among the strongest organizational realities at Bradford."

52.    The Official Statement, however, misleadingly omitted reference to any such known "pre-eminent financial fact" or "organizational reality" that would call into question the College's ability to service the Bonds out of its tuition revenue. Indeed, as part of their effort to sweep material, adverse facts under the rug and out of view, the Defendants presented enrollment information in the Official Statement in a manner that intentionally concealed the College's persistent attrition crisis. The Official Statement, for example, reported 1993-1997 enrollment levels only for the *fall* semester of each year; yet, as the Defendants well knew but failed to disclose, enrollment in the *spring* semester of each of those years was markedly lower than fall enrollment levels, as a result of the College's chronic inability to retain students. As then known but not disclosed, the average rate of mid-year student attrition during this time period was over 7%, *without even taking into account* students who completed the academic year in June but who failed to return to the College the following fall. By omitting key attrition information, the  Defendants materially overstated the College's actual historical