enrollment levels and, as a result, misportrayed the College's ability to service the nearly $18 million dollars in debt that the Defendants sought to place with the purchasers of the Bonds

53. _Financial Aid_. Likewise, at the time that the Official Statement was prepared, the Defendants knew, or but for their reckless disregard for the truth should have known, that the representations in the Official Statement regarding financial aid were false and misleading when made. The Defendants stated in the Official Statement that the amount of financial aid to be awarded by the College was anticipated to drop to 29.9% of student income in the 1997-98 academic year, and to 28.8% in 1998-99.

54. There was no reasonable basis for the Defendants to make any such statements. There were only two months remaining in that fiscal year when, in the Official Statement, the Defendants "estimate[d] that financial aid will be reduced to 29.9% of student income" for the 1997-98 academic year. However, by the date of the Official Statement, the College knew that spring semester enrollment was lower than predicted in its budget and consequently student revenues for the spring semester would be lower. It had also, by that time, made all financial aid commitments, and Defendants knew (or would have known, but for their reckless disregard for their duties) that financial aid commitments were almost a quarter of a million dollars greater than budgeted. In reality, however, financial aid awards for 1997-98 actually consumed *over 35%* of student income, as the College's audited financials for the year soon confirmed. At the time the Official Statement was distributed, the College possessed, and the Defendants had access to, the data that proved the 1997-98 "estimate" was substantially incorrect. The actual percentage of student aid was in line with the College's track record, as the Defendants knew well from past experience: In every year since 1989, and

-20-

notwithstanding its annual budget deficits, the College had without fail increased the level of financial aid that it awarded to students. The College's audited financials for that time period confirm this fact

55.    With respect to its statements about the next academic year, the Official Statement represented that "[t]he College's financial plan *currently* calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income" (emphasis added). This statement, too, was materially misleading and without reasonable basis. The College's 1998-1999 budget — which was originally submitted to the Trustee Defendants on April 29, 1998, reviewed by the Finance Committee of the Board on May 8, 1998, and revised at a "special meeting" of the College's administration later that month — reflects that financial aid spending for the 1998-1999 academic year was budgeted to be 31.3% of student income, an increase of almost 10% (or $280,000) over what was represented in the Official Statement.

56.    The Official Statement further omitted the material fact that the persistent and increasing level of financial aid funded by the College was anomalously high relative to peer institutions. The percentage of financial aid as a percentage of the College's receipts for tuition and fees was well above average for comparable institutions as by the Massachusetts Health and Educational Facilities Authority, an independent state agency for the year ending in 1997.

57.    Lack of Strategic Plan. Although the Official Statement repeatedly referred to Bradford's "strategic plan . . . to increase enrollment" and its "strategic initiatives . . . for the past two years," the College in reality had no business plan or strategic program to meet any of the goals articulated in the Official Statement, on which the Bondholders relied in

-21-

purchasing the Bonds and on which ACA relied in insuring the Bonds. Nor did long-range planning form an integral part of the Trustee Defendants' deliberations. Specifically, even though student retention had long been recognized as a critical problem, the College had no plan to improve retention rates at the time that the Bonds were issued. With regard to the aim of reducing financial aid awards, no plan was in place to modify the College's practices in order to realize this goal: No one advised or instructed the College personnel responsible for awarding aid to reduce the amount of aid awarded, nor did any of the Trustee or Officer Defendants take steps to control the amount of aid given. Moreover, there was no systematic effort to impose budget discipline. In short, the College had no strategic plan to staunch its operating losses despite representations to the contrary in the Official Statement

58.    The College's lack of a viable strategic plan was confirmed a few short months after the Bonds were issued, in a report authored by the College's accrediting body, the NEASC. The NEASC report, published in January 1999 based on, *inter alia*, an on-site evaluation of the College in early November 1998, found that "Bradford College has not recently engaged in systematic, broad-based planning . . . . There is no evidence that an effective strategic plan, or even a strategic planning process, is now in place." With respect to the College's regular revenue shortfalls, the NEASC determined that "[t]he College does not currently have a realistic plan in place to address the critical issues raised by these operating deficits." In connection with enrollment growth, the NEASC noted the College's goal of growing enrollment to over 700 students but observed that "it is difficult to determine precisely how this figure is anchored in current planning for recruitment, retention, faculty size, curricular structure, and many other parameters." Whatever informal planning discussions

-22-

that did occur were "fragmented, tentative, unformed, and almost wholly within the parameters of the status quo. They provide an illusion of planning that is not an effective substitute for those systematic, broad-based mechanisms which could bring together all stakeholders in the College's community." In the final analysis, "[t]he College does not have a functional strategic plan, based on a widely accepted and coherent mission, informed by institution-wide, up-to-date assessment systems and linked to its budget processes." And, consistent with the absence of a strategic plan, the NEASC found that the College's "disturbing record" of 11 consecutive annual operating budget deficits was "punctuated by so many 'surprises' that these disorienting events seem almost to have become routine.

59.     Unrealistic Enrollment Projections.     The Official Statement described the College's plan to increase enrollment over 30% in three years and the College's belief, based on the increased number of applications it had received to date, that it could meet its goal of enrolling 225 new students in the fall of 1998. But the number of applications was misleading because the College began to accept and count standardized web applications. Because a prospective student could easily send a standardized Web application to several schools, the College's admission personnel recognized that students who submitted web applications were far less likely to attend if accepted. Thus the College knew its matriculation rate for accepted students would almost certainly decline. The College also knew that counting web applications artificially inflated the applications numbers. The College failed to disclose these matters.

60.     Further, the College failed to disclose that the quality of student applying to the College was declining. While the Official Statement showed historic acceptance rates for the College of between 77% and 80%, for Fall 1998 the College's acceptance rate was only 70%,

a steep decline which substantially reduced the possibility of the College meeting its enrollment goal. Although the College had more applications for Fall 1998, it had fewer actual acceptances than it had for Fall 1997. Given the number of actual acceptances at the time of the Official Statement, and applying the College's historic matriculation rate, it would have been clear that the College would likely fail to meet fall enrollment goal by 15%, but by focusing on the misleading application numbers and not disclosing the actual acceptance numbers or rates, the College misled prospective purchasers of its bonds.

61.    The College also knew the number of students who had actually placed deposits for Fall 1998 had dropped. The number of students who had actually placed deposits by spring 1998 was the best indicator or how many students would be enrolling. Despite more applicants, the number of students who had actually placed deposits at the time of the Official Statement, had declined by almost 20%

62.    The combination of inflated application numbers, reduced acceptances, reduced deposit rates and lower expected matriculation rates meant that at the time of the Official Statement was issued, based on the information the College already had, it was almost impossible for the College to meet its enrollment target, and any statement to the contrary was misleading. The Officer Defendants. By omitting to include vital admissions data that demonstrated the enrollment goal was unachievable, the Defendants falsely perpetrated the belief that the College would be able to generate sufficient revenue to repay the bonds

63.    No Equity Financing. The bond financing was not intended to cover the complete cost of the dormitory construction and renovation project. The Official Statement unequivocally represented that the College would therefore make a $1 million equity

-24-

contribution toward the completion of the project. This representation was false and misleading, however. At the time the Official Statement was prepared and circulated, there was no present intention among the Defendants to commit the College to contribute any of its own funds toward the construction project. Rather, the Defendants' true intention was to cut corners on the project in an effort to bring project costs down to the level of the bond financing. According to the minutes of the February 5, 1998 joint meeting of the Finance and the Building and Grounds Committees of the Board, the Trustee Defendants on those committees — who at the time were Defendants Sughrue, Short, Davis, Hayden, Ferlazzo, Crago, Childs, Cochran, Dill, Marcus, and Turben — reviewed the financing proposal for the construction project, and determined that the amount to be financed under the Bonds "does not cover all the cost of the three-phase project." These Trustee Defendants, therefore, agreed to recommend to the full Board as follows:

> The College will have to review the projects and attempt to reduce the final two phases to correspond with the bond financing *or* the College will have to include an equity contribution to fund a portion of the construction. It was agreed that the bond financing would proceed as recommended with Advest and that the College would make every effort to reduce its construction costs *or* make an equity contribution *at the end in the final phase of the project*.

(Emphases added). The Defendants knowingly or recklessly failed to disclose this contingent and delayed nature of the College's putative "equity" contribution, and instead falsely and misleadingly represented that $1 million of the College's own funds "will be used" for the construction project.

*The Accelerating Financial Crisis*

*and the Trustee Defendants' Breaches of Fiduciary Duty*

64.    After the bond offering, when the academic year began in September 1998, the College enrolled only 532 students, 79 fewer than projected in the budget that the College had prepared back in May. Fully three-quarters of this enrollment deficit was attributable to the failure of previously enrolled students to return to Bradford — a level of attrition consistent with that of prior years. Predictably, the College's actual revenues were more than $2 million — or 13.25% — below budget.

65.    Faced with an accelerating financial crisis, the Trustee Defendants approved a revised 1998-99 budget in the fall of 1998. The revised budget relied upon more than $1.5 million in endowment funds (plus a one-time $600,000 gift) to partially offset losses from operations. This diversion of endowment funds represented greater than 7% of the appreciated market value of the endowment. This percentage was very high compared to the average spending rate of institutions similar to the College, and as a matter of law gave rise to a presumption of the Trustee Defendants' imprudence under the express terms of § 2 of the Massachusetts Uniform Management of Institutional Funds Law, Mass. G.L. c. 180A.

66.    Despite the College's massive revenue shortfall, the budgeted amount of financial aid *increased* by $280,000 for 1998-99. Tuition assistance was provided to 479 recipients, or an incredible 90% of enrolled students, a 10% increase over the previous year. Average aid per recipient shot up to $9,600, an increase of $770 over original projections. Instead of reducing financial aid to 28.8% of student income (as Defendants purported in the Official Statement), financial aid under the revised budget mushroomed to 35% of student income; and given the recurrent deficiencies of the College's budgeting process, the actual percentage was no doubt known by the Defendants to be even higher.

-26-

67.    As part of its effort to slash spending and reduce its operating losses, the College gutted its admissions program through budget cuts and employee layoffs. These stop-gap measures further guaranteed the College's inability to recruit enough new students to survive, let alone to meet its financial obligations as they came due.

*The New Administration and the Closure of the College*

68.    Defendant Short resigned as President of the College in the summer of 1998. In early 1999, the College's new president, Jean Scott, underscored the materiality of the misrepresentations and omissions of the Official Statement in a letter responding to the NEASC's report. With respect to enrollment issues, President Scott wrote that the College "agree[s] that poor retention is among the important causes of our systemic financial problems." In connection with the College's budget, President Scott confirmed that "our accounting methods mask some of what should be seen as 'deficit spending,' since the College draws a larger percentage from its endowment than is customary or, in our view, prudent." And as regards the lack of a viable business plan, she admitted that "[t]he College does need a functional strategic plan, based on a widely accepted mission, informed by assessment, and linked to the allocation of resources."

69.    Defendant Kiszka resigned from his positions as Vice President and Chief Financial Officer of the College in the summer of 1999. That fall, his successor, Brenda Smith, described the College's financial situation upon to her arrival as "an incredible red flag" of insurmountable problems, centering on the College's "struggling" due to an abnormally high level of tuition discounting.

70.    On or about November 22, 1999, the College announced that it would cease operations in June 2000. This announcement of the College's closure confirmed Defendant Kiszka's original (but undisclosed) assessment, at the February 1997 meeting of the Board, that the College could survive no more than three years given its financial and operational disarray.

71.    The Bonds were secured by a lien on the College's tuition proceeds; unless the College stopped operations, the bondholders' investment was protected. On November 22, 1999, the Bondholders learned for the first time that a reasonable possibility existed that their bonds would not be paid in accordance with the bond indenture.

72.    On January 5, 2000, the indenture trustee for the Bonds gave a "Notice of Default" under the indenture. On August 22, 2000, the indenture trustee notified the College that an "Event of Default" had occurred under the indenture. On October 31, 2000, the indenture trustee declared immediately due and payable the principal amount of the Bonds, together with accrued interest. As of the date hereof, the accelerated principal under the Bonds remains unpaid and outstanding.

73.    On November 21, 2000 the Plaintiffs and ACA Financial Guaranty Corporation filed an action in the United States District Court for the District of Massachusetts, No. 00-12408-NG against the College, Advest, and certain trustees and officers of the College alleging violations of federal and state securities laws and commission of various torts in connection with the issuance and sale of the Bonds. This complaint was subsequently dismissed without prejudice. To induce the voluntarily dismissal, without prejudice, of this complaint, the College and all of the defendants named in this action entered into a Standstill and Tolling

-28-

Agreement dated as of November 21, 2000 (the "First Tolling Agreement"), and later into a Second Standstill and Tolling Agreement dated as of June 22, 2001 (the "Second Tolling Agreement", and together with the First Tolling Agreement, the "Tolling Agreements"). The Tolling Agreements tolled the deadline for commencement of all claims brought by the Plaintiffs in this action through the date of the filing of this Complaint. Each of the Plaintiffs is either a party to, or identified beneficiary of, the Tolling Agreements.

**COUNT I**
**Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants**

74.    The Bondholders reallege and incorporate by reference paragraphs 1 through 73 above as if set forth fully herein.

75.    Each of the Defendants knew, or was reckless in failing to know, of the material omissions and misrepresentations contained in the Official Statement as set forth above. Because of their Board membership and/or their executive positions with the College, the Trustee Defendants and Defendants Short and Kiszka (a) knew or had access to information concerning the material adverse non-public information about the College's financial condition, which information was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements and other public representations of and about the College.

76.    Further, through its position as underwriter of the Bonds, Defendant Advest knew, or would have known in the absence of reckless disregard of the facts alleged herein, the actual financial and operating condition of the College, but failed to ensure that the public statements for which it was responsible accurately reflected the actual financial and operating condition of the College.

77.    The Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal material adverse information regarding the financial and operational condition of the College as specified herein.    The Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false and misleading statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Bondholders and others similarly situated in connection with their purchases of the Bonds.

79.    The Bondholders have suffered damages in that they purchased the Bonds in reliance on the Defendants' misrepresentations and omissions.    The true facts concealed by these misrepresentations and omissions were a substantial factor in causing loss to the Bondholders.    The Bondholders would not have purchased the Bonds at the prices they paid, or at all, if they had not been so misled regarding the College's inability to service the debt

that it incurred by reason of the issuance of the Bonds, or otherwise to repay the Bonds.  For these injuries and damages, the Bondholders are entitled to relief as requested below.

## COUNT II

### Violation of § 20(a) of the Exchange Act and Rule 10b-5

### Against the Trustee Defendants and Defendants Short and Kiszka

80.    The Bondholders reallege and incorporate by reference paragraphs 1 through 79 above as if set forth fully herein.

81.    The Trustee Defendants and Defendants Short and Kiszka acted as controlling persons of the College within the meaning of § 20 of the Exchange Act.  By reason of their positions as senior officers and/or trustees, as alleged above, these Defendants had the power and authority to cause the College to engage in the wrongful conduct complained of herein

82.    By reason of such wrongful conduct, the Trustee Defendants and Defendants Short and Kiszka are liable to the Bondholders pursuant to § 20(a) of the Exchange Act.  The true facts concealed by the misrepresentations and omissions of these Defendants were a substantial factor in causing loss to the Plaintiffs.  As a direct and proximate result of these Defendants' wrongful conduct, the Plaintiffs suffered damages for which they are entitled to relief as requested below.

## COUNT III
### Violation of § 12(a)(2) of the Securities Act of 1933,
### Against Advest

83.    The Bondholders reallege and incorporate by reference paragraphs 1 through 82 above as if set forth fully herein.

84.    Advest was the firm offer underwriter of the Bonds and sold bonds to all of the plaintiffs.    Advest sold the bonds by means of the Official Statement, a prospectus that contained the numerous untrue statements of material fact described above.    For the reasons set forth above, the Official Statement also omitted to material facts necessary to make the statements contained in the Official Statement not misleading.    Advest knew or, in the exercise of reasonable care, should have known that the statements identified above were untrue and/or misleading.

85.    The conduct of Advest alleged above constituted a violation of the §12(a)(2) of the Securities Act of 1933, causing the Bondholders substantial loss and injury.    The true facts concealed by the misrepresentations and omissions caused substantial losses to the Bondholders for which they are entitled to relief as requested below.

BASIS OF ALLEGATIONS

86.    Plaintiffs have alleged the foregoing based upon the investigation of counsel and their agents, which investigation included a review of the College's Board meeting minutes, financial statements, accreditation report and response thereto, media reports about the College, and interviews of and discussions with College personnel.    Pursuant to FED. R. CIV. P. 11(b)(3), Plaintiffs believe that after reasonable opportunity for discovery, substantial additional evidentiary support will likely exist for the allegations set forth herein.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand relief as follows:

(a)    That the Defendants be held jointly and severally liable to the Plaintiffs for the losses that they have incurred;

-32-

(b)    That the Plaintiffs be awarded pre- and post-judgment interest;

(c)    That the Plaintiffs be awarded their reasonable costs and expenses (including attorneys' fees) incurred in connection with this action;

(d)    That the Plaintiffs be awarded such other and further relief as the Court determines is just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

T. ROWE PRICE TAX-FREE HIGH YIELD
FUND, INC., SMITH BARNEY INCOME
FUNDS/SMITH BARNEY MUNICIPAL HIGH
INCOME FUND, DRYDEN NATIONAL
MUNICIPALS FUND, INC. AND LOIS AND
JOHN MOORE

By their attorneys,

Thomas Hoffman, Esq.  BBO # 237320
Michael Tabb, Esq. BBO # 491310
Greene & Hoffman, P.C.
125 Summer Street, 14th Floor
Boston, Massachusetts  02110
(617) 261-0040

Dated: July 27, 2004

-33-

New Issue

Ratings: **Standard & Poor's BBB-**
(See "Ratings" herein)

*In the opinion of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, Bond Counsel, under existing law, assuming continued compliance with certain tax covenants and provisions of the Internal Revenue Code of 1986, as amended, interest on the Series 1998 Bonds will not be included in the gross income of holders of the Series 1998 Bonds for federal income tax purposes. Interest on the Series 1998 Bonds will not be included item for the purposes of computation of the alternative minimum tax imposed on individuals and corporations, although interest on the Series 1998 Bonds will be taken into account in computing the alternative minimum tax applicable to certain corporations. Income from the Series 1998 Bonds, including any profit made of the sale thereof, is exempt from Massachusetts personal income taxes, and the Series 1998 Bonds are exempt from Massachusetts personal property taxes. For federal and Massachusetts tax purposes, interest includes original issue discount. For a discussion of federal and state tax law matters, see "TAX EXEMPTION" herein.*



### $17,930,000
## MASSACHUSETTS INDUSTRIAL FINANCE AGENCY
## REVENUE BONDS
## BRADFORD COLLEGE ISSUE, SERIES 1998

Dated: May 1, 1998

Due: November 1, as shown below

The Massachusetts Industrial Finance Agency Revenue Bonds Bradford College Issue, Series 1998 (the "*Series 1998 Bonds*") are issued by the Massachusetts Industrial Finance Agency (the "*Issuer*") pursuant to a Loan and Trust Agreement, dated as of May 1, 1998 (the "*Trust Agreement*") among the Issuer, Bradford College (the "*Institution*") and Chittenden Trust Company as trustee (the "*Trustee*"), to fund a loan to the Institution. The Series 1998 Bonds are special obligations of the Issuer, payable solely from payments to be made under the Trust Agreement and other funds held thereunder.



The Series 1998 Bonds are issuable only as fully registered bonds without coupons and, when issued, will be registered in the name of Cede & Co., as Bondowner and nominee for The Depository Trust Company ("DTC"), New York, New York. DTC will act as securities depository for the Series 1998 Bonds. Purchases of the Series 1998 Bonds will be made in book-entry form, in the denomination of $5,000 each or any integral multiple thereof. Purchasers will not receive certificates representing their interest in the Series 1998 Bonds purchased. So long as Cede & Co., is the Bondowner, as nominee of DTC, references herein to the Bondowners or registered owners shall mean Cede & Co., and shall not mean the Beneficial Owners (as hereinafter defined) of the Series 1998 Bonds. See "THE DEPOSITORY TRUST COMPANY" herein.

Principal and semiannual interest on the Series 1998 Bonds will be paid by the Trustee and paying agent. So long as DTC or its nominee, Cede & Co., is the Bondowner, such payments will be made directly to DTC. Disbursement of such payment to the DTC Participants is the responsibility of DTC and disbursements of such payments to the Beneficial Owners is the responsibility of the DTC Participants, as more fully described herein. Interest will be payable on November 1, 1998 and semiannually thereafter on May 1 and November 1.

The Series 1998 Bonds are subject to redemption prior to maturity, at various premiums, or at par under certain circumstances, as described more fully herein.

THE SERIES 1998 BONDS DO NOT CONSTITUTE A GENERAL OBLIGATION OF THE ISSUER OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE ISSUER OR A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS OR ANY POLITICAL SUBDIVISION THEREOF. THE SERIES 1998 BONDS ARE PAYABLE SOLELY FROM THE PAYMENTS AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE TRUST AGREEMENT. THE ISSUER HAS NO TAXING POWER.

## MATURITIES, AMOUNTS, RATES, AND PRICES OR YIELDS

### $3,075,000 Serial Bonds

| Due November 1 | Principal Amount | Interest Rate | Price or Yield | Due November 1 | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|---|---|---|---|
| 2000 | $285,000 | 4.50% | 100% | 2005 | $360,000 | 5.00% | 5.05% |
| 2001 | 295,000 | 4.50% | 4.65% | 2006 | 375,000 | 5.00% | 5.15% |
| 2002 | 305,000 | 4.70% | 4.75% | 2007 | 390,000 | 5.10% | 5.20% |
| 2003 | 320,000 | 4.80% | 4.85% | 2008 | 410,000 | 5.20% | 5.25% |
| 2004 | 335,000 | 4.90% | 4.95% | | | | |

$5,510,000 5.25% Term Bonds Due November 1, 2018 to Yield 5.88%
$9,345,000 5.625% Term Bonds Due November 1, 2028 to Yield 5.93%
(Accrued interest to be added from May 1, 1998.)

The Series 1998 Bonds are offered when, as and if issued and accepted by the Underwriter, subject to prior sale, to withdrawal or modification of the ...er without notice, and to the approval of legality by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, as Bond Counsel and ...okidas & Bluestein, Boston, Massachusetts, as Co-Bond Counsel. Certain legal matters will be passed upon for the Institution by its counsel, Jason S. ...ohen, Esq., Haverhill, Massachusetts and for the Underwriter by its counsel, Bingham Dana LLP, Boston, Massachusetts. The Series 1998 Bonds are expected to be available for delivery to DTC in New York, New York, on or about May 13, 1998.

April 30, 1998

## ADVEST, INC.

IN CONNECTION WITH THE OFFERING OF THE SERIES 1998 BONDS, THE UNDERWRITER MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 1998 BONDS AT LEVELS ABOVE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

No dealer, broker, salesman or other person has been authorized by the Issuer or the Underwriter to give any information or to make any representations other than is contained in this Official Statement and the Appendices hereto in connection with the offering described herein, and if given or made, such other information or representation must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or a solicitation of an offer to buy any securities other than those identified on the cover page or an offer to sell or a solicitation of an offer to buy such securities in any jurisdiction in which it is unlawful to make such offer, solicitation or sale. The Issuer neither has nor assumes any responsibility as to the accuracy or completeness of the information contained in this Official Statement, other than that appearing under the captions "THE ISSUER" and "LITIGATION" (but only insofar as it relates to the Issuer).

Certain information in this Official Statement has been obtained from Bradford College, The Depository Trust Company and other sources believed to be reliable. No representation or warranty is made, however, as to the accuracy or completeness of such information and nothing contained in this Official Statement is, or may be relied on as, a promise or representation by the Issuer or the Underwriter. The information herein relating to Bradford College, and its affairs and condition has been provided by such entity, and neither the Issuer nor the Underwriter make any representation with respect to or warrant the accuracy of such information. This Official Statement is submitted in connection with the sale of securities referred to herein and may not be used, in whole or in part, for any other purpose. The information and expression of opinions set forth herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the parties referred to above since the date hereof.

# THE DEPOSITORY TRUST COMPANY

Subject to the provisions discussed below in the section entitled "Book-Entry Only System," the Series 1998 Bonds will be issued only as fully registered bonds without coupons in the minimum denominations set forth below. Principal or redemption premium, if any, of the Series 1998 Bonds will be payable at the principal corporate trust office of the Trustee, and interest on the Series 1998 Bonds will be paid by check or draft mailed (or at the option of an owner of $1,000,000 or more of the Series 1998 Bonds, by wire transfer) by the Trustee to the registered owner as of the applicable Record Date.

## Book-Entry Only System

The Depository Trust Company, New York, New York ("DTC") will act as securities depository for the Series 1998 Bonds. The Series 1998 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Series 1998 Bond certificate will be issued for each maturity of the Series 1998 Bonds, in the principal amount of such maturity, and will be deposited with DTC. DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds securities that its participants ("Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct participants ("Direct Participants") include securities brokers and dealers, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants."). The rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the Series 1998 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 1998 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 1998 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participant's records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 1998 Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series 1998 Bonds, except in the event that use of the book-entry only system for the Series 1998 Bonds is discontinued.

To facilitate subsequent transfers, all Series 1998 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of Series 1998 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 1998 Bonds. DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 1998 Bonds are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

8

Redemption notices shall be sent to Cede & Co. If less than all of the Series 1998 Bonds within a single maturity of an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to Series 1998 Bonds. Under its usual procedure, DTC mails an Omnibus Proxy to the issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 1998 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy.)

Principal, redemption premium, if any, and interest payments on the Series 1998 Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts for customers in bearer form or registered in the "street name," and will be the responsibility of such Participant and not of DTC, the Paying Agent, the Institution or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Issuer, the Trustee or the Paying Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursements of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuer believes to be reliable, but none of the Issuer, the Institution or the Underwriter takes responsibility for the accuracy thereof.

For every transfer and exchange of the Series 1998 Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax, fee or other governmental charge that may be imposed in relation hereto.

<u>No Responsibility of Issuer, the Institution, Trustee and Paying Agent.</u>

NONE OF THE ISSUER, THE INSTITUTION, THE PAYING AGENT OR THE TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATIONS TO DTC PARTICIPANTS OR PERSONS FOR WHOM THEY ACT AS NOMINEES WITH RESPECT TO THE PAYMENTS TO OR THE PROVIDING OF NOTICE FOR DTC PARTICIPANTS, INDIRECT PARTICIPANTS, OR BENEFICIAL OWNERS.

SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 1998 BONDS, AS NOMINEE OF DTC, REFERENCES HEREIN TO THE BONDOWNERS OR REGISTERED OWNERS OF THE SERIES 1998 BONDS SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 1998 BONDS.

<u>Certificated Series 1998 Bonds</u>

DTC may discontinue providing its services as securities depository with respect to the Series 1998 Bonds at any time by giving reasonable notice to the Issuer and the Trustee. In addition, the Issuer may determine that continuation of the system of book-entry transfers through DTC (or successor securities depository) is not in the best interests of the Beneficial Owners. If for either reason the Book-Entry Only system is discontinued, Series 1998 Bond certificates will be delivered as described in the Agreement and the Beneficial Owner, upon registration of certificates held in the Beneficial Owner's name, will become the Bondowner. Thereafter, Series 1998 Bonds may be exchanged for an equal aggregate principal amount of Series 1998 Bonds in other authorized denominations and of the same maturity, upon surrender thereof at the principal corporate trust office of the Paying Agent. The transfer of any Series 1998 Bond may be registered on the books maintained by the Paying Agent for such purpose only upon the assignment in the form satisfactory to the Paying Agent. For every exchange or registration of transfer of Series 1998 Bonds, the Issuer and the Paying Agent may make a charge sufficient to reimburses them for any tax or other governmental charge required to be paid with respect to such exchange or

registration of transfer, but no other charge may be made to the Bondowner for any exchange or registration of transfer of the Series 1998 Bonds. The Paying Agent will not be required to transfer or exchange any Series 1998 Bond during the notice period preceding any redemption if such Series 1998 Bond (or any part thereof) is eligible to be selected or has been selected for redemption.

## ESTIMATED SOURCES AND USES OF FUNDS

The proceeds of the Series 1998 Bonds, together with other funds provided by the Institution, (exclusive of accrued interest) are expected to be applied as follows:

| | |
|---|---|
| Sources of Funds | |
| Principal Amount of the Series 1998 Bonds | $17,930,000 |
| Equity Contribution | 1,000,000 |
| | $18,930,000 |
| Total | |
| Use of Funds | |
| Original Issue Discount | $ 823,291 |
| Deposit to Project Fund | 11,383,739 |
| Deposit to Trustee-Held Fund for Retirement of Series 1995 Bonds | 5,128,709 |
| Debt Service Reserve Fund | 1,252,891 |
| Costs of Issuance | 341,370 |
| | $18,930,000 |
| Total | |

## THE SERIES 1998 PROJECT

Project Financing

A portion of the proceeds of the Series 1998 Bonds, together with an equity contribution by the Institution, will be used by the Institution for the construction or alteration of buildings, site development or the acquisition and installation of equipment and furnishings, or any combination of the foregoing in connection with any or all of the following: (i) repairs, renovations and improvements to two residence halls, Tupelo East and West, located on the Campus; (ii) the construction of a new residence hall complex, known as the "Residential Quadrangle"; (iii) renovations to Conover Hall; (iv) the funding of a Debt Service Reserve Fund; and (v) the financing of various costs of issuance. For a complete description of the Series 1998 Project, see Appendix A – "Certain Information Regarding the Institution" under the heading "The Project."

Refunding of Series 1995 Bonds

A portion of the proceeds of the Series 1998 Bonds will be used to refund the Series 1995 Bonds. No escrow will be established to accomplish defeasance of the Series 1995 Bonds. Bond proceeds in an amount sufficient to defease the outstanding principal on the Series 1995 Bonds, plus any interest due thereon, shall be deposited in an account for that purpose with the Trustee. Notice will be given to Series 1995 Bondowners of the Series 1995 Bonds' redemption, to occur on the first call date following the issuance of the Series 1998 Bonds, which is expected to be June 3, 1998. Until the Series 1995 Bonds are redeemed, and the letter of credit issued by Family Mutual Savings Bank to support payments thereon is terminated, Family Bank will have a lien on and security interest in substantially all of the real property of the Institution to secure the Institution's reimbursement obligation with respect to such letter of credit.

## BONDOWNERS' RISKS

Payment of Debt Service

The principal of, redemption premium, if any, and interest on the Series 1998 Bonds are payable solely from the amounts paid by the Institution to the Issuer under the Trust Agreement. No representation or assurance can be made that revenues will be realized by the Institution in the amount necessary to make payments at the times and in the amounts sufficient to pay the debt service on the Series 1998 Bonds.

Future revenues and expenses of the Institution will be affected by events and conditions relating generally to, among other things, demand for the Institution's educational services, the ability of the Institution to provide the required educational services, management capabilities, economic developments in the Institution's service area, the Institution's ability to control expenses, competition, costs, the amount of financial aid awarded to students, legislation, governmental regulation and developments affecting the federal or state tax-exempt status of non-profit organizations. Unanticipated events and circumstances may occur which cause variations from the Institution's expectations. For a description of the Institution and a discussion of the financial condition of the Institution, see Appendix A - "Certain Information Regarding the Institution". Certain audited financial statements of the Institution are included in Appendix B.

Dependence on Tuition Payments

Colleges and universities are in general highly dependent upon tuition and fee revenues from students and, to a lesser extent, dormitory and other auxiliary enterprise revenues to pay debt service. One of the goals of the Institution's strategic plan is to increase enrollment to at least 725 full-time students by the fall of 2000. See Appendix A - "Certain Information Regarding the Institution" under the heading "Accounting Matters". A failure by the Institution to attract and retain students in sufficient numbers to accomplish such goal could adversely affect the ability of the Institution to make required payments on the Series 1998 Bonds. Demographics for traditional college-age students also are intensifying the competition for students by all colleges and universities, including the Institution.

Enforceability

The remedies granted to the Trustee or the owners of the Series 1998 Bonds upon an event of default under the Trust Agreement may be dependent upon judicial actions which are often subject to discretion and delay. Under existing law, the remedies specified in the Trust Agreement may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 1998 Bonds will be qualified as to the enforceability of the provisions of the Trust Agreement by limitations imposed by state and federal laws, rulings and decisions affecting equitable remedies regardless of whether enforceability is sought in a proceeding at law or in equity and by bankruptcy, reorganization, insolvency, receivership or other similar laws affecting the rights of creditors generally.

No Redemption Upon Loss of Tax Exemption

As described under "TAX EXEMPTION" herein, non-compliance with certain requirements of the Internal Revenue Code of 1986, as amended, could cause interest on the Series 1998 Bonds to be included in gross income for federal income tax purposes, retroactive to the date of issuance of the Series 1998 Bonds. The Series 1998 Bonds are not required to be redeemed and are not subject to acceleration, and the interest rates on the Series 1998 Bonds will not be changed, in the event interest thereon is determined to be includable in gross income for federal income tax purposes. No provision has been made to compensate bondowners for federal income taxes, interest and/or penalties which may be assessed in connection with any such tax liability or such determination or for any other loss or any diminution of gain which may occur.

11

Enforceability of Lien on Tuition Receipts

The Trust Agreement provides that the Institution shall make payments to the Issuer sufficient to pay the Series 1998 Bonds and the interest thereon as the same become due. The obligation of the Institution to make such payments is secured in part by a lien granted to the Issuer by the Institution, pursuant to the Trust Agreement, on the Tuition Receipts of the Institution. Pursuant to the Massachusetts Uniform Commercial Code, the security interest in Tuition Receipts may not continue to be perfected if the proceeds are not paid over to the Trustee by the Institution within 9 days of their receipt by the Institution. Furthermore, to the extent that Tuition Receipts are derived from direct payments from the federal government, enforcement by the Issuer of any right to receive such direct payments may be subject to provisions of the Assignment of Claims Act of 1940, with respect to which the Institution and the Issuer may be required to comply. In the event of bankruptcy of the Institution, pursuant to the Bankruptcy Code, any receivable coming into existence and any Tuition Receipts received on or after the date which is 90 days (or, in some circumstances, one year) prior to the commencement of the case in bankruptcy court might not be subject to the lien of the Issuer, and under certain circumstances a court of equity may have power to direct the use of Tuition Receipts to meet expenses of the Institution before paying debt service on the Series 1998 Bonds. With respect to receivables and Tuition Receipts not subject to the lien, the Issuer would occupy the position of an unsecured creditor. The effectiveness of the security interest in Tuition Receipts may also be limited by other factors, including statutory liens, constructive trust, equitable or other rights impressed or conferred by a court in the exercise of its equitable jurisdiction, rights of third parties in Tuition Receipts converted to cash and not in the possession of the Trustee, and the failure to file financing or continuation statements under the Uniform Commercial Code.

## LITIGATION

There is no litigation now pending against the Institution or, to the knowledge of its officers, threatened, restraining or enjoining the issuance, sale, execution or delivery of the Series 1998 Bonds, or in any way contesting or affecting the validity of Series 1998 Bonds, any proceedings of the Institution concerning the issuance or sale thereof or the security provided for the payment of the Series 1998 Bonds. There is no litigation pending against the Issuer or, to the knowledge of the officers of the Issuer, threatened against the Issuer seeking to restrain or enjoin the issuance or delivery of any of the Series 1998 Bonds or in any way contesting the existence or powers of the Issuer relating to the issuance of the Series 1998 Bonds.

## TAX EXEMPTION

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Bond Counsel, is of the opinion that, under existing law, interest on Series 1998 Bonds will not be included in the gross income of holders of the Series 1998 Bonds for federal income tax purposes. This opinion is expressly conditioned upon compliance with certain requirements of the Internal Revenue Code of 1986, as amended (the "Code"), which requirements must be satisfied subsequent to the date of issuance of the Series 1998 Bonds in order to assure that interest on the Series 1998 Bonds is and continues to be excludable from the gross income of the holders thereof. Failure to so comply could cause the interest on the Series 1998 Bonds to be included in the gross income of the holders thereof, retroactive to the date of issuance of the Series 1998 Bonds. In particular, and without limitation, those requirements include restrictions on the use, expenditure and investment of proceeds and payment of rebate, or penalties in lieu of rebate, to the United States, subject to certain exceptions. The Issuer and the Institution have provided covenants and certificates as to their respective continued compliance with such requirements.

In the opinion of Bond Counsel, under existing law, interest on the Series 1998 Bonds will not constitute a preference item under section 57(a)(5) of the Code for purposes of computation of the alternative minimum tax imposed on certain individuals and corporations under section 55 of the Code. However, interest on the Series 1998 Bonds will be included in "adjusted current earnings" of corporate holders of the Series 1998 Bonds and therefore will be taken into account under section 56(g) of the Code in the computation of the alternative minimum tax applicable to certain corporations.