

New Issue

Ratings: Standard & Poor's BBB-
(See "Ratings" herein)

*In the opinion of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, Bond Counsel, under existing law, assuming continued compliance with certain tax covenants and provisions of the Internal Revenue Code of 1986, as amended, interest on the Series 1998 Bonds will not be included in the gross income of holders of the Series 1998 Bonds for federal income tax purposes. Interest on the Series 1998 Bonds will not constitute a preference item for the purposes of computation of the alternative minimum tax imposed on individuals and corporations, although interest on the Series 1998 Bonds will be taken into account in computing the alternative minimum tax applicable to certain corporations. Income from the Series 1998 Bonds, including any profit made of the sale thereof, is exempt from Massachusetts personal income taxes, and the Series 1998 Bonds are exempt from Massachusetts personal property taxes. For federal and Massachusetts tax purposes, interest includes original issue discount. For a discussion of federal and state tax law matters, see "TAX EXEMPTION" herein.*



**$17,930,000**
**MASSACHUSETTS INDUSTRIAL FINANCE AGENCY**
**REVENUE BONDS**
**BRADFORD COLLEGE ISSUE, SERIES 1998**

Dated: May 1, 1998

Due: November 1, as shown below

The Massachusetts Industrial Finance Agency Revenue Bonds Bradford College Issue, Series 1998 (the *"Series 1998 Bonds"*) are issued by the Massachusetts Industrial Finance Agency (the *"Issuer"*) pursuant to a Loan and Trust Agreement, dated as of May 1, 1998 (the *"Trust Agreement"*), among the Issuer, Bradford College (the *"Institution"*) and Chittenden Trust Company as trustee (the *"Trustee"*), to fund a loan to the Institution. The Series 1998 Bonds are special obligations of the Issuer, payable solely from payments to be made under the Trust Agreement and other funds held thereunder.



The Series 1998 Bonds are issuable only as fully registered bonds without coupons and, when issued, will be registered in the name of Cede & Co., as Bondowner and nominee for The Depository Trust Company ("DTC"), New York, New York. DTC will act as securities depository for the Series 1998 Bonds. Purchases of the Series 1998 Bonds will be made in book-entry form, in the denomination of $5,000 each or any integral multiple thereof. Purchasers will not receive certificates representing their interest in the Series 1998 Bonds purchased. So long as Cede & Co., is the Bondowner, as nominee of DTC, references herein to the Bondowners or registered owners shall mean Cede & Co., and shall not mean the Beneficial Owners (as hereinafter defined) of the Series 1998 Bonds. See "THE DEPOSITORY TRUST COMPANY" herein.

Principal and semiannual interest on the Series 1998 Bonds will be paid by the Trustee and paying agent. So long as DTC or its nominee, Cede & Co., is the Bondowner, such payments will be made directly to DTC. Disbursement of such payment to the DTC Participants is the responsibility of DTC and disbursements of such payments to the Beneficial Owners is the responsibility of the DTC Participants, as more fully described herein. Interest will be payable on November 1, 1998 and semiannually thereafter on May 1 and November 1.

The Series 1998 Bonds are subject to redemption prior to maturity, at various premiums, or at par under certain circumstances, as described more fully herein.

THE SERIES 1998 BONDS DO NOT CONSTITUTE A GENERAL OBLIGATION OF THE ISSUER OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE ISSUER OR A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS OR ANY POLITICAL SUBDIVISION THEREOF. THE SERIES 1998 BONDS ARE PAYABLE SOLELY FROM THE PAYMENTS AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE TRUST AGREEMENT. THE ISSUER HAS NO TAXING POWER.

## MATURITIES, AMOUNTS, RATES, AND PRICES OR YIELDS

### $3,075,000 Serial Bonds

| Due November 1 | Principal Amount | Interest Rate | Price or Yield | Due November 1 | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|---|---|---|---|
| 2000 | $285,000 | 4.50% | 100% | 2005 | $360,000 | 5.00% | 5.05% |
| 2001 | 295,000 | 4.50% | 4.65% | 2006 | 375,000 | 5.00% | 5.15% |
| 2002 | 305,000 | 4.70% | 4.75% | 2007 | 390,000 | 5.10% | 5.20% |
| 2003 | 320,000 | 4.80% | 4.85% | 2008 | 410,000 | 5.20% | 5.25% |
| 2004 | 335,000 | 4.90% | 4.95% | | | | |

$5,510,000 5.25% Term Bonds Due November 1, 2018 to Yield 5.88%
$9,345,000 5.625% Term Bonds Due November 1, 2028 to Yield 5.93%
(Accrued interest to be added from May 1, 1998.)

The Series 1998 Bonds are offered when, as and if issued and accepted by the Underwriter, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, as Bond Counsel and Lokidas & Bluestein, Boston, Massachusetts, as Co-Bond Counsel. Certain legal matters will be passed upon for the Institution by its counsel, Jason S. Cohen, Esq., Haverhill, Massachusetts and for the Underwriter by its counsel, Bingham Dana LLP, Boston, Massachusetts. The Series 1998 Bonds are expected to be available for delivery to DTC in New York, New York, on or about May 13, 1998.

## ADVEST, INC.

April 30, 1998

IN CONNECTION WITH THE OFFERING OF THE SERIES 1998 BONDS, THE UNDERWRITER MAY OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE SERIES 1998 BONDS AT LEVELS ABOVE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

No dealer, broker, salesman or other person has been authorized by the Issuer or the Underwriter to give any information or to make any representations other than is contained in this Official Statement and the Appendices hereto in connection with the offering described herein, and if given or made, such other information or representation must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or a solicitation of an offer to buy any securities other than those identified on the cover page or an offer to sell or a solicitation of an offer to buy such securities in any jurisdiction in which it is unlawful to make such offer, solicitation or sale. The Issuer neither has nor assumes any responsibility as to the accuracy or completeness of the information contained in this Official Statement, other than that appearing under the captions "THE ISSUER" and "LITIGATION" (but only insofar as it relates to the Issuer).

Certain information in this Official Statement has been obtained from Bradford College, The Depository Trust Company and other sources believed to be reliable. No representation or warranty is made, however, as to the accuracy or completeness of such information and nothing contained in this Official Statement is, or may be relied on as, a promise or representation by the Issuer or the Underwriter. The information herein relating to Bradford College, and its affairs and condition has been provided by such entity, and neither the Issuer nor the Underwriter make any representation with respect to or warrant the accuracy of such information. This Official Statement is submitted in connection with the sale of securities referred to herein and may not be used, in whole or in part, for any other purpose. The information and expression of opinions set forth herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the parties referred to above since the date hereof.

## TABLE OF CONTENTS

<u>Page</u>

Introduction .................................................................................................................................... 1

The Issuer ...... .................................................................................................................................. 2

Sources of Payment and Security for the Series 1998 Bonds ....................................................... 3

The Series 1998 Bonds.................................................................................................................... 4

The Depository Trust Company....................................................................................................... 8

Estimated Sources and Uses of Funds............................................................................................ 10

The Series 1998 Project.................................................................................................................. 10

Bondowners' Risks ......................................................................................................................... 11

Litigation......................................................................................................................................... 12

Tax Exemption ................................................................................................................................ 12

Legality of Series 1998 Bonds for Investment............................................................................... 13

Continuing Disclosure .................................................................................................................... 14

Underwriting ................................................................................................................................... 14

Legal Matters................................................................................................................................... 14

Rating.............................................................................................................................................. 14

Miscellaneous ................................................................................................................................. 14


Appendix A  -  Certain Information Regarding the Institution........................................................ A-1

Appendix B  -  Audited Financial Statements for Fiscal Years ending June 30, 1997 and June 30, 1995 ...........B-1

Appendix C  -  Summary of Definitions ......................................................................................... C-1

Appendix D  -  Summary of Loan and Trust Agreement................................................................ D-1

Appendix E-1  - Form of Opinion of Bond Counsel...................................................................... E-1

Appendix E-2  - Form of Opinion of Co-Bond Counsel ............................................................... E-2

Appendix F  -  Form of Continuing Disclosure Agreement........................................................... F-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

Official Statement
$17,930,000

## MASSACHUSETTS INDUSTRIAL FINANCE AGENCY
## REVENUE BONDS, BRADFORD COLLEGE ISSUE, SERIES 1998

### INTRODUCTION

This Official Statement, including the cover page, and the Appendices hereto, sets forth certain information concerning the $17,930,000 Massachusetts Industrial Finance Agency Revenue Bonds, Bradford College Issue, Series 1998 (the *"Series 1998 Bonds"*).

The Series 1998 Bonds will be issued pursuant to a Loan and Trust Agreement dated as of May 1, 1998 (the *"Trust Agreement"*), among the Massachusetts Industrial Finance Agency, a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts (the *"Issuer"*), Bradford College, a non-profit corporation formed under Chapter 180 of the General Laws of The Commonwealth of Massachusetts (the *"Institution"*) and Chittenden Trust Company, as trustee (the *"Trustee"*, which term includes any successor trustee under the Trust Agreement). Pursuant to the Trust Agreement, the Issuer will loan proceeds from the sale of the Series 1998 Bonds to the Institution (the *"Loan"*), and the Institution will agree in the Trust Agreement to make payments to the Issuer sufficient to pay the principal of and interest on the Series 1998 Bonds, and the Issuer will assign to the Trustee in trust for the benefit and security of the Series 1998 Bondholders, the Issuer's rights under the Trust Agreement and the revenues to be received from the Institution except as otherwise provided therein. The definitions of certain terms used and not defined herein are contained in Appendix C -- "Summary of Definitions."

The Institution will apply the Loan to (i) refund the Issuer's Variable Rate Demand Revenue Bonds, (Bradford College Issue, 1995 Series A), dated November 3, 1995 (the "Series 1995 Bonds"); and (ii) finance costs incurred in connection with certain renovations at the facilities of the Institution or the construction of new facilities of the Institution. See "THE SERIES 1998 PROJECT" herein and Appendix A – "Certain Information Regarding the Institution" under the heading "The Project." In addition, a portion of the proceeds of the Series 1998 Bonds will be used to fund a debt service reserve fund for the Series 1998 Bonds and to pay costs of issuing the Series 1998 Bonds. A more detailed description of the use of proceeds of the Series 1998 Bonds and other moneys, including approximate amounts and purposes, is set forth below under "ESTIMATED SOURCES AND USES OF FUNDS."

The obligation of the Institution to make payments under the Trust Agreement is a general obligation of the Institution to which the full faith and credit of the Institution is pledged. See "SOURCES OF PAYMENT AND SECURITY FOR THE SERIES 1998 BONDS." The Issuer is obligated to pay the principal of, premium, if any, and interest on the Series 1998 Bonds solely from the revenues and funds pledged therefor as provided in the Trust Agreement.

THE SERIES 1998 BONDS DO NOT CONSTITUTE A GENERAL OBLIGATION OF THE ISSUER OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS OR ANY POLITICAL SUBDIVISION THEREOF; EXCEPT TO THE EXTENT PAID FROM BOND PROCEEDS, THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE SERIES 1998 BONDS ARE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED FOR THEIR PAYMENT IN ACCORDANCE WITH THE TRUST AGREEMENT. THE ISSUER HAS NO TAXING POWER.

The payment of the principal of, premium, if any, and interest on the Series 1998 Bonds will be payable solely from, and secured by the Issuer's pledge to the Trustee of (i) payments to be received by the Trustee, for the account of the Issuer, from the Institution under the Trust Agreement (except certain rights to payment of indemnification, reimbursement and administrative fees) and (ii) additional amounts, if any received by the Trustee pursuant to the Trust Agreement.

**THE SERIES 1998 BONDS ARE SECURED BY A LIEN ON THE TUITION RECEIPTS OF THE INSTITUTION, WHICH LIEN IS PARI PASSU WITH A LIEN GRANTED TO THE U.S. DEPARTMENT OF EDUCATION TO SECURE A $1,500,000 LOAN TO THE INSTITUTION. THE SERIES 1998 BONDS ARE NOT SECURED BY A MORTGAGE LIEN OR SECURITY INTEREST IN ANY REAL OR OTHER PERSONAL PROPERTY OF THE INSTITUTION.**

The Series 1998 Bonds are subject to redemption prior to maturity including special redemption at par, optional redemption and mandatory sinking fund redemption under certain circumstances. See "THE SERIES 1998 BONDS" herein.

The agreements of the Issuer and the Institution with the Trustee for the benefit of the Bondholders are fully set forth in the Trust Agreement, and neither any advertisement of the Series 1998 Bond nor this Official Statement shall be construed as constituting an agreement with the purchasers of the Series 1998 Bonds. Insofar as any statements are made in this Official Statement involving matters of opinion, regardless of whether expressly so stated, they are intended merely as such and not as representations of fact.

## THE ISSUER

The Issuer is a body politic and corporate and a public instrumentality of The Commonwealth of Massachusetts and is authorized and empowered under the laws of The Commonwealth of Massachusetts, including Chapter 23A and, to the extent incorporated therein, Chapter 40D of the Massachusetts General Laws, each as amended (collectively, the *"Enabling Act"*), to issue the Series 1998 Bonds for the purposes described herein and to enter into the Trust Agreement. **The Issuer has no taxing power.**

The Members of the Board of Directors of the Issuer and the Officers of the Agency are as follows:

<u>Members of the Board of Directors</u>

<u>Robert L. Beal</u>, Chairman; Partner, The Beal Companies, Inc., Boston, Massachusetts; former President, Greater Boston Real Estate Board.

<u>David F. Squire</u>, Vice Chairman; Business Consultant, Weston, Massachusetts; former Vice President of Administration, Brandeis University, Waltham, Massachusetts.

<u>Richard S. Kronish</u>, Member; Associate Professor, University of Massachusetts, Boston, Massachusetts; Advisor to the Boston District Council of Carpenters.

<u>Paul Stelzer</u>, Member; President, Appleton Corporation, Holyoke, Massachusetts.

<u>Lisa Campoli</u>, Member, Principal and Senior Vice President, Lynch Murphy Walsh & Partners, Boston, Massachusetts.

<u>Dix F. Davis</u>, Member; Vice President, Allmerica Asset Management, Inc., Worcester, Massachusetts.

<u>Charles D. Baker</u>, Member; Secretary, Executive Office for Administration and Finance, The Commonwealth of Massachusetts.

David Tibbetts, Member, Director, Department of Economic Development, The Commonwealth of Massachusetts.

Officers of the Issuer

Michael P. Hogan, Executive Director.

Patricia G. Simard, Director of Finance.

David T. Slatery, Secretary/General Counsel.

## SOURCES OF PAYMENT AND SECURITY FOR THE SERIES 1998 BONDS

General

THE SERIES 1998 BONDS DO NOT CONSTITUTE A GENERAL OBLIGATION OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE ISSUER OR A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS OR ANY SUBDIVISION THEREOF, AND EACH COVENANT AND UNDERTAKING OF THE ISSUER IN THE TRUST AGREEMENT AND IN THE SERIES 1998 BONDS IS NOT A GENERAL OBLIGATION OF THE ISSUER OR A DEBT OR PLEDGE OF THE FAITH AND CREDIT OF THE COMMONWEALTH OF MASSACHUSETTS, BUT IS A LIMITED OBLIGATION PAYABLE SOLELY FROM THE REVENUES AND OTHER FUNDS PROVIDED UNDER THE TRUST AGREEMENT. THE TRUST AGREEMENT DOES NOT REQUIRE THE ISSUER TO PAY ANY FUNDS OR REVENUES FROM ANY SOURCE OTHER THAN PLEDGED RECEIPTS. THE ISSUER HAS NO TAXING POWER.

The Trust Agreement provides that the Institution will make Loan payments sufficient to pay in full the purchase price or principal of and interest on the Series 1998 Bonds. Such payments from the Institution are required to be made monthly in advance of the dates that payments are due on the Bonds. The Trust Agreement also provides for the Institution to pay certain fees and expenses (consisting generally of fees, charges and expenses of the Trustee and the Issuer) associated with the Series 1998 Bonds. Loan obligations are a general obligation of the Institution to which the full faith and credit of the Institution is pledged.

Security

Pursuant to the Trust Agreement, the Issuer assigns and pledges to the Trustee in trust for the benefit and security of the Bondowners upon the terms thereof (a) all Revenues to be received from the Institution or derived from any security provided under the Trust Agreement, (b) all rights to receive such Revenues and the proceeds of such rights, and (c) all funds and investments held from time to time in the funds established under the Trust Agreement except for the Rebate Fund. Such assignment and pledge does not include: (i) the rights of the Issuer pursuant to provisions for consent, concurrence, approvals or other action by the Issuer, notice to the Issuer or the filing of reports, certificates or other documents with the Issuer, or (ii) the powers of the Issuer as stated in the Trust Agreement to enforce the provisions of the Trust Agreement. The Trust Agreement shall remain in full force and effect until such time as the Series 1998 Bonds and the interest thereon and certain other required payments have been fully paid or until adequate provision for such payment has been made.

"Revenues" means all rates, payments, rents, fees, charges, and other income and receipts, including proceeds of insurance, eminent domain and sale, and including proceeds derived from any security provided under the Trust Agreement, payable to the Issuer or the Trustee under the Trust Agreement, excluding Additional Payments and other fees of the Issuer or the Trustee, reimbursements to the Issuer or the Trustee for expenses incurred by the Issuer or the Trustee, and indemnification of the Issuer and the Trustee.

Pursuant to the Trust Agreement, as additional security for its obligations to make payments under the Trust Agreement, the Institution grants to the Issuer a security interest in and lien on its Tuition Receipts. Such lien is pari passu with a lien granted by the Institution to the U.S. Department of Education (the "Department") to secure a $1,500,000 loan. The intercreditor arrangements among the Issuer, the Department and the Institution provide that upon any exercise of remedies with respect to such lien, the Department and the Issuer would share the proceeds of such liens on a pari passu basis and that after a default under the Department's loan facility or the Trust Agreement, the Department and the Issuer would attempt in good faith to negotiate an intercreditor agreement to regulate and coordinate the exercise of remedies against the Institution. The Series 1998 Bonds are not secured by a mortgage lien or security in any real or personal property.

The Trust Agreement constitutes a general obligation of the Institution. The Trust Agreement imposes certain restrictions on the Institution as to the incurrence of debt, the encumbering of property and the maintenance of investments. The Institution also has covenanted in the Trust Agreement to maintain certain financial covenants for each fiscal year of the Institution. See Appendix C – "Summary of Definitions" and Appendix D – "Summary of the Agreement."

The Issuer has previously issued the Series 1995 Bonds, which currently are outstanding in the principal amount of $5,210,000 (as of June 30, 1997) and which will be refunded in whole from a portion of the proceeds of the Series 1998 Bonds. See "THE SERIES 1998 PROJECT - Refunding of Series 1995 Bonds" below. In addition, the Institution has outstanding indebtedness in the aggregate amount of approximately $4,800,000 (as of June 30, 1997). For a complete description of the Institution's outstanding indebtedness and the security therefor, see Appendix A – "Certain Information Regarding the Institution" under the heading "Outstanding Indebtedness" and Appendix B – "Audited Financial Statements."

**Debt Service Reserve Fund**

The Trust Agreement provides for the establishment and maintenance of a Debt Service Reserve Fund in an amount equal to the Debt Service Reserve Fund Requirement to be held by the Trustee. The Debt Service Reserve Fund may be drawn upon to pay principal of and interest on the Bonds to the extent there are insufficient funds available therefor in the Debt Service Fund. See Appendix C - "Summary of Definitions" and Appendix D - "Summary of the Agreement" under the heading "Debt Service Reserve Fund."

**Additional Indebtedness**

The Issuer may issue Additional Indebtedness, including Additional Bonds on a parity with the Series 1998 Bonds, to provide additional funds to complete the Project, to provide additional moneys for the Debt Service Reserve Fund, to refund Bonds previously issued under the Trust Agreement and to pay costs of issuance of such Additional Bonds or to finance or refinance any other project or projects of the Institution permitted under the Act only if certain financial covenants and other conditions are met. For other provisions relating to the issuance of Additional Indebtedness, see Appendix D - "Summary of the Agreement" under the heading "Additional Bonds" and "Restrictions on Borrowings."

The Institution is restricted in its ability to mortgage its Core Campus, but it is allowed to grant liens on property or Tuition Receipts in connection with replacement or repair of fixtures. The Institution is permitted to grant mortgages in connection with the construction of new buildings on its Core Campus, and is allowed to grant mortgages, as long as a parity pledge is granted to Series 1998 Bondowners. For other provisions relating to Restricted Indebtedness, see Appendix D - "Summary of the Agreement" under the heading "Restricted Indebtedness."

## THE SERIES 1998 BONDS

The following is a summary of certain provisions of the Series 1998 Bonds. Reference is hereby made to the Series 1998 Bonds and the Trust Agreement, each in their entirety, for the detailed provisions of the Series 1998 Bonds. Certain provisions of the Trust Agreement are summarized in Appendices C and D hereof.

4

Description of the Series 1998 Bonds

The Series 1998 Bonds will be issued in fully registered form, without coupons, in denominations of $5,000 or integral multiples thereof. The Series 1998 Bonds initially will be dated May 1, 1998, and will bear interest from such date payable on November 1, 1998 and on each May 1 and November 1 thereafter at the rate or rates per annum shown on the cover page of this Official Statement. Interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The Series 1998 Bonds will mature on November 1 of each of the years and in the principal amounts shown on the cover page of this Official Statement.

Debt Service Requirements

The following table sets forth, for each respective bond year, the amounts required to be made available in such year by the Institution for payment of the principal or sinking fund installments, interest and total debt service on the Series 1998 Bonds.

Series 1998 Bonds

| Year Ending November 1, | Principal or Sinking Fund Installments | Interest | Total Debt Service |
|---|---|---|---|
| 1999 | -- | $965,101.26 | $965,101.26 |
| 2000 | $285,000.00 | 965,101.26 | 1,250,101.26 |
| 2001 | 295,000.00 | 952,276.26 | 1,247,276.26 |
| 2002 | 305,000.00 | 939,001.26 | 1,244,001.26 |
| 2003 | 320,000.00 | 924,666.26 | 1,244,666.26 |
| 2004 | 335,000.00 | 909,306.26 | 1,244,306.26 |
| 2005 | 360,000.00 | 892,891.26 | 1,252,891.26 |
| 2006 | 375,000.00 | 874,891.26 | 1,249,891.26 |
| 2007 | 390,000.00 | 856,141.26 | 1,246,141.26 |
| 2008 | 410,000.00 | 836,251.26 | 1,246,251.26 |
| 2009 | 435,000.00 | 814,931.26 | 1,249,931.26 |
| 2010 | 455,000.00 | 792,093.76 | 1,247,093.76 |
| 2011 | 480,000.00 | 768,206.26 | 1,248,206.26 |
| 2012 | 505,000.00 | 743,006.26 | 1,248,006.26 |
| 2013 | 530,000.00 | 716,493.76 | 1,246,493.76 |
| 2014 | 560,000.00 | 688,668.76 | 1,248,668.76 |
| 2015 | 590,000.00 | 659,268.76 | 1,249,268.76 |
| 2016 | 620,000.00 | 628,293.76 | 1,248,293.76 |
| 2017 | 650,000.00 | 595,743.76 | 1,245,743.76 |
| 2018 | 685,000.00 | 561,618.76 | 1,246,618.76 |
| 2019 | 725,000.00 | 525,656.26 | 1,250,656.26 |
| 2020 | 760,000.00 | 484,875.02 | 1,244,875.02 |
| 2021 | 805,000.00 | 442,125.02 | 1,247,125.02 |
| 2022 | 850,000.00 | 396,843.76 | 1,246,843.76 |
| 2023 | 895,000.00 | 349,031.26 | 1,244,031.26 |
| 2024 | 950,000.00 | 298,687.52 | 1,248,687.52 |
| 2025 | 1,000,000.00 | 245,250.00 | 1,245,250.00 |
| 2026 | 1,060,000.00 | 189,000.00 | 1,249,000.00 |
| 2027 | 1,120,000.00 | 129,375.00 | 1,249,375.00 |
| 2028 | 1,180,000.00 | 66,375.00 | 1,246,375.00 |

5

Redemption Provisions

## Mandatory Redemption

The Series 1998 Bonds maturing on November 1, 2018 are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus interest, if any, accrued thereon to the date fixed for redemption, on each November 1 of the years and in the principal amounts set forth below:

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2009 | $435,000 | 2014 | $560,000 |
| 2010 | 455,000 | 2015 | 590,000 |
| 2011 | 480,000 | 2016 | 620,000 |
| 2012 | 505,000 | 2017 | 650,000 |
| 2013 | 530,000 | 2018 | 685,000* |

* Final Maturity

The Series 1998 Bonds maturing on November 1, 2028 are subject to mandatory sinking fund redemption at a redemption price equal to 100% of the principal amount thereof plus interest, if any, accrued thereon to the date fixed for redemption, on each November 1 of the years and in the principal amounts set forth below:

| Year | Principal Amount | Year | Principal Amount |
|------|------------------|------|------------------|
| 2019 | $725,000 | 2024 | $ 950,000 |
| 2020 | 760,000 | 2025 | 1,000,000 |
| 2021 | 805,000 | 2026 | 1,060,000 |
| 2022 | 850,000 | 2027 | 1,120,000 |
| 2023 | 895,000 | 2028 | 1,180,000* |

* Final Maturity

## Optional Redemption

The Series 1998 Bonds maturing on or before November 1, 2008 are not subject to optional redemption prior to maturity, unless redeemed pursuant to the extraordinary optional redemption provisions set forth below. The Series 1998 Bonds maturing after November 1, 2008 are subject to optional redemption prior to maturity at the written direction of the Institution (together with the deposit of necessary moneys in the Redemption Fund) as a whole or in part at any time on and after November 1, 2008 in the order of maturity determined by the Institution at the following redemption prices (expressed as percentages of the principal amount redeemed), plus accrued interest to the date fixed for redemption:

| Redemption Period | Redemption Price |
|-------------------|------------------|
| November 1, 2008 through October 31, 2009 | 102% |
| November 1, 2009 through October 31, 2010 | 101% |
| November 1, 2010 and thereafter | 100% |

### Special Redemption

The Series 1998 Bonds are subject to redemption as a whole or in part at any time, in such order of maturity or sinking fund installments as directed by the Institution at their principal amounts, without premium, plus accrued interest to the redemption date, from any excess moneys in the Project Fund upon completion of the Project or from proceeds of insurance or eminent domain awards, under certain circumstances. See Appendix D -- "Summary of the Agreement" under the headings "Construction Fund" and "Damage to or destruction of the Project".

### Selection of Bonds to be Redeemed

In the event of a redemption of less than all of the Series 1998 Bonds of a particular maturity, the Series 1998 Bonds or portions of the Series 1998 Bonds of such maturity to be redeemed will be selected in such manner as the Trustee shall determine, provided that so long as DTC or its nominee is the Bondowner, the Series 1998 Bonds or portions of the Series 1998 Bonds to be redeemed shall be selected by DTC in such manner as DTC may determine.

### Notice of Redemption and Other Notices

So long as DTC or its nominee is the Series 1998 Bondholder, the Issuer and Trustee will recognize DTC or its nominee as the Series 1998 Bondholder, for all purposes, including notices and voting.  Conveyance of notices and other communications by DTC to DTC Participants, by DTC Participants to Indirect Participants, and by DTC Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory and regulatory requirements which may be in effect from time to time.  In the event DTC or its nominee is not the Series 1998 Bondholder, notices will be sent by the Trustee to the registered holders of the Series 1998 Bonds in accordance with the provisions of the Trust Agreement.

The Trustee shall give notice of redemption to the Series 1998 Bondowners by first class mail not less than 30 days nor more than 45 days prior to the date fixed for redemption.  So long as DTC or its nominee is the Series 1998 Bondholder, any failure on the part of DTC or failure on the part of a nominee of a Beneficial Owner (having received notice from a DTC Participant or otherwise) to notify the Beneficial Owner so affected shall not affect the validity of the redemption.

### Effect of Redemption

Notice of redemption having been given in the manner provided in the Trust Agreement, and amounts sufficient for the redemption being held by the Trustee for that purpose, the Series 1998 Bonds so called for redemption shall become due and payable on the Redemption Date, and interest thereon shall cease to accrue and the holders of the Series 1998 Bonds so called for redemption shall thereafter no longer have any security or benefit under the Trust Agreement except to receive payment of the redemption price for such Series 1998 Bonds. If such amounts shall not be so sufficient on the Redemption Date, such Series 1998 Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

### Acceleration

In the event of a default by the Institution, the Trustee may accelerate the Series 1998 Bonds and declare the outstanding principal amount and the accrued interest thereon immediately due and payable.  See Appendix D - "Summary of the Agreement" under the heading "Default by the Institution".

7

## THE DEPOSITORY TRUST COMPANY

Subject to the provisions discussed below in the section entitled "Book-Entry Only System," the Series 1998 Bonds will be issued only as fully registered bonds without coupons in the minimum denominations set forth below. Principal or redemption premium, if any, of the Series 1998 Bonds will be payable at the principal corporate trust office of the Trustee, and interest on the Series 1998 Bonds will be paid by check or draft mailed (or at the option of an owner of $1,000,000 or more of the Series 1998 Bonds, by wire transfer) by the Trustee to the registered owner as of the applicable Record Date.

Book-Entry Only System

The Depository Trust Company, New York, New York ("DTC") will act as securities depository for the Series 1998 Bonds. The Series 1998 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Series 1998 Bond certificate will be issued for each maturity of the Series 1998 Bonds, in the principal amount of such maturity, and will be deposited with DTC. DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds securities that its participants ("Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct participants ("Direct Participants") include securities brokers and dealers, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants.") The rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the Series 1998 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 1998 Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 1998 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participant's records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 1998 Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Series 1998 Bonds, except in the event that use of the book-entry only system for the Series 1998 Bonds is discontinued.

To facilitate subsequent transfers, all Series 1998 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of Series 1998 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 1998 Bonds. DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 1998 Bonds are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

8

Redemption notices shall be sent to Cede & Co. If less than all of the Series 1998 Bonds within a single maturity of an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to Series 1998 Bonds. Under its usual procedure, DTC mails an Omnibus Proxy to the issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 1998 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy.)

Principal, redemption premium, if any, and interest payments on the Series 1998 Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts for customers in bearer form or registered in the "street name," and will be the responsibility of such Participant and not of DTC, the Paying Agent, the Institution or the Issuer, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Issuer, the Trustee or the Paying Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursements of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuer believes to be reliable, but none of the Issuer, the Institution or the Underwriter takes responsibility for the accuracy thereof.

For every transfer and exchange of the Series 1998 Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax, fee or other governmental charge that may be imposed in relation hereto.

No Responsibility of Issuer, the Institution, Trustee and Paying Agent.

NONE OF THE ISSUER, THE INSTITUTION, THE PAYING AGENT OR THE TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATIONS TO DTC PARTICIPANTS OR PERSONS FOR WHOM THEY ACT AS NOMINEES WITH RESPECT TO THE PAYMENTS TO OR THE PROVIDING OF NOTICE FOR DTC PARTICIPANTS, INDIRECT PARTICIPANTS, OR BENEFICIAL OWNERS.

SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 1998 BONDS, AS NOMINEE OF DTC. REFERENCES HEREIN TO THE BONDOWNERS OR REGISTERED OWNERS OF THE SERIES 1998 BONDS SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 1998 BONDS.

Certificated Series 1998 Bonds

DTC may discontinue providing its services as securities depository with respect to the Series 1998 Bonds at any time by giving reasonable notice to the Issuer and the Trustee. In addition, the Issuer may determine that continuation of the system of book-entry transfers through DTC (or successor securities depository) is not in the best interests of the Beneficial Owners. If for either reason the Book-Entry Only system is discontinued, Series 1998 Bond certificates will be delivered as described in the Agreement and the Beneficial Owner, upon registration of certificates held in the Beneficial Owner's name, will become the Bondowner. Thereafter, Series 1998 Bonds may be exchanged for an equal aggregate principal amount of Series 1998 Bonds in other authorized denominations and of the same maturity, upon surrender thereof at the principal corporate trust office of the Paying Agent. The transfer of any Series 1998 Bond may be registered on the books maintained by the Paying Agent for such purpose only upon the assignment in the form satisfactory to the Paying Agent. For every exchange or registration of transfer of Series 1998 Bonds, the Issuer and the Paying Agent may make a charge sufficient to reimburses them for any tax or other governmental charge required to be paid with respect to such exchange or

registration of transfer, but no other charge may be made to the Bondowner for any exchange or registration of transfer of the Series 1998 Bonds. The Paying Agent will not be required to transfer or exchange any Series 1998 Bond during the notice period preceding any redemption if such Series 1998 Bond (or any part thereof) is eligible to be selected or has been selected for redemption.

## ESTIMATED SOURCES AND USES OF FUNDS

The proceeds of the Series 1998 Bonds, together with other funds provided by the Institution, (exclusive of accrued interest) are expected to be applied as follows:

| Sources of Funds | |
|---|---|
| Principal Amount of the Series 1998 Bonds | $17,930,000 |
| Equity Contribution | 1,000,000 |
| Total | $18,930,000 |

| Use of Funds | |
|---|---|
| Original Issue Discount | $    823,291 |
| Deposit to Project Fund | 11,383,739 |
| Deposit to Trustee-Held Fund for Retirement of Series 1995 Bonds | 5,128,709 |
| Debt Service Reserve Fund | 1,252,891 |
| Costs of Issuance | 341,370 |
| Total | $18,930,000 |

## THE SERIES 1998 PROJECT

### Project Financing

A portion of the proceeds of the Series 1998 Bonds, together with an equity contribution by the Institution, will be used by the Institution for the construction or alteration of buildings, site development or the acquisition and installation of equipment and furnishings, or any combination of the foregoing in connection with any or all of the following: (i) repairs, renovations and improvements to two residence halls, Tupelo East and West, located on the Campus; (ii) the construction of a new residence hall complex, known as the "Residential Quadrangle"; (iii) renovations to Conover Hall; (iv) the funding of a Debt Service Reserve Fund; and (v) the financing of various costs of issuance. For a complete description of the Series 1998 Project, see Appendix A – "Certain Information Regarding the Institution" under the heading "The Project."

### Refunding of Series 1995 Bonds

A portion of the proceeds of the Series 1998 Bonds will be used to refund the Series 1995 Bonds. No escrow will be established to accomplish defeasance of the Series 1995 Bonds. Bond proceeds in an amount sufficient to defease the outstanding principal on the Series 1995 Bonds, plus any interest due thereon, shall be deposited in an account for that purpose with the Trustee. Notice will be given to Series 1995 Bondowners of the Series 1995 Bonds' redemption, to occur on the first call date following the issuance of the Series 1998 Bonds, which is expected to be June 3, 1998. Until the Series 1995 Bonds are redeemed, and the letter of credit issued by Family Mutual Savings Bank to support payments thereon is terminated, Family Bank will have a lien on and security interest in substantially all of the real property of the Institution to secure the Institution's reimbursement obligation with respect to such letter of credit.

## BONDOWNERS' RISKS

Payment of Debt Service

The principal of, redemption premium, if any, and interest on the Series 1998 Bonds are payable solely from the amounts paid by the Institution to the Issuer under the Trust Agreement. No representation or assurance can be made that revenues will be realized by the Institution in the amount necessary to make payments at the times and in the amounts sufficient to pay the debt service on the Series 1998 Bonds.

Future revenues and expenses of the Institution will be affected by events and conditions relating generally to, among other things, demand for the Institution's educational services, the ability of the Institution to provide the required educational services, management capabilities, economic developments in the Institution's service area, the Institution's ability to control expenses, competition, costs, the amount of financial aid awarded to students, legislation, governmental regulation and developments affecting the federal or state tax-exempt status of non-profit organizations. Unanticipated events and circumstances may occur which cause variations from the Institution's expectations. For a description of the Institution and a discussion of the financial condition of the Institution, see Appendix A - "Certain Information Regarding the Institution". Certain audited financial statements of the Institution are included in Appendix B.

Dependence on Tuition Payments

Colleges and universities are in general highly dependent upon tuition and fee revenues from students and, to a lesser extent, dormitory and other auxiliary enterprise revenues to pay debt service. One of the goals of the Institution's strategic plan is to increase enrollment to at least 725 full-time students by the fall of 2000. See Appendix A - "Certain Information Regarding the Institution" under the heading "Accounting Matters". A failure by the Institution to attract and retain students in sufficient numbers to accomplish such goal could adversely affect the ability of the Institution to make required payments on the Series 1998 Bonds. Demographics for traditional college-age students also are intensifying the competition for students by all colleges and universities, including the Institution.

Enforceability

The remedies granted to the Trustee or the owners of the Series 1998 Bonds upon an event of default under the Trust Agreement may be dependent upon judicial actions which are often subject to discretion and delay. Under existing law, the remedies specified in the Trust Agreement may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the delivery of the Series 1998 Bonds will be qualified as to the enforceability of the provisions of the Trust Agreement by limitations imposed by state and federal laws, rulings and decisions affecting equitable remedies regardless of whether enforceability is sought in a proceeding at law or in equity and by bankruptcy, reorganization, insolvency, receivership or other similar laws affecting the rights of creditors generally.

No Redemption Upon Loss of Tax Exemption

As described under "TAX EXEMPTION" herein, non-compliance with certain requirements of the Internal Revenue Code of 1986, as amended, could cause interest on the Series 1998 Bonds to be included in gross income for federal income tax purposes, retroactive to the date of issuance of the Series 1998 Bonds. The Series 1998 Bonds are not required to be redeemed and are not subject to acceleration, and the interest rates on the Series 1998 Bonds will not be changed, in the event interest thereon is determined to be includable in gross income for federal income tax purposes. No provision has been made to compensate bondowners for federal income taxes, interest and/or penalties which may be assessed in connection with any such tax liability or such determination or for any other loss or any diminution of gain which may occur.

11

Enforceability of Lien on Tuition Receipts

The Trust Agreement provides that the Institution shall make payments to the Issuer sufficient to pay the Series 1998 Bonds and the interest thereon as the same become due. The obligation of the Institution to make such payments is secured in part by a lien granted to the Issuer by the Institution, pursuant to the Trust Agreement, on the Tuition Receipts of the Institution. Pursuant to the Massachusetts Uniform Commercial Code, the security interest in Tuition Receipts may not continue to be perfected if the proceeds are not paid over to the Trustee by the Institution within 9 days of their receipt by the Institution. Furthermore, to the extent that Tuition Receipts are derived from direct payments from the federal government, enforcement by the Issuer of any right to receive such direct payments may be subject to provisions of the Assignment of Claims Act of 1940, with respect to which the Institution and the Issuer may be required to comply. In the event of bankruptcy of the Institution, pursuant to the Bankruptcy Code, any receivable coming into existence and any Tuition Receipts received on or after the date which is 90 days (or, in some circumstances, one year) prior to the commencement of the case in bankruptcy court might not be subject to the lien of the Issuer, and under certain circumstances a court of equity may have power to direct the use of Tuition Receipts to meet expenses of the Institution before paying debt service on the Series 1998 Bonds. With respect to receivables and Tuition Receipts not subject to the lien, the Issuer would occupy the position of an unsecured creditor. The effectiveness of the security interest in Tuition Receipts may also be limited by other factors, including statutory liens, constructive trust, equitable or other rights impressed or conferred by a court in the exercise of its equitable jurisdiction, rights of third parties in Tuition Receipts converted to cash and not in the possession of the Trustee, and the failure to file financing or continuation statements under the Uniform Commercial Code.

## LITIGATION

There is no litigation now pending against the Institution or, to the knowledge of its officers, threatened, restraining or enjoining the issuance, sale, execution or delivery of the Series 1998 Bonds, or in any way contesting or affecting the validity of Series 1998 Bonds, any proceedings of the Institution concerning the issuance or sale thereof or the security provided for the payment of the Series 1998 Bonds. There is no litigation pending against the Issuer or, to the knowledge of the officers of the Issuer, threatened against the Issuer seeking to restrain or enjoin the issuance or delivery of any of the Series 1998 Bonds or in any way contesting the existence or powers of the Issuer relating to the issuance of the Series 1998 Bonds.

## TAX EXEMPTION

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Bond Counsel, is of the opinion that, under existing law, interest on Series 1998 Bonds will not be included in the gross income of holders of the Series 1998 Bonds for federal income tax purposes. This opinion is expressly conditioned upon compliance with certain requirements of the Internal Revenue Code of 1986, as amended (the "Code"), which requirements must be satisfied subsequent to the date of issuance of the Series 1998 Bonds in order to assure that interest on the Series 1998 Bonds is and continues to be excludable from the gross income of the holders thereof. Failure to so comply could cause the interest on the Series 1998 Bonds to be included in the gross income of the holders thereof, retroactive to the date of issuance of the Series 1998 Bonds. In particular, and without limitation, those requirements include restrictions on the use, expenditure and investment of proceeds and payment of rebate, or penalties in lieu of rebate, to the United States, subject to certain exceptions. The Issuer and the Institution have provided covenants and certificates as to their respective continued compliance with such requirements.

In the opinion of Bond Counsel, under existing law, interest on the Series 1998 Bonds will not constitute a preference item under section 57(a)(5) of the Code for purposes of computation of the alternative minimum tax imposed on certain individuals and corporations under section 55 of the Code. However, interest on the Series 1998 Bonds will be included in "adjusted current earnings" of corporate holders of the Series 1998 Bonds and therefore will be taken into account under section 56(g) of the Code in the computation of the alternative minimum tax applicable to certain corporations.

Bond Counsel has not opined as to other federal tax consequences of holding the Series 1998 Bonds. However, prospective purchasers should be aware that (i) section 265 of the Code denies a deduction for interest on indebtedness incurred or continued to purchase or carry the Series 1998 Bonds or, in the case of a financial institution, that portion of a holder's interest expense allocated to the Series 1998 Bonds, (ii) with respect to insurance companies subject to the tax imposed by section 831 of the Code, section 832 (b)(5)(B)(1) reduces the deduction for losses incurred by 15 percent of the sum of certain items, including interest on the Series 1998 Bonds, (iii) interest on the Series 1998 Bonds earned by certain foreign corporations doing business in the United States could be subject to a foreign branch profits tax imposed by section 884 of the Code, (iv) passive investment income, including interest on the Series 1998 Bonds, may be subject to federal income taxation under section 1375 of the Code for an S Corporation that has Subchapter C earnings and profits at the close of the taxable year if greater than 25% of the gross receipts of such S Corporation is passive investment income, (v) section 86 of the Code requires recipients of certain Social Security and Railroad Retirement benefits to take into account in determining gross income, receipts or accruals of interest on the Series 1998 Bonds and (vi) receipt of investment income, including interest on the Series 1998 Bonds may, pursuant to Section 32(i) of the Code, disqualify the recipient from obtaining the earned income credit otherwise provided by section 32(a) of the Code.

In the opinion of Bond Counsel, interest on the Series 1998 Bonds and any profit made on the sale thereof are also exempt from Massachusetts personal income taxes and the Series 1998 Bonds are exempt from Massachusetts personal property taxes. Bond Counsel has not opined as to the other Massachusetts tax consequences resulting from holding the Series 1998 Bonds. However, prospective purchasers should be aware that the Series 1998 Bonds are included in the measure of Massachusetts estate and inheritance taxes, and the Series 1998 Bonds and the interest thereon are included in the measure of Massachusetts corporate excise and franchise taxes. Bond Counsel has not opined as to the taxability of the Series 1998 Bonds, their transfer and the income therefrom, including any profit made on the sale thereof, under the laws of states other than the Commonwealth.

For federal and Massachusetts tax purposes, interest includes original issue discount. Original issue discount with respect to the Series 1998 Bonds is equal to the excess, if any, of the stated redemption price at maturity of the Series 1998 Bonds over the initial offering price thereof to the public, excluding underwriters and other intermediaries, at which price a substantial amount of all Series 1998 Bonds with the same maturity were sold. Original issue discount accrues actuarially over the term of the Series 19998 Bonds. Holders should consult their own tax advisers with respect to the computations of original issue discount on such accruals of interest during the period in which any Series 1998 Bond is held.

On the date of delivery of the Series 1998 Bonds, the original purchasers will be furnished with an opinion of Bond Counsel substantially in the form attached hereto as Appendix E-1 - "FORM OF OPINION OF BOND COUNSEL."

## LEGALITY OF SERIES 1998 BONDS FOR INVESTMENT

The Act provides that the Series 1998 Bonds are legal investments in which all public officers and public bodies of the Commonwealth of Massachusetts, its political subdivisions, all municipalities and municipal subdivisions, all insurance companies and associations, including cooperative banks, building and loan associations, investment companies and other fiduciaries may properly and legally invest funds in their control or belonging to them. The Act also provides that the Series 1998 Bonds are securities which may properly and legally be deposited with and received by all public officers and bodies of The Commonwealth of Massachusetts or any agency or political subdivision thereof and all municipalities and public corporations for any purposes for which the deposit of bonds or other obligations of The Commonwealth of Massachusetts is now or may hereafter by authorized by law.

13

## CONTINUING DISCLOSURE

In order to assist the Underwriter in complying with Rule 15c2-12 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended ("Rule 15c2-12"), the Institution will undertake in a Continuing Disclosure Agreement dated as of the date of delinquency of the Bonds, (the "Undertaking") between the Institution and the Trustee, for the benefit of the holders of the Series 1998 Bonds, to provide the Trustee certain annual information and notices required to be provided by Rule 15c2-12. The proposed form of the Undertaking is set forth in Appendix F – "Form of Continuing Disclosure Agreement". The Undertaking may be amended or modified with Bondowners' consent under certain circumstances set forth herein. Copies of the Undertaking when executed by the parties thereto upon the delivery of the Series 1998 Bonds will be on file at the principal office of the Trustee. The Issuer has not committed to provide any continuing disclosure to the owners of the Series 1998 Bonds or to any other person.

## UNDERWRITING

The Bonds are being purchased by Advest, Inc., as Underwriter. The Underwriter has agreed to purchase the Bonds at a discount of $161,370. The Institution has agreed to indemnify the Underwriter and the Issuer against certain liabilities, including certain liabilities arising under federal and state securities laws. The Underwriter may offer and sell the Bonds to certain dealers (including dealers depositing Series 1998 Bonds into unit investment trusts) and others at prices lower than the public offering prices stated on the cover page hereof. The initial offering price may be changed from time to time by the Underwriter.

## LEGAL MATTERS

All legal matters incidental to the authorization and issuance of the Series 1998 Bonds by the Issuer are subject to approval of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts, Bond Counsel and Krokidas & Bluestein, Boston, Massachusetts, as Co-Bond Counsel. The unqualified approving opinions of such counsel, in substantially the forms attached hereto as Exhibits E-1 and E-2, will be delivered at settlement. Jason Cohen, Esq., Haverhill, Massachusetts will pass upon certain legal matters for the Institution. Certain legal matters will be passed upon for the Underwriter by its counsel, Bingham Dana, LLP, Boston, Massachusetts.

## RATINGS

Standard & Poor's has assigned a rating of "BBB-" to the Series 1998 Bonds. Such ratings reflect only the view of the rating agency at the time of issuance of the Series 1998 Bonds. An explanation of the significance of the rating may be obtained from Standard & Poor's. There is no assurance that such rating will continue for any given period of time or that it will not be revised or withdrawn entirely by the rating agency, if in its judgment circumstances so warrant. A revision or withdrawal of the rating may have an effect on the market price of the Series 1998 Bonds.

## MISCELLANEOUS

The references to the Act and the Trust Agreement are brief summaries of certain provisions thereof. Such summaries do not purport to be complete, and reference is made to the Act and the Trust Agreement for full and complete statements of such provisions. The agreements of the Issuer with the holders of the Series 1998 Bonds are fully set forth in the Trust Agreement, and neither any advertisement of the Series 1998 Bonds nor this Official Statement is to be construed as constituting an agreement with the Bondowners. So far as any statements are made in this Official Statement involving matters of opinion, whether or not expressly so stated, they are intended merely as such and not as representations of fact. Copies of the documents mentioned in this paragraph are on file at the offices of the Issuer and of the Trustee.

Information relating to DTC and the book-entry system described herein under the heading "THE DEPOSITORY TRUST COMPANY – Book-Entry Only System" has been furnished by DTC and is believed to be reliable, but none of the Issuer, the Institution or the Underwriter make any representations or warranties whatsoever with respect to any such information.

Appendix A contains a letter from the Institution to the Issuer which contains certain information relating to the Institution. With respect to the letter from the Institution, while the information contained therein is believed to be reliable, the Issuer and the Underwriter make no representations or warranties whatsoever with respect to the information contained therein.

Appendix B to this Official Statement contains the audited financial statements of the Institution together with the report of its independent public accountants, Gordon, Harrington & Osborn, P.C.

The Issuer and the Underwriter have relied on the information contained in Appendix A and the Financial Statements contained in Appendix B.

Appendix C – "Summary of Definitions" and Appendix D – "Summary of the Agreement" have been prepared by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Bond Counsel. The proposed forms of legal opinions contained in Appendix E-1 and Appendix E-2 have been prepared by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Bond Counsel and Krokidas & Bluestein, Co-Bond Counsel, respectively. Appendix F – "Form of Continuing Disclosure Agreement" has been prepared by Bingham Dana LLP, Counsel to the Underwriter.

The Appendices are incorporated herein as an integral part of this Official Statement.

The Institution has reviewed the portions of this Official Statement describing it, "The Series 1998 Project," "Estimated Sources and Uses of Funds," "Bondowners' Risks," "Litigation" as it relates to the Institution and Appendix B, and has furnished Appendix A to this Official Statement, and has approved all such information for use with this Official Statement. At the closing, the Institution will certify that such portions of this Official Statement, except for any projections and opinions contained in such portions, do not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they are made, not misleading.

The Issuer neither has nor assumes any responsibility as to the accuracy or completeness of the information contained in this Official Statement, other than that appearing under the captions "The Issuer" and "Litigation" (but only insofar as it relates to the Issuer).

The execution and delivery of this Official Statement by its Executive Director has been duly authorized by the Issuer.

<div style="text-align:center">

MASSACHUSETTS INDUSTRIAL FINANCE AGENCY


/s/ Michael P. Hogan
Executive Director

</div>

15

[THIS PAGE INTENTIONALLY LEFT BLANK]

A

Appendix A

Certain Information Regarding the Institution

[THIS PAGE INTENTIONALLY LEFT BLANK]

# BRADFORD COLLEGE

*320 SOUTH MAIN STREET ◆ HAVERHILL, MASSACHUSETTS 01835-7393*
*(978) 372-7161 ◆ FAX (978) 521-0480*

<div align="right">APPENDIX A</div>

Massachusetts Industrial Finance Agency
75 Federal Street
Boston, Massachusetts 02110

Ladies and Gentlemen:

We are pleased to submit the following information with respect to Bradford College (the "College" or "Bradford") and the Project. This letter and the information contained herein are submitted to the Massachusetts Industrial Finance Agency for inclusion in its Official Statement relating to its Revenue Bonds, Bradford College Issue, Series 1998 (the "Bonds").

## INTRODUCTION

Bradford College is a private, non-profit, non-sectarian, coeducational institution of higher education situated on a 71 acre campus approximately 35 miles from Boston in Bradford, Massachusetts. The campus consists of 20 buildings. Bradford offers primarily liberal arts programs on its campus and as of spring 1998, Bradford had full-time equivalent enrollment of 547.

Mission Statement

Bradford's mission statement states: "The mission of Bradford College is to provide a practical liberal arts education at the baccalaureate level
- in a small college setting;
- to a diverse group of students, men and women, from across the United States and the world;
- with a faculty who excel at teaching and care deeply about students;
- in an intimate community in which learning and personal development go hand in hand."

To implement this mission, the College developed a program called the "Bradford Plan for a Practical Liberal Arts Education." The Bradford Plan is intended to provide a liberal arts education that prepares students in a practical way for life. Programs of study include: Creative Arts, Humanities, Human Studies, Management, and Natural Science and Mathematics. Also offered are the following special programs: Teacher Certification Program, Honors Program and the College Learning Program.

History

Bradford College, founded in 1803, began as Bradford Academy, one of the earliest New England coeducational academies. By 1836, Bradford chose to devote itself exclusively to the education of women. With a focus on the liberal arts, students were prepared for productive lives in a society that normally placed many restrictions on women's opportunities. In 1902, the College offered a program specifically designed for high school graduates. This laid the foundation for the College's transition from secondary school to college. In 1932, Bradford Academy became Bradford Junior College. Then in 1971, Bradford reopened its enrollment to male students and also received authorization from the Commonwealth of Massachusetts to grant the bachelor's degree and change its name to Bradford College.

## ACCREDITATION, MEMBERSHIPS AND AFFILIATIONS

Bradford College is regionally accredited by the New England Association of Schools and Colleges, Inc. The College's last accreditation review was finalized in November 1992, and the next accreditation review was scheduled to begin in 1997. However, due to certain changes in academic programs, the College was granted a one year delay. As a result, Bradford College currently is in the process of renewing its accreditation, which is expected to be finalized in spring 1999. Bradford College is affiliated with: Northeast Consortium of Colleges and Universities in Massachusetts, Boston Conservatory of Music, Central College International Studies Program, Council on International Educational Exchange, National Theater Institute, Washington Center, School for International Training, and Sea Education Association (SEA). Bradford College also is a participating member of the Visiting Fellows Program of the Woodrow Wilson Foundation.

## ORGANIZATION AND GOVERNANCE

The College is governed by a Board of Trustees (the "Board"), which includes the President of the College as a voting member. The Board Bylaws fix the number of members of the Board at 24. Two members of the Board are Alumni Trustees, selected by the Board on nomination made by the Alumni Association of Bradford College. The term of an Alumni Trustee is three years. An Alumni Trustee is eligible for election for no more than two successive terms as an Alumni Trustee. New members of the Board of Trustees shall be elected by a majority of the Trustees at each Annual Meeting of the Board. Persons nominated for Trusteeship other than Alumni Trustee are elected to terms of three years and shall be eligible for election to no more than three successive terms. Thereafter, such person may not be elected again until one year after the end of the third term of office or of any subsequent term to which such person may be elected. The terms of service are staggered as a matter of practice, so that the terms of approximately one-third of the Trustees terminate annually. The Board has a minimum of three regular meetings per year, with special meetings scheduled upon the request of the President of the College, Chairman or Vice-Chairman of the Board, or by any three members of the Board. The Chairman of the Board and the President of the College are ex-officio members of all committees.

The following is a list of the members of the Board of Trustees and Officers of the Board for academic year 1997-98, the year of each Trustees' election to the Board and the current principal business or professional affiliation of each member.

| Name of Trustee | Year Elected | Principal Affiliation |
|---|---|---|
| Karen M. Sughrue '70, Chairman | 1986 | Vice President of Programs Council on Foreign Relations New York, New York |
| Garry L. Crago, Vice Chairman | 1995 | Production Manager Polaroid Corporation Waltham, Massachusetts |
| Jean W. Childs '56 | 1992 | Community Activist Wellesley Hills, Massachusetts |
| Paula Edwards Cochran '49 | 1993 | President Polly's Interiors Boca Raton, Florida |
| G. Steven Davis, Jr. | 1996 | Fleet Investment Management Manchester, NH |

| | | |
|---|---|---|
| Julia B. DeMoss '63 | 1998 | Assistant Vice President<br>Cigna Systems, Philadelphia, PA |
| William R. Dill, Ph.D. | 1994 | Academic Consultant<br>Cumberland Foreside, Maine |
| Leslie A. Ferlazzo | 1991 | President – Woodstock Corporation<br>Boston, Massachusetts |
| Joyce Schaffer Fleming '70 | 1998 | Office Manager, Fleming Landscape and<br>Irrigation Systems<br>Cedar Rapids, Michigan |
| Eric W. Hayden | 1995 | Dean, College of Management<br>University of Massachusetts<br>Boston, Massachusetts |
| Catherine Chapin Kobacker | 1991 | Community Activist<br>Gahanna, Ohio |
| Anne Marcus '71 | 1990 | Children's Television Productions<br>Greenwich, Connecticut |
| Celeste Reid '72 | 1998 | Work/Family Directions<br>Boston, Massachusetts |
| Richard J. Sheehan, Jr. | 1998 | Attorney<br>Haverhill, Massachusetts |
| Joseph Short* | 1989 (expires June 30, 1998) | President<br>Bradford College<br>Bradford, Massachusetts |
| Gregory E. Thomas | 1996 | Pastor, Calvary Baptist Church<br>Haverhill, Massachusetts |
| Susan K. Turben, Ph.D. '56 | 1992 | Turben Developmental Services, F.D.<br>Wolloughby Hills, Ohio |

Officers of the Board of Trustees

| | | |
|---|---|---|
| Donald W. Kiszka, Treasurer | ** | Vice President for Administration and<br>Finance<br>Bradford College<br>Bradford, Massachusetts |
| Ellen Nangle, Secretary | ** | Bradford College<br>Bradford, Massachusetts |

* Dr. Short will resign as President of Bradford College on June 30, 1998 and will cease to be a Trustee on that date. Dr. Jean Scott will become President of the College on July 1, 1998. Dr. Scott will become a member of the Board on that date.
** Mr. Kiszka and Ms. Nangle are not Trustees of the College.

A-3

BRADFORD COLLEGE ADMINISTRATION

**Dr. Joseph Short.** - *Outgoing President.* Dr. Short has served as president of Bradford College since 1989. Prior to joining Bradford, he served as a consultant to various international, foreign affairs and economic development organizations. From 1977 to 1984, Dr. Short served as Executive Director for Oxfam America. In 1969, Dr. Short returned from Tanzania where he served as director of the Southern African Student Fellowship Program and the African Graduate Fellowship Program for the African-American Institute. Dr. Short has written two books: *American Business and Foreign Policy: Cases in Coffee and Cocoa Trade Regulation, 1961-1974,* (Garland, 1987) and *Diversity in Development: U.S. Voluntary Assistance to Africa* (Interaction, 1986). Dr. Short received his M.A. and Ph. D. from Columbia University in 1963 and 1974 respectively, and his B.A. from Texas Christian University in 1961. Dr. Short is leaving Bradford at the end of the 1997/98 academic year to pursue other opportunities.

**Dr. Jean A. Scott,** - *Incoming President* Dr. Scott earned her Ph.D. at Harvard University in History. She has been a full-time administrator for seventeen years. She has experience as a teacher and academic administrator, spokesperson, planner, enrollment manager and proponent of diversity in private and public education and is involved in educational activities on national. State and local levels. Prior to her current position as Vice President for Enrollment and Student Services since October 1997, she served as Interim President from August 1996 to October 1997, and Vice President for Enrollment and Student Services from December 1994 to August 1996 at State University of New York, College at Potsdam. She has been an Associate Dean of Academic Administration and Dean of Undergraduate Admission at other colleges. She has been an Assistant Professor of History at Duke University. She received the Duke Endowment Teaching Award and the Duke Alumni Distinguished Teacher Award. Her research on colleges, students and the admission process has been the focus of her publications and presentations. She will assume her duties as President of Bradford College on July 1, 1998.

**Donald W. Kiszka,** - *Vice President for Administration and Finance·Treasurer.* Mr. Kiszka has served as Vice President for Administration and Finance since 1989. During his tenure, he has overseen the automation of record keeping and an update to the computer system, initiated a financial planning program, overseen the rehabilitation of the campus, the development of a facilities Master Plan, including a facilities audit and secured a federal loan and a 1995 Bond Issue for the capital improvements. Prior to joining Bradford, he served as Vice President of Financial Administration for Wheeling Jesuit College. From 1966 to 1980, he served at Siena College, first as the comptroller and for eleven years as the Vice President for Business Affairs. Mr. Kiszka received his B.B.A. from Siena College in 1953.

**Dr. Janet E. Schulte,** - *Vice President of Academic Affairs and Dean of the Faculty (Interim).* Dr. Schulte has served as Interim Vice President/ Dean since 1996. Previously she served as Associate Dean of Academic Affairs at Bradford College from 1994-1996. Prior professional positions include Assistant to the President of Lesley College (1985-1989; 1991-1994), coordinator of women's studies at Brandeis University (1990-1991), coordinator of fellowship applications at the Bunting Institute of Radcliffe College (1983-1985), and research assistant to the President's Office at Smith College (1980-1983). She has authored articles, book reviews, and reference materials on the history of women, immigrants, and leisure. Dr. Schulte received her Ph.D. from Brandeis University (1994), the M.T.S. from Harvard Divinity School (1986), and the A.B. from Smith College (1980).

**James M. Abbuhl.** - *Vice President for Enrollment Management.* Started Bradford in September 1997 after serving as Vice President for Enrollment Management at Walsh University in Ohio for eight years from 1989 to 1997. From 1984 to 1989 he was Director of Admissions at Mercy College in Detroit, Michigan. Mr. Abbuhl was an Assistant Director of Admissions at Ohio State University Lima Campus from 1979 to 1984. He received his M.A. from Bowling Green University in 1979 and his B.S. from Ashland University in 1977.

**Michael Garroway.** - appointed *Vice President of Institutional Advancement* on January 1, 1998, after serving as Director of Development since 1994. He brings 22 years of experience in fundraising and development to Bradford. Previously, he served as Director of Capital Programs and Major Gifts at the Massachusetts Audubon Society and as Executive Director of the Castle Hill Foundation. Garroway is a graduate of the Harvard Institute

of Arts Administration (1978), and holds a Master degree from the New England Conservatory of Music (1977), and a Bachelor of Arts degree from Bowdoin College (1970).

Trev Williams, - *Dean of Students and Vice President of Student Affairs* Mr. Williams has served as Dean of Students and Vice President of Student Affairs since 1994. Prior to joining Bradford, Mr. Williams served as Dean of Students at Hampshire College from 1987 to 1994. From 1982 to 1987, Mr. Williams was the Special Assistant to the Vice Chancellor for Student Affairs at the University of Massachusetts, Amherst. Mr. Williams also served as Acting Dean of Students at Southern Vermont College in 1987.

## ACADEMIC PROGRAMS AND FACULTY

Academic Programs

The College currently awards 26 majors through courses offered in the Divisions of Creative Arts, Humanities, Human Studies, Management, and Natural Sciences and Mathematics. Students, working with faculty advisors, may also create a Self-Designed Major. The College majors are as follows:

**Division of Creative Arts:**
Graphic Design
Performing Arts (Dance, Music, Theater)
Visual Arts (Art History, Studio Art)

**Division of Human Studies:**
International Studies                      Politics
Psychology                                Social Policy and Human Services
Sociology
**Division of Humanities:**
American Culture Studies                  Communications Studies
Creative Writing                          English
Ethnic Studies                            European Studies
French                                    Gender and Sexuality
History                                   Philosophy
Professional Writing                      Spanish
World Literature

**Division of Management:**
Management
Marketing

**Division of Natural Science and Mathematics:**
Biology
Environmental Science
Marine Biology

The College also offers minors, an honors program, a program for students with learning disabilities (College Learning Program), and a program of study leading to the advanced provisional certificate for elementary education. Classroom experiences are supported by several departments including the Hemingway Library, the Center for Academic Achievement, the Career and Internship Center, the Center for International and English Language Services, the Registrar, and the Center for Information Technology.

A-5

In conjunction with its strategic initiatives, the College currently is reviewing its academic and co-curricular programs and organizational design with an aim toward improving the educational offerings of the College and enhancing its attractiveness to current and prospective students. The overall emphasis of this planning process is to create a program of study and learning that will meet students' personal and professional goals in a liberal arts context. Among the initiatives under development are: a renewed emphasis on advising, a stronger first-year colloquium focused on writing and community service, the incorporation of experimental learning into the curriculum, developing means to recognize student learning that takes place outside the classroom, redesigning the college calendar to accommodate more flexible student learning opportunities, and revision of the general education goals and curriculum. Members of the planning groups include faculty, administrators, staff, students and trustees.

Faculty

As of spring 1998, Bradford's faculty includes 34 full-time faculty and 40 part-time members. The College is currently seeking to hire five faculty positions for 1998-1999, four of which are replacements for visiting positions or vacancies and one which is an additional or new faculty line. Consequently, the Bradford full-time faculty will grow to 36 next year. Approximately 85% of the full-time faculty have terminal degrees in their field; 18% of the full-time faculty are women.

Other Employees

Bradford employs 124 non-faculty employees, of which 20 are part time. Eighty-four non-faculty employees are employed on a salaried basis and 48 are compensated on an hourly basis. Employees of Bradford are not represented by any labor unions. Management is not aware of any union organizing activities and considers its relations with its employees to be satisfactory.

EXISTING FACILITIES

Bradford's campus is located in a 71-acre suburban setting in Bradford, Massachusetts. Consisting of more than 20 separate buildings, Bradford provides a cohesive academic setting within a residential neighborhood. Bradford's physical resources include ten residence halls, four classroom buildings, office space for faculty and administrators, a library and parking facilities. The following table summarizes the academic and student facilities by size, date of construction or acquisition, date of latest renovation and principal use.

Summary of Facilities

| Building Name/ Address | Gross Square Footage | Year of Construction (or Acquisition) | Year of Latest Renovation | Principal Use |
|---|---|---|---|---|
| Bookstore | 2957 | 1951 | 1995 | Bookstore and Offices |
| Academy Hall | 120,536 | 1870 | 1995 | Administrative offices, dining room, residence hall. |
| Hasseltine Hall | 28,058 | 1940 | 1992 | Academic |
| Denworth Hall | 27,681 | 1940 | 1995 | Academic |
| Dorothy Bell Study Center and Conover Hall | 65,188 | 1961 | 1995 | Academic (library) |
| Tupelo East Residence Halls | 25,800 | 1964 | - | Residence hall |
| Tupelo West Residence Halls | 25,800 | 1964 | - | Residence hall |
| Campus Center | 15,407 | 1904 | 1995 | Student Activities |

A-6

| | | | | |
|---|---|---|---|---|
| Cluster Houses | 20,551 | 1954 | 1995 | Residence halls |
| Alumni House | 3,600 | 1933 | 1995 | Administration |
| Coats House | 4,148 | 1926 | 1993 | Health Facilities |
| Bicknell Chapel | 1,951 | 1957 | - | Chapel and Classrooms |
| President's House | 4,340 | 1953 | 1989 | Residence |
| Kimball Tavern | 6,467 | 1693 | - | Meeting and social activities |

## THE PROJECT

The Project to be financed with the Series 1998 Bonds consists of (i) renovations to existing residence halls and construction of new residential facilities to be completed in three phases, as described below; (ii) refunding of the College's Series 1995 Bonds; (iii) the establishment of a Debt Service Reserve Fund; and (iv) the payment of certain costs of issuance.

The primary purpose of the Project is to expand residential capacity, which will enable Bradford College to accommodate increased enrollment. In addition, the Project will enhance the residential life component of Bradford College, with anticipated corresponding improvements to the competitive position of the College and its ability to retain students. Furthermore, the Project is necessary due to the deteriorated condition of the Tupelo East and West residence halls and the Cluster Houses.

### Residential Quadrangle Project

The construction of a dormitory residential quadrangle on Bradford College's south campus will comprise phases one and three of the Project. In phase one, which has begun, new townhouse-style dormitories will be constructed around the existing cluster housing. The first phase of construction will entail approximately 45,600 square feet and is scheduled to be completed by fall 1998. Such construction is being performed under a fixed price contract totaling $3,195,000. In phase three, existing cluster housing will be demolished and replaced with an additional 18,200 square feet of townhouse units. Existing parking lots will be reconfigured and new lot constructed to increase parking by 58 spaces to 126 total spaces. This phase is planned to begin in spring 2000 and be completed in August 2000. The residential quadrangle project will add approximately 115 new beds to Bradford College's dormitory facilities and is expected to cost approximately $6,200,000.

### Tupelo East and West Renovation

The Tupelo East and Tupelo West residence halls were constructed in 1964 and contain approximately 180 beds total. During phase two of the Project, the residence halls will be refurbished and new additions constructed with proceeds of the Bonds. The new additions will contain approximately 70 beds. Renovations will include a new roof, HVAC upgrades and exterior improvements. The Tupelo project will consist of approximately 20,660 square feet of new construction and 42,000 square feet of renovated space per building. The estimated cost of this component of the project is $5,500,000. Phase two is planned to begin in January 1999 for completion by fall 1999.

A small component of the project includes improvements to Conover Hall, including replacement of the roof and certain other renovations.

## ENROLLMENT

Bradford College had 602 full- and part-time students enrolled as of September 30, 1997. Spring 1998 full- and part-time enrollment was 566 and full-time equivalent enrollment was 547. Approximately 38% of these students are male and 62% are female. The table below depicts Bradford's enrollment statistics over the last five years.

### Bradford College Fall Semester Enrollment Statistics

|             | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------------|------|------|------|------|------|
| Full - Time | 441  | 484  | 488  | 485  | 550  |
| Part - Time | 50   | 52   | 52   | 44   | 32   |
| ELI Students| 28   | 27   | 48   | 39   | 20   |
| Headcount   | 519  | 563  | 588  | 568  | 602  |
| FTE Basis   | 484  | 529  | 555  | 544  | 584  |

Source: Bradford College

### Trends in Applications and Admissions

The table below shows, for the academic years indicated, Bradford's application, acceptance and matriculation statistics for the combined freshman, transfer and College Learning Program classes.

### Admissions Trends

|                | Fall Semester | | | | |
|----------------|------|------|------|------|------|
|                | 1993 | 1994 | 1995 | 1996 | 1997 |
| Applications   | 926  | 1127 | 1028 | 1015 | 865  |
| Acceptances    | 715  | 898  | 803  | 780  | 690  |
| Enrollment     | 186  | 223  | 224  | 195  | 234  |
| % Accepted     | 77%  | 80%  | 78%  | 78%  | 80%  |
| % Matriculated | 26.0%| 24.8%| 28.0%| 25%  | 34%  |

Source: Bradford College

Trends and strategic initiatives with respect to admissions and enrollment are discussed below under "Accounting Matters-Management Report" and "Strategic Initiatives."

### Geographic Areas of Representation

As demonstrated in the following table, approximately 45% of Bradford's freshman undergraduate students are from Massachusetts, while approximately 25% are from other New England States. The 602 students enrolled at Bradford in the fall of 1997 represented 30 states and U.S. territories and 30 foreign countries.

A-8

## Geographical Distribution of Freshman Matriculants

Fall Semester

|  | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Massachusetts | 48% | 50% | 45% | 51% | 48% |
| Other New England | 18 | 17 | 29 | 24 | 26 |
| Mid-Atlantic | 14 | 12 | 9 | 13 | 12 |
| North Central | 1 | 1 | 1 | 1 | |
| South | 2 | 2 | 3 | 2 | - |
| West | 5 | 4 | 2 | 2 | 1 |
| International | 12 | 14 | 11 | 7 | 4 |
| Total | 100% | 100% | 100% | 100% | 9 |
| | | | | | 100% |

Source: Bradford College


Student Fees and Comparative Fee Data

   The table below shows Bradford's undergraduate tuition, room and board for the most recent five-year period. During this time, annual increases have ranged from 1.8% to 6.0%, with an average annual increase of 4.5%.

### Undergraduate Fees

Academic Year

|  | 1993-94 | 1994-95 | 1995-96 | 1996-97 | 1997-98 |
|---|---|---|---|---|---|
| Tuition | $13,220 | $14,080 | $15,080 | $15,380 | $15,850 |
| Room, Board & Fees | 6,380 | 6,660 | 6,980 | 7,080 | 7,285 |
| Total | $19,600 | $20,740 | $22,060 | $22,460 | $23,135 |

Source: Bradford College

   The table below lists comparative fees for academic year 1996-97 for selected colleges and universities in the Northeast to which Bradford applicants frequently cross-apply. Bradford's policy is to set tuition rates such that the College will rank in the middle of this group.

### Comparative Undergraduate Fees for 1997-98

| | Tuition/Fees | Room & Board | Total |
|---|---|---|---|
| Hampshire College | $22,600/300 | $5,990 | $28,890 |
| Boston University | 20,570/294 | 7,050 | 27,914 |
| Wheaton College | 19,740/150 | 6,250 | 26,140 |
| Emerson College | 16,640/425 | 8,080 | 25,145 |
| Clark University | 20,040/440 | 4,250 | 24,730 |
| Northeastern University | 15,045/191 | 8,025 | 23,261 |
| **Bradford College** | **15,850/565** | **6,720** | **23,135** |
| Roger Williams College | 14,520/580 | 6,860 | 21,960 |
| Curry College | 14,805/735 | 5,750 | 21,290 |
| Merrimack College | 13,980 | 6,900 | 20,880 |
| New England College | 14,974/150 | 5,732 | 20,856 |
| Franklin Pierce College | 14,850/525 | 4,930 | 20,305 |

Source: New England Board of Higher Education

## FINANCIAL AID

Bradford offers a comprehensive financial aid program, which maintains its commitment to assisting students in attaining their educational goals. Eligibility for all aid from Bradford is based on a combination of financial need and academic ability, with financial need being the predominant factor. Financial aid is offered to students in the form of loans, grants and/or employment. The loan programs are supported by loan counseling services provided by the Financial Advising Office staff.

The financial aid sources available to Bradford students include Bradford grants and scholarships, Federal Supplement Educational Opportunity Grants, State Scholarships, Federal Pell Grants, Federal Stafford Loans Subsidized and Unsubsidized as well as Federal College Work-study/Bradford Student Employment programs. For those families whose need still is not met by these programs, the College offers a variety of "non-need-based" loans, monthly payment plans and/or employment options. Bradford's ability to provide adequate financial aid to its students in the future will depend on the status of government programs and on the financial resources of Bradford College. The College's inability to provide an attractive financial aid package to its students may, in turn, adversely affect enrollment.

During the 1997-98 academic year, approximately 81% of the enrolled students are receiving some form of financial assistance, of which 75% of these students received Bradford College Funds.

The table below shows trends in financial aid for the last five complete fiscal years:

### Student Financial Aid

Fiscal Year Ended June 30,

| | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| **Scholarships** | | | | | |
| Bradford Funds | $2,711,972 | $3,280,586 | $3,285,656 | $3,484,221 | $3,887,137 |
| State Grants | $220,266 | 241,894 | $247,744 | $426,012 | $540,301 |
| Federal Grants | $355,856 | $391,828 | $393,505 | $459,217 | $528,602 |
| Private Scholarships | $38,791 | $46,001 | $46,751 | $20,544 | $85,035 |
| Subtotal: | $3,326,885 | $3,960,309 | $3,973,656 | $4,425,994 | $5,041,075 |
| | | | | | |
| **Loans** | | | | | |
| Perkins | $39,200 | $35,300 | $35,300 | $58,400 | $56,000 |
| Stafford & Family Loans | $1,600,223 | $1,997,588 | $1,988,156 | $2,055,237 | $2,527,101 |
| MA No-Interest Loans | $70,193 | $84,710 | $84,710 | $178,327 | $157,500 |
| Subtotal: | $1,709,616 | $2,117,598 | $2,108,166 | $2,291,964 | $2,740,601 |
| | | | | | |
| **Employment** | | | | | |
| Federal | $107,856 | $214,540 | $114,994 | $184,994 | $562,762* |
| Bradford | $3,729 | $4,000 | $5,240 | $51,600 | $75,050* |
| Subtotal: | $111,585 | $218,540 | $120,234 | $236,594 | $637,812 |
| | | | | | |
| TOTAL: | $5,148,086 | $6,296,447 | $6,202,056 | $6,954,552 | $8,419,488 |

* Based on eligibility, not actual
Source: Bradford College

A-10

## ENDOWMENT AND INVESTMENTS

From the fiscal year ended June 30, 1995 to the fiscal year ended June 30, 1997, the market value of the College's endowment and investments portfolio increased by approximately 66% from $12,796,185 in fiscal year 1995 to $21,262,078 in fiscal year 1997. The market value of endowment and investments increased approximately 189% from June 30, 1992 to June 30, 1997.

The market value of Endowment and Investments for each of the past five fiscal years is provided below. Included in the fiscal year 1995, 1996 and 1997 figures are $3,750,000, $5,657,876 and $6,422,585, respectively, representing beneficial interests in perpetual trusts. Under this arrangement, a donor has established and funded a perpetual trust, which is being administered by the Greater Kansas City Community Foundation, an independent trustee. Under the terms of the trust, the College has the irrevocable right to receive the income earned on the trust assets in perpetuity, but will not receive the assets held in trust. Distributions received by the College have not been restricted by the donor.

### Market Value of Endowment and Investments

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 |
| Endowment | $9,486,275 | $13,167,959 | $12,796,185 | $19,457,580 | $21,262,078* |
| % change | 28.8% | 45.4% | (2.8%) | 52.1% | 9.3% |

* As of June 30, 1997, the College's Unrestricted Endowment is $11,153,838, calculated as total Endowment ($21,262,078) less beneficial interests in perpetual trusts ($6,422,585) and Donor Restricted Funds ($3,685,655).

Source: Bradford College

### Investment Management

The overall investment policy at Bradford College is established by the Finance Committee of the Board of Trustees. The current investment objective and guidelines include performance objectives of long term total return equal to at least inflation plus 5% per year, and asset mix guidelines of equities at 50 - 70% and fixed income securities at 30 - 50%. Specific investment decisions are made by the College's portfolio managers, Wellington Management Company, and are reviewed by the Finance Committee, which monitors the performance of the portfolio three times a year. For the twelve-month period ending December 31, 1997, the overall portfolio produced a twelve-month return of 23.2%.

### Development Activities

The Institutional Advancement Division of the College is responsible for the development program, public relations, publications and alumni relations of the College. In addition to the Vice President of Institutional Advancement, the development activities are staffed by a Director of Annual Giving, Director of Alumni Affairs, Major Gifts Officer and support staff responsible for all record keeping and prospect research. Besides the development staff, the program is assisted by the President, Trustees, members of the College community and alumni volunteers. In addition to alumni, who provide the major private support of the College, parents, friends, corporations and foundations are solicited for annual support as well as capital gifts. The College is also the beneficiary of deferred gifts in the form of bequests, annuities and pooled income funds.

A-11

## Annual Giving

The Annual Fund represents the core of the College's fund raising program with the primary purpose of supporting the current operations of the College through the receipt of unrestricted gifts as well as funding projects that are budget relieving.

The following table reflects the last five years of support for Bradford College from annual giving. Annual giving declined upon full implementation of the College's Capital Campaign, as several donors shifted gifts from Annual Fund Gifts to the Century III Capital Campaign.

### Private Gifts and Contributions

|  | 1992-93 | 1993-94 | 1994-95 | 1995-96 | 1996-97 |
|---|---|---|---|---|---|
| Annual Fund Gifts/ Alumni | $571,758 | $614,445 | $457,408 | $389,695 | $381,868 |

Source: Bradford College

## Capital Campaign

Bradford College is currently in the final phase of a capital campaign, called the Century III Campaign which began its initial phase in 1992 and will run through the end of 1998. The first priority of the Century III Campaign is to increase endowment. The second priority is to secure funds for renovation of the Academy Hall dining room and kitchen facilities representing the first step in a Campus Center restoration. A goal of $17,750,000 has been established for the Century III Campaign. As of February 28, 1998, the College has received campaign commitments totaling $16,541,295 (which includes $5 million in a foundation held by others). Plans are currently underway to raise an additional $3 million to complete the funds needed for the restoration of the Campus Center (the old gym) through an approach to a select group of alumni and friends.

## ACCOUNTING MATTERS

The following summaries of financial matters should be read in conjunction with the financial statements of the College, related notes, and the accountants' report included as Appendix B to this Official Statement.

Management Report

Over the past nine years, one of the main goals of the Administration has been to bring financial equilibrium and stability to the College. The College defines Financial Equilibrium as:

- Preserving the useful life of our physical assets;
- Increasing endowment funds or restricted investment funds through additional gifts, investment returns and maintaining spending at or below that of annual growth;
- Maintaining the operating budget at a level that will sustain and enhance our educational objectives;
- Increasing net revenue levels through enrollment growth, additional programs and reduction in the percentage of tuition levels allocated to financial aid; and
- Operating the College within a balanced budget or to achieve an annual surplus.

During the period of 1989 through 1997, approximately $7 million was allocated to restore, improve and increase physical assets to enhance the educational programs of the College. To accomplish these goals, the College received a $1.5 million Department of Education loan to complete renovations to certain academic buildings. In addition, through a term loan with Family Bank, additional funds were borrowed to make the improvements to various buildings and eliminate

deferred maintenance. In 1995, a bond issue totaling $5.4 million was issued to replace the term loan at Family Bank and to increase residential living space in Academy Hall. This bond issue will be refunded with the proceeds of the Bonds. There will continue to be, as described in "Outstanding Indebtedness," a demand note with Family Bank which is secured by the fixed income portion of the College's endowment. This amount is approximately equal to $6,000,000.

In 1989, the overall market value of the Endowment Fund was $6.9 million. The market value as of December 31, 1997, was over $21 million, an increase of approximately 204%. For the five years ending December 31, 1997, the overall return on investment was 15.5%. The Endowment and Investments have grown due to market appreciation and the College's capital campaign. Approximately $14 million over the past five years has been directed to endowment funds.

From 1989 to 1997, the education general operating budget, excluding financial aid, has increased from $4.7 million to $11.7 million, an increase of 149%. In that period, the full-time equivalent (FTE) enrollment for Bradford College has increased from 400 in fall 1989 to 550 students as of fall 1997. The Bradford FTE, including English Language Program students, increased from 436 students to 567 students for the same period. This enrollment growth has helped sustain the College in its enhancement of its education objectives.

Despite the enrollment growth, the College has incurred operating budget deficits in each year since 1989. The College has attempted to minimize the size of the budget deficits by instituting cost-containment measures. In addition, the College has funded some of these deficits with a line of credit from Family Bank instead of drawing significantly from its endowment funds.

Likewise, during this period of enrollment growth, there has been a substantial increase in financial aid funded by the College. However, during the 1997-98 academic year, the College estimates that financial aid will be reduced to 29.9% of student income versus 30.3% the previous year. This expected reduction is a result of change in methodology of aiding students with college-funded support versus additional loans funded by students and/or parents. The College's financial plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income. Approximately 80% of full-time students receive Bradford-funded financial aid.

To attain the final goal of a balanced budget as noted at the beginning of this statement, the College is planning to increase enrollment to the level of at least 725 full-time students by fall 2000, with approximately 80% of those students living in campus facilities. As of April 3, 1998, applications received by the College to date total 879, an increase of more than 18% from April 3, 1997. The total of 879 exceeds total applications received for the fall 1997. The majority of increases have been the traditional freshmen application pool.

Based on this increase in applications, historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College believes that it can reach its goal of enrolling 225 new students for the fall of 1998 while increasing the quality of its students and reducing slightly the average amount of financial aid awards to such students from College funds. If these goals are in fact met and if the College can otherwise successfully implement its budget, it expects to achieve a small operating budget surplus for the 1998-1999 fiscal year. Conversely, failure to achieve this enrollment goal and future enrollment targets may adversely affect the College's ability to reach Financial Equilibrium.

The College operates on a fiscal year ending June 30. The financial statements of the College have been prepared on an accrual basis in accordance with generally accepted accounting principles for educational institutions. In 1995, the College adopted Statement of Financial Account Standards ("SFAS") No. 116, "Accounting for Contributions Received and Contributions Made" and SFAS No. 117, "Financial Statements of Not-for-Profit Organizations."

SFAS No. 116 establishes new guidance for the reporting of contributions and pledges and requires not-for-profit organizations to distinguish between contributions received that increase permanently restricted net assets, temporarily restricted net assets, and unrestricted net assets. It also requires recognition of the expiration of donor restrictions in the period in which the restrictions expire.

SFAS No. 117 requires classification of net assets and revenue, expenses, gains and losses based on the donor or absence of donor imposed restrictions. It requires that the amounts for each of three classes of assets- permanently restricted, temporarily restricted and unrestricted- be displayed in the statement of activities.

Information regarding the changes in accounting principles implemented by the College is included in the notes to the audited fiscal year 1996 financial statements included in Appendix B to this Official Statement.

As a result of these new accounting standards, comparisons with prior years are impractical. The following table of the Statement of Activity is derived from, and should be read in conjunction with, the audited fiscal year 1996 and 1997 financial statements issued after the adoption of SFAS No. 116 and SFAS No. 117 included in Appendix B to this Official Statement. The following Statement of Current Fund Revenue, Expenditures and Other Changes presents summaries extracted from the College's financial statements for the fiscal years ended June 30, 1993 through June 30, 1995 prior to the adoption of SFAS No. 116 and SFAS No. 117.

## Schedule of Activities
### (Following Adoption of SFAS No. 116 & 117)
#### Fiscal Year Ended June 30,

|  | 1996 Totals | 1997 Totals |
|---|---|---|
| Revenues: |  |  |
| Tuition and Fees | $7,858,211 | $8,078,970 |
| Less: Financial Aid | 3,675,637 | 3,897,989 |
| Net tuition and fees | 4,182,574 | 4,180,981 |
| Contributions | 4,839,428 | 1,356,211 |
| Grants, contacts and other exchange transactions | 452,616 | 470,767 |
| Investment income | 647,528 | 697,076 |
| Net realized gains | 1,097,155 | 2,283,274 |
| Net unrealized gains | 779,611 | 1,277,410 |
| Miscellaneous income | 12,383 | 118,448 |
| Other operating income | 226,825 | 217,859 |
| Sales and services of auxiliary activities | 2,478,181 | 2,571,370 |
| Total operating revenues | 14,716,311 | 13,173,396 |
| Net assets released for operations | - | - |
| Total operating revenues & other support | 14,716,311 | 13,173,396 |
| Expenses: |  |  |
| Educational and program services: |  |  |
| Instructional | 2,717,951 | 2,797,962 |
| Instructional support | 1,393,426 | 741,577 |
| Student services | 1,548,835 | 1,605,337 |
| General institutional | 1,850,732 | 2,353,724 |
| Auxiliary expenditures | 903,961 | 978,204 |
| Maintenance | 1,726,828 | 1,766,571 |
| Supporting services: |  |  |
| General and administrative | 1,388,529 | 1,512,283 |
| Institutional advancement | 1,228,741 | 1,056,310 |
| Total expenses | 12,758,823 | 12,811,788 |
| Change in net assets | 1,957,488 | 361,608 |
| Net assets at beginning of year | 14,457,460 | 16,414,948 |
| Net assets at end of year | $16,414,948 | $16,776,556 |

A-14

## Statement of Current Funds, Expenditures and Other Changes
### (Prior to Adoption of SFAS No. 116 & 117)
#### Fiscal Year Ended June 30,

| | 1993 | 1994 | 1995 |
|---|---|---|---|
| **Revenues:** | | | |
| Educational and general: | | | |
| Tuition, net | $3,242,743 | $3,431,971 | $3,970,110 |
| Other operating income | $110,862 | $128,616 | $280,419 |
| Miscellaneous income | $82,021 | $60,300 | $61,733 |
| Gifts and grants | $1,196,285 | $713,446 | $636,281 |
| Federal & state financial aid | $319,265 | $322,043 | $319,084 |
| Investment income | $32,222 | $27,923 | $28,663 |
| Consolidated fund income | $539,079 | $882,798 | $958,200 |
| Total educational and general | $5,522,477 | $5,567,097 | $6,254,490 |
| | | | |
| Auxiliary activities | $1,911,384 | $1,967,476 | $2,337,082 |
| Total Revenues | $7,433,861 | $7,534,573 | $8,591,572 |
| | | | |
| **Expenditures and mandatory transfers:** | | | |
| Educational and general: | | | |
| General administration | $1,038,655 | $1,140,488 | $1,282,533 |
| Student services | $1,224,703 | $1,331,368 | $1,439,476 |
| General institutional | $414,143 | $552,179 | $769,742 |
| Institutional advancement | $861,072 | $766,704 | $692,015 |
| Instruction | $2,592,699 | $2,704,008 | $2,665,667 |
| Library and instructional support | $577,705 | $624,146 | $669,122 |
| Maintenance | $1,129,357 | $1,150,047 | $1,615,538 |
| Total educational and general | $7,838,334 | $8,268,940 | $9,134,093 |
| | | | |
| Auxiliary activities: | | | |
| Expenditures | $1,301,451 | $1,002,728 | $748,365 |
| Mandatory transfer | $47,909 | $46,728 | $45,547 |
| Total auxiliary activities | $1,349,360 | $1,049,456 | $793,912 |
| Total expenditures and mandatory transfers | $9,187,694 | $9,318,396 | $9,928,005 |
| | | | |
| Excessive (deficit) of revenues over expenditures and mandatory transfers | ($1,753,833) | ($1,783,823) | ($1,336,433) |
| Transfer to plant fund | | | |
| Purchase of plant and equipment | ($126,611) | ($140,431) | ($173,499) |
| Debt service | ($96,676) | ($124,890) | ($89,721) |
| Transfer from cash reserve fund | | | |
| Transfer from consolidated fund | $572,000 | $500,000 | $498,000 |
| Transfer from life income funds | | | |
| | | | |
| Total increase (decrease) in current funds: | ($1,405,120) | ($1,549,144) | ($1,101,653) |

Plant Assets

The following table displays the College's Plant assets and related accumulated depreciation for each of the past five fiscal years.

### Net Investment in Plant

|  | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
|  | 1993 | 1994 | 1995 | 1996 | 1997 |
| Building, land and grounds | $9,447,932 | $9,975,683 | $10,084,373 | $12,238,703 | $12,588,044 |
| Furniture and equipment | 3,688,762 | 3,851,479 | 4,149,726 | 4,374,575 | 4,951,566 |
| Subtotal | 13,136,694 | 13,827,162 | 14,234,099 | 16,613,278 | 17,539,610 |
| Less accumulated depreciation | (8,032,891) | (8,684,287) | (9,425,014) | (10,281,417) | (11,297,361) |
| Subtotal | 5,103,803 | 5,142,875 | 4,809,085 | 6,331,861 | 6,242,249 |
| Construction in progress | 320,155 | 257,140 | 1,008,286 | 396,670 | 181,236 |
| Art and artifacts | 95,650 | 95,650 | 95,650 | 95,650 | 103,150 |
| Total investment in plant | $5,519,608 | $5,495,665 | $5,913,021 | $6,824,181 | $6,526,635 |

### Outstanding Indebtedness

As of June 30, 1997, the College's audited outstanding indebtedness and obligations were the following:

|  | Rate | Maturity | Outstanding |
|---|---|---|---|
| Note Payable to Family Bank | 8.50% | 1998 | $57,000 |
| Equipment Loan from Aramark Educational Services |  | 1999 | $49,824 |
| Capitalized Leases for Furniture and Equipment |  | 2000 | $285,792 |
| Bradford Junior College Dormitory Bonds of 1962 (Department of Housing and Urban Development) | 3.375% | 2002 | $215,000 |
| College Housing Academic Facilities Loan of 1992 (Department of Education) | 5.50% | 2022 | $1,398,640 |
| Demand Note Payable to Family Bank* | variable |  | $4,800,000 |
| MIFA Variable Rate Demand Bonds, Series 1995** | 3.85% | 2025 | $5,310,000 |

\* The note is secured by the fixed income portion of the College's endowment, which is equal to approximately $6,000,000.
\*\* The Bonds will refinance this loan.

### FUTURE BORROWING PLANS

The College currently has no capital financing plans that would require it to incur additional debt in the next five years. Future capital needs are expected to be funded from operations and fundraising, and are expected to be modest. The College currently leases, with an option to purchase, a building located at 378 South Main Street, Bradford, Massachusetts, which houses the Institutional Advancement Office. The College intends to negotiate a purchase of the building with the current owner by the end of fiscal year 1999. Current market value of the building is estimated to be $300,000.

A-16

## BUDGETING

Bradford College develops an annual budget with input from the operating officers of the College and the College Budget Advisory Committee ("CBAC"), consisting of faculty, staff and the College Cabinet (which includes the executive officers of the College). This process reviews and recommends to the President the tuition and fee adjustments, the revenue budget, and the corresponding expense budgets for the coming year. The CBAC seeks to allocate and distribute resources in response to evolving program needs and in accordance with institutional plans and priorities.

The budget process begins in the fall before the next fiscal year. A preliminary review of the budget status is presented to the Trustees in January and the President recommends the proposed tuition and fee schedule to the Finance Committee at that time. A preliminary budget is presented to the Finance Committee and the full Board acts upon this budget at its May meeting. A final budget is presented to the Finance Committee and acted upon by the full Board at its annual meeting in October of each year.

## STRATEGIC INITIATIVES

With the submission to the President of a comprehensive marketing plan by George Dehne Associates in the spring of 1997, the College embarked upon an intensive process of strengthening Bradford's student recruitment efforts. As a result of the Dehne Report's recommendations, new resources - human, physical and financial - were supplied to the Office of Admissions and Financial Aid and a faculty member was released from teaching duties to serve as coordinator of Planning and Transition and to work with an Executive Committee drawn from trustees, faculty, staff and students oversee the planning and transition process. The Coordinator works with faculty and staff and provides periodic reports to the Cabinet and the Trustees, to review, revise and establish programs and services to attract and retain students.

Some results have already been realized, including changes approved by the Curriculum Committee to facilitate students' quest for independent and experiential learning, and changes in nomenclature (from "concentration" to "major") to make the College's programs more understandable to its audiences.

A major emphasis emerging from the Planning and Transition process and also a goal of the academic area and focus on faculty development through the C.A. Johnson Fund, is the Experiential Education Program. This program is to begin in the fall of 1998 semester with an initial funding request of $100,000.

In addition, the Student Affairs staff is also discussing programs recommended by George Dehne to enhance student life on campus. Increased activity in the area of clubs, sports, and intramurals has been a major goal of this effort.

The strategic initiatives of the College for the past two years and for the next three years are as follows:

1.  To continually improve the educational program of the Bradford Plan, including curricular and co-curricular, experiential and campus-life elements and their interactions.

2.  To move the College to Financial Equilibrium by fiscal year 1999, as described above in the "Management Report", by creating conditions for regular balanced budgets.

3.  To increase net tuition revenues by close management of three variables: increased enrollment, prudent use of financial aid and setting of tuition and fee levels to attract students.

4.  To complete the full renovation and restoration of academic campus facilities by calendar year 1998 with the exception of Denworth Hall, and a full renovation and additions to residential facilities by the calendar year 2000.

5.  To substantially enhance the reputation of Bradford College for qualitative education through public relations, publications and alumni programming.

## PENSION PLANS

The College participates in a defined contribution retirement plan administered by Teachers Insurance and Annuity Association of America and College Retirement Equities Fund.  All full-time employees who have attained the age of 26 and have completed one year of service are eligible.  Employees contribute 5% and the College contributes 10% of participating employees' earnings. The College's contributions under the plan were $370,115 and $367,000 for the fiscal years 1997 and 1996, respectively.

## INSURANCE

The College carries standard industry insurance policies, including real and personal property, general comprehensive liability, workers' compensation, and employer's liability and automobile liability.

## LITIGATION

The College is not aware of any litigation pending or threatened to which Bradford is a party wherein any unfavorable decision would have a material adverse impact on the College or on its ability to enter into the Loan and Trust Agreement and carry out its obligations thereunder.

BRADFORD COLLEGE

By:____/s/ Joseph Short_____
       Dr. Joseph Short, President

By:____/s/ Donald W. Kiszka_____
       Donald W. Kiszka, Vice President of Administration and
       Finance/Treasurer