UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al., <br> Plaintiffs, <br> v. <br> KAREN M. SUGHRUE, et al., <br> Defendants. | C.A. No. 04-11667-RGS |

### MEMORANDUM IN SUPPORT OF
### BRADFORD DEFENDANTS' MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(6), the Bradford Defendants[1] move to dismiss the Complaint ("Cp."). As the Complaint shows, plaintiffs chose to invest in the borderline-junk bonds of a college that disclosed not only that it was bleeding cash but also that its only hope was to try to increase enrollment to an unprecedented level. As the college explicitly warned might be the case, this level of enrollment proved unattainable, and the college was unable to survive. Plaintiffs have no right to recover the uninsured balance of the bonds from the college's officers and trustees when the risks of which they complain were so plainly disclosed.

### Plaintiffs' Allegations[2]

In May 1998, the Massachusetts Industrial Finance Agency ("MIFA") issued $17.93 million in revenue bonds on behalf of Bradford College ("the College"). Cp. ¶¶1,

---

[1] "Bradford Defendants" refers to all defendants in this action except Advest, Inc.
[2] The Bradford Defendants rely on the allegations in the Complaint and on the Official Statement attached to the Complaint. *See* Fed. R. Civ. P. 10(c). A highlighted copy of the Official Statement and its Appendices A and B is attached hereto as Exhibit 1. Defendants also rely on meeting minutes that are referenced in and integral to the allegations of the Complaint (Exhibit 2 hereto), as well as certain allegations that plaintiffs have made in the complaint in the parallel action they have brought in Massachusetts state court (Exhibit 3 hereto). *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) ("[i]n deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"); *In re Raytheon Securities Litigation*, 157 F. Supp. 2d 131, 146 (D. Mass. 2001) (in considering motion to dismiss securities claim court may consider "documents pertinent to the action").

2, 43, 44, and Exhibit A thereto. The primary purpose of the bonds was to fund the building and renovation of dormitories on campus, as well as to retire approximately $5 million in existing debt from a prior bond issue. *Id.* ¶41. Approximately $5 million of the bond amount had to be insured before the bonds could be sold. Exhibit 3 at ¶¶11, 64, 65. The Official Statement by which the bonds were offered, which was issued May 1, 1998, stated that the College was not certifying the accuracy of any "opinions" or "projections" in the document. *Id.* Exhibit 1 (Official Statement ("OS")), at page 15.[3]

The Official Statement, which included detailed audited financial materials, showed that the College was on the verge of insolvency and struggling to survive. It disclosed, among other things: that the College had incurred operating budget deficits for each of the past nine years; that it had borrowed money to continue operating; that it suffered from persistent and serious cash-flow problems; and that its "goal" was to reach "financial stability," which it defined as meeting its budget. *See* OS at Appx. A, at pages A-12 to A-17; OS, Appx. B, at pages 2-4 of 1996 and 1997 Financial Statements, and at pages 2-6 of 1994 and 1995 Financial Statements. The Official Statement also warned that the College's revenues were largely dependent on enrollment, and that, unless the College could increase its enrollment by an amount that was plainly unprecedented in the College's recent history, the College was unlikely to reach financial stability and might not be able to pay the bonds. OS at page 11, and at Appx. A, pages A-8, A-12, A-13. Although the Official Statement noted the College's "belief" that enrollment could be so increased, based on the increased numbers of applications the College had received for the upcoming term, it warned of the difficulties of achieving this goal given the

---

[3] The Official Statement was issued by MIFA and signed by MIFA's Executive Director, Michael P. Hogan. Cp. ¶1; OS at page 15.

2

"intensifying ... competition for students," and it cautioned that it might not be able to reach these enrollment goals. OS at 11, and at Appx. A, page A-13. The Official Statement also flagged the need to improve student "retention," and it disclosed that the College had lost nearly 10% of its students between the first and second semesters of the then-current academic year. OS at Appx. A, pages A-7, A-8, A-17. Finally, the Official Statement prominently disclosed the "BBB-" rating that Standard & Poor's had given the bonds, the lowest rating before junk-bond status.[4] OS at pages 1, 14.

Unfortunately, the factors the Official Statement identified as necessary to save the College did not come to pass: enrollments did not increase to the level required to reach financial stability, and the College continued to suffer losses. Cp. ¶¶64-67. In late November 1999, the College decided to close its doors at the end of the academic year. *Id.* ¶70.

Plaintiffs are three large bond funds, and two individuals, who accepted the risks identified in the Official Statement in purchasing the bonds. Cp. ¶¶1, 8-11. Plaintiffs now attempt to recover the uninsured portion of their losses from 19 defendants on a theory of securities fraud, claiming that the Official Statement did not disclose the College's poor financial prospects. Sixteen of the defendants are individuals who are alleged only to have been members of the College's Board of Trustees, a group that met three times a year (the "Trustee Defendants").[5] Cp. ¶¶13-28, 38. Plaintiffs also sue two individuals who were officers of the College, Joseph Short and Donald Kiszka (the

---

[4] *See, e.g., Resolution Trust Corp. v. Stroock & Stroock & Lavan*, 853 F. Supp. 1422, 1425 (S.D. Fla. 1994) (quoting expert's testimony that bonds rated BBB were "the closest substitute to junk" that could be legally purchased); www.beginnersinvest.about.com/od/ratingagencies ("the term 'junk' is reserved for all bonds with Standard & Poor's ratings below BBB").

[5] The "Trustee Defendants" are Karen M. Sughrue, Garry L. Crago, Jean W. Childs, Paula Edwards Cochran, G. Stevens Davis, Jr., Julia B. DeMoss, William R. Dill, Leslie A. Ferlazzo, Joyce Shaffer Fleming, Eric W. Hayden, Catherine Chapin Kobacker, Anne Marcus, Celeste Reid, Richard J. Sheehan, Jr., Gregory E. Thomas, and Susan K. Turben. Cp. ¶¶13-28.

3

"Officer Defendants").[6] Cp. ¶¶29, 31. Plaintiffs have also sued Advest, Inc. ("Advest"), the company that underwrote the bond issue and that is alleged to have been "responsible" for preparing the Official Statement. Cp. ¶¶2, 12. The College filed bankruptcy after defaulting on the bonds and is not named as a defendant.

Plaintiffs' claims are meritless on their face because, among other things, the Official Statement disclosed and even explicitly warned of the risks that plaintiffs claim were concealed or misrepresented.

## DISCUSSION

### I.  PLAINTIFFS HAVE FAILED TO STATE AN ACTIONABLE CLAIM UNDER THE SECURITIES EXCHANGE ACT OF 1934.

Count I of the Complaint purports to assert a claim under Section 10(b) of the Exchange Act and Rule 10b-5, but falls short. To state such a claim, plaintiffs must plead: 1) that defendants made a <u>representation or omission</u> of <u>material fact</u>; 2) that defendants' representation was motivated by <u>scienter</u>, i.e., intent to deceive, manipulate, or defraud; 3) that defendants made the alleged representation or omission in the context of a purchase or sale of securities; 4) that plaintiffs <u>relied</u> on defendants' representation or omission; and 5) that plaintiffs' reliance proximately <u>caused their damages</u>. *See Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir. 1978); *In re Biogen Securities Litigation*, 179 F.R.D. 25, 34 (D. Mass. 1997). The complaint must at a minimum "(1) <u>specify the statements</u> that the plaintiff contends were fraudulent, (2) <u>identify</u> the speaker, (3) state <u>where and when</u> the statements were made, and (4) explain <u>why</u> the statements were fraudulent." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (emphasis added). Additionally, "to state a claim of securities fraud, the statements alleged to be misleading

---

[6] Defendant Joseph Short is alleged to have been both an officer and a trustee of the College. Cp. ¶29.

4

must be misleading to a material degree," *In re Cabletron Systems, Inc.*, 311 F.3d 11, 27 (1st Cir. 2002), which means that, "taken together and in context," the representations "would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). The Complaint flunks every one of these requirements.

### A. Plaintiffs' Factual Allegations Do Not Support the Claim that the Official Statement Contained Material Misrepresentations or Omissions.

#### 1. The Official Statement Disclosed the College's Financial Instability and Operational Problems.

Contrary to plaintiffs' assertion that the Official Statement "portrayed the financial and operational condition of the College as both stable and improving," the Official Statement in fact recited a depressing litany of objective information that showed that the College's financial condition was nothing short of dismal. Cp. ¶44. The Official Statement, for example, reported that the College had incurred operating budget deficits in every year since 1989, and that its expenses, as reflected in its operating budget, had increased by 149% from 1989 to 1997 (from $4.7 million to $11.7 million), far outpacing student revenues, which were the College's primary source of operating capital. OS at Appx. A, pages A-13, A-14, and A-15, and at Appx. B, pages 2-4 of 1996 and 1997 Financial Statements, and pages 2-6 of 1994 and 1995 Financial Statements. Indeed, the Official Statement showed that, from 1993 to 1997, the College's expenses had increased at twice the rate of its tuition revenues.[7]

The Official Statement also disclosed that the College had lost more than $1 million every year in 1993, 1994, and 1995 – all years when net tuition revenues were

---

[7] As is set out on pages A-14 and A-15 of Appendix A to the Official Statement, net tuition grew from $3.2 million in 1993 to $4.2 million in 1997 (an increase of 31%), while total expenses during this same period grew from $7.8 million to $12.8 million (an increase of 64%).

5

less than $4 million.[8] Although the "Schedule of Activities" in the Official Statement showed that the College's revenues had exceeded its expenses in 1996 and 1997, the Official Statement left no doubt that the College continued to face serious operational problems. The audited financial statements for 1996 and 1997 showed, for example, that significant portions of the revenues reflected in the Schedule of Activities for 1996 and 1997 consisted of unreliable and fortuitous sources of income, namely, unprecedented 15% and 25% gains in investments (most of which was attributable to "permanently restricted" assets that were not available as operating capital), as well as one-time contributions to the College (approximately $3 million in 1996, and $1 million in 1997).[9] OS, Appx. A, at page A-14. It also made clear that, but for the steep and unusual investment gains in 1996 and 1997, the College would have <u>lost more than $3 million</u> in 1997.[10] Additionally, the "Statement of Activities" included in the audited financial statements for 1996 and 1997 showed that the College had incurred a loss in unrestricted

---

[8] *See* OS, Appx. A at page A-15 (Statement of Current Funds Expenditures and Other Changes) (showing loss of $1,405,120 in 1993, loss of $1,549,144 in 1994, and loss of $1,101,653 in 1995); OS, Appx. B, 1994 and 1995 Financial Statements, at page 5 (Statements of Current Fund Revenues, Expenditures and Other Changes).

[9] The Notes to the Financial Statements show that the amounts identified as "net realized gains" and "net unrealized gains" on the Statement of Activities at page A-14 of Appendix A to the Official Statement, and which total $1,876,766 for 1996 ($1,097,155 + $779,611) and $3,560,684 for 1997 ($2,283,274 + $1,277,410), are attributable to appreciation in investments. *See* OS, Appx. B, Notes to Financial Statements for 1996 and 1997, at pages 12-13 (setting out "the investment return and its classification in the statement of activities for the year ended June 30, 1997"). The Notes also explain that, for 1997, the average annual yield on the College's investments was 25.6% and the total annual return 28.6%, while for 1996, the average annual yield was 15.7% and the total annual return 18.3%. *Id.* at page 13. The financial statements and their notes show that a large part of the investment gain for both 1996 and 1997 related to "Permanently Restricted" assets ($1,351,699 of the realized gain in 1997, and $507,982 in 1996). *Id.* at pages 3, 12. The "Statement of Activities" in the financial statements also shows contributions of $3,023,403 in 1996 and of $1,204,439 in 1997. OS, Appx. B, 1996 and 1997 Financial Statements, at page 3.

[10] OS, Appx. A at A-14 (reducing 1997 total operating revenues of $13,173,396 by sum of net realized gains and net unrealized gains ($2,283,274 + $1,277,410 = $3,560,684) yields operating revenues of $9,612,712, which results in <u>loss of $3,199,076</u>); *see also id.* (reducing 1996 total operating revenues of $14,716,311 by sum of net realized gains and net unrealized gains ($1,097,155 + $779,611 = $1,876,766) yields operating revenues of $12,839,545, which exceeds total expenses by only $80,722).

assets of $679,386 in 1996, and an even greater loss of $1,722,691 in 1997.[11] The Official Statement also disclosed that the College had borrowed approximately $5 million to fund its operations, and that its unrestricted endowment was only $11 million, plainly not enough to keep the College going for long in view of its continued and substantial losses. OS, Appx. A at pages A-11, A-13, A-16.

Not only did the Official Statement disclose the many objective facts that spelled out the College's instability, but it also stated – in nearly "read my lips" fashion -- that the College's financial situation was quite the opposite of "stable." It stated that the College's "goal" -- by definition, a state the College had not reached -- was to "bring financial equilibrium and stability to the College," which it defined as including "[o]perating the College within a balanced budget." OS, Appx. A at page A-12 (emphasis added). It stated that, to reach a "balanced budget," and, thus, financial stability, the College would have to increase revenues by upping enrollment to 725 full-time students – a 32% increase which, according to the enrollment figures in the Official Statement, the College had in recent history never achieved.[12] Id. at pages A-8, A-13. The Official Statement also warned that competition for students was intensifying, that the College might not be able to meet this ambitious enrollment goal, and that, if it could not do so, it might not be able to pay the bonds. OS at 11, and at Appx. A, page A-13. Where no reasonable investor who read the Official Statement could fail to see that the College was in serious financial difficulty and that its hopes were pinned on achieving the

---

[11] See OS, Appx. B, 1996 and 1997 Financial Statements, "Statement of Activities," "Changes in net assets," for "Unrestricted" assets column.

[12] The enrollment statistics in the Official Statement showed that the largest single increase in enrollment in the past four years was 9% in 1994 (a jump from 484 "FTE," or full-time equivalent, students, in 1993, to 529 in 1994). OS, Appx. A, at page A-8. This increase, however, was followed by a 5% increase in enrollment in 1995, a 2% decrease in 1996, and a 7% increase in 1997. Id.

admittedly uncertain goal of a significant expansion, there is plainly no factual basis for plaintiffs' claim that the Official Statement concealed the College's financial difficulties.

### 2. The Official Statement Disclosed the College's Enrollment Figures and Its Problems With Student Retention.

Nor is there any factual basis for plaintiffs' assertion that, notwithstanding the inclusion of accurate enrollment figures, the Official Statement "concealed," "ignored," and "omitted" the College's "abysmal student retention rate" and its "persistent attrition crisis." Cp. ¶45. This assertion founders not only on the Official Statement's references to the need to improve student "retention" (including the straightforward disclosure that the very project the bonds would finance was intended to "improve[ ]" the College's "ability to retain students"), but also on its disclosure of the significant decrease in the College's enrollment (approximately 10%) from one semester to the other during its then-current academic year. OS, Appx. A at page A-8 (602 full and part-time students were enrolled "as of September 30, 1997," but "full-time equivalent" enrollment for "Spring 1998" was only 547, a loss of 55 students); id. at pages A-7, A-17 (referencing need to improve "retention") (emphasis added). Plaintiffs cannot pursue a claim that is belied by the plain terms of the Official Statement.

### 3. The Official Statement Disclosed the College's Cash-Flow Problems.

The Official Statement disclosed detailed, audited cash-flow data about the College. See, e.g., Section I(A)(1) above; OS, Appx. B. That information included a "Statement of Cash Flows" that showed that the College's cash flow position had deteriorated in 1997, in that the College had lost almost three times as much cash in its operations from July 1996 to June 1997 ($1,825,680) as it had lost from July 1995 to

June 1996 ($609,454). OS, Appx. B, 1996 and 1997 Financial Statements, at page 4. Notwithstanding the disclosure of this information, plaintiffs claim that the Official Statement was misleading because it did not include opinions allegedly voiced by Trustee Defendant Ferlazzo and Officer Defendant Kiszka in February 1997 that the College could not survive more than two to five years if it continued to face the same "cash flow model" that existed <u>in February 1997</u>. Cp. ¶46. The fact that the Official Statement did not include these pessimistic opinions about the future cannot support the claim.

First, "[t]he federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1209 (1st Cir. 1996). Nor do the federal securities laws require a company to be pessimistic in making public statements when its financial information is accurately disclosed, as it was here. In *Albert Fadem Trust v. American Elec. Power Co., Inc.*, 334 F. Supp. 2d 985 (S.D. Ohio 2004), the court held, on a motion to dismiss, that the plaintiff had failed sufficiently to plead that optimistic statements about the company's likely success were false when they were made. As the court stated, "people in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Id.* at 1026, *citing Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Where plaintiffs do not claim that the College's actual cash flow data were not fully disclosed, they cannot base a securities fraud claim on the purported failure to disclose pessimistic opinions about the future implications of those problems.

The claim fails for the further reason that plaintiffs do not allege that even the two defendants who are said to have voiced such opinions in February 1997, much less any of the other defendants, entertained the same pessimistic opinions when the bonds were issued 15 months later in May 1998, and plaintiffs' own allegations belie any such inference. Cp. ¶¶46, 47. As plaintiffs allege, these purported opinions were based on the hypothetical assumption that the cash-flow situation that was in effect as of February 1997 would continue indefinitely. As the Official Statement shows, however, there was no basis for such an assumption in May 1998: not only had the College made efforts after February 1997 to increase enrollments and thus the tuition revenues on which its cash flow depended, but, as plaintiffs acknowledge, the College had actually received an increased number of applications for the upcoming fall 1998 term by the time the Official Statement was issued, thus suggesting a different cash-flow model from February 1997.[13]

### 4. The Official Statement Did Not Make an Actionable Misstatement in Estimating Future Reductions in College-Funded Financial Aid.

Plaintiffs also claim that the Official Statement made a misrepresentation by stating that the amount of financial aid awarded by the College "was <u>anticipated</u> to drop to 29.9% of student income in the 1997-98 academic year, and to 28.8% in 1998-99." Cp. ¶¶45, 53-54 (emphasis added). Plaintiffs cannot base a claim on these projections because they are obviously forward-looking statements: as of May 1, 1998, there were still two months left in the 1997-98 academic year, and the 1998-1999 academic year was entirely prospective. Cp. ¶¶54, 55. As the court stated in *Orton v. Parametric*

---

[13] *See* OS, Appx. A at pages A-6, A-7, A-13, A-17 (College was pursuing efforts to "enhanc[e] its attractiveness to current and prospective students"; College had hired an outside consultant to recommend changes in recruiting and curriculum, devoted "new resources" to recruiting and retaining students, and undertook to make its dormitories more attractive by the multi-million project financed by the bonds); Cp. ¶60 ("the College had more applications for Fall 1998").

10

*Technology Corporation*, No. Civ. A. 03-10290-WGY (D. Mass. Nov. 3, 2004) (2004 WL 2475330 at *11-12), "forward-looking statements," even if they are known to be untrue when made, are not actionable because "it is unlikely, as a matter of law, that such statements would be material to a reasonable investor or to the marketplace as a whole."[14]

Nor do plaintiffs allege any facts to suggest that either of the estimates was false when made, much less materially so. They assert only that the "estimate" of reductions in financial aid expenditures to 29.9% of student income for 1997-98, the year then in progress, was "substantially incorrect" because financial aid awards for that year were <u>subsequently</u> determined to be more than 35% of student income, and also because plaintiffs claim that certain benchmarks suggested that the estimate would not actually be attained. Cp. ¶54. Specifically, plaintiffs assert that, by the time the Official Statement was released on May 1, 1998, the College's spring semester enrollment, and therefore its revenues for the 1997-98 academic year, were lower by some unspecified amount than the year's budget had assumed, and that financial aid commitments for the 1997-98 academic year were also greater than budgeted. *Id.* Plaintiffs therefore claim that stating financial aid commitments as 29.9% of actual revenue was incorrect by some unspecified amount. Where plaintiffs do not state the percentage that would have been indicated by the figures originally in the budget, or even the amount by which they evidently believe the estimate was "incorrect" on May 1, 1998, they have plainly failed to allege that the estimate was misleading at all, much less to a material degree.

---

[14] Any possible materiality in such statements would be further undercut by the warning in the Official Statement that the College does not certify the accuracy of any of the projections or opinions set forth therein, as well as by the assertion that any statements "involving matters of opinion ... are intended merely as such and not as representations of fact." OS at pages 14-15.

Plaintiffs similarly fail to allege any facts that could support an inference that the estimate of financial aid for the next academic year was false when made. Plaintiffs claim that the statement that the College "plan[ned]" to reduce financial aid spending for the 1998-99 academic year to 28.8% of student income lacked a "reasonable basis" because, they allege, the College's 1998-99 budget contained assumptions about amounts of revenue and financial aid under which financial aid made up 31.3% of student income. Cp. ¶55. Plaintiffs, however, rely on figures from a budget that they allege was revised after the Official Statement was issued. *Id.* There is no allegation that any of the Bradford Defendants knew what the final budget numbers (much less actual revenues) would be when the Official Statement was issued, nor do plaintiffs allege any facts suggesting that a difference of approximately 2% in the estimate of future financial aid awards would have been materially misleading in any event.

Finally, there is no merit in plaintiffs' allegation that, even though the College disclosed that it provided financial aid to 80% of its students and that the amount of financial aid it awarded had increased every year, it should also have disclosed that the level of financial aid funded by College was "anomalously high relative to peer institutions." Cp. ¶¶54, 56; OS, Appx. A at pages A-10, A-13. As the court held in *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 375 (3rd Cir. 1993), "[t]he federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably," and, instead, "it is precisely and uniquely the function of the prudent <u>investor, not the issuer</u> of securities, to make such comparisons among investments." *Id.* at 375-76 (emphasis in original). *See also In re*

*Cabletron,* 311 F.3d at 36 (corporation had no obligation to disclose information on industry-wide trends that was available to public).

### 5. The Official Statement Did Not Make an Actionable Misstatement in Projecting Future Increases in Enrollment.

Plaintiffs have similarly failed to allege a sufficient factual basis for their assertion that the Official Statement made an actionable misrepresentation in stating that "[t]he College is <u>planning</u> to increase enrollment to the level of at least 725 full-time students by fall 2000," and that "[b]ased on [the] increase in applications, historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College <u>believes</u> it can reach its <u>goal</u> of enrolling 225 new students for the fall of 1998." Cp. ¶59; OS, Appx. A at page A-13 (emphasis added). This claim fails in the first instance because these statements, which relate to "plans," "goals," and "beliefs" about the future, are not only forward-looking projections but plainly optimistic opinions, which as a matter of law are not actionable. *See Shaw,* 82 F.3d at 1209 ("[t]he federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data"); *Orton,* 2004 WL 2475330 at *8 ("[t]he corporate puffery rule 'covers loose optimism about both an issuer's current state of affairs and its future prospects'"), *quoting In re Boston Tech. Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 54 (D. Mass. 1998). Plaintiffs cannot rely on the statement for the further reason that the Official Statement expressly advised that the College was <u>not certifying</u> the accuracy of any "projections and opinions" in the Offering Statement. OS at page 15.

Evidently recognizing their inability to base a securities fraud claim on projections of future events, plaintiffs assert that the projections were false when made

13

because, they allege, "in reality" there was "no business plan or strategic program to meet any of the goals articulated" in the Official Statement, including increasing enrollment. Cp. ¶57. The Official Statement, however, shows that the College was taking affirmative steps to increase enrollment: it had hired an outside consultant to recommend ways to attract and retain students, had designated a faculty member to lead these efforts, and was undertaking a large dormitory renovation project for the express purpose of making its campus more attractive and thus increasing enrollment and improving retention. OS, Appx. A at pages A-7, A-17, A-18. That these efforts did not succeed or that plaintiffs may believe them to have been insufficient does not reasonably suggest that the College was lying in stating that it "planned" to increase enrollment.

Plaintiffs also err in asserting that the enrollment projections for the 1998-99 academic year were false because, they claim, "based on the information the College already had, it was <u>almost impossible</u> for the College to meet its enrollment <u>target</u>" of increasing enrollment by 225 students in fall 1998. Cp. ¶¶59, 62 (emphasis added). Even if securities fraud claims could be grounded on facts that suggest that a projection was overly optimistic, the matters on which plaintiffs rely fail to suggest that any of the defendants should have recognized that the prediction was too high. First, there is no merit in plaintiffs' assertion that the College should have known that the admittedly increased number of applications it had received was "misleading" and thus not ground for optimism because the College had "beg[u]n to accept and count web applications," which plaintiffs claim the College's admissions employees recognized resulted in a lower matriculation rate (plaintiffs, however, do not make such an allegation of their own knowledge). Cp. ¶¶59, 60. Plaintiffs offer no basis for their suggestion that students are

14

less likely to attend schools to which they apply over the internet because they can send applications to "several" different schools by internet. *Id.* Plaintiffs do not claim that students who apply traditionally do not send applications to "several" schools, nor do they allege that students who apply by internet send applications to more schools than students who apply traditionally. Indeed, such an inference would be unreasonable in view of the application fees that colleges charge regardless of whether applications are submitted by internet or by traditional delivery methods. Nor do plaintiffs allege the amount of any likely difference in yield between internet and traditional applications to suggest that any possible difference would be material.

There is no merit in the assertion that the number of deposits and applications the College had received as of May 1, 1998, should have led the Bradford Defendants to realize, as plaintiffs assert, "that the College would likely fail to meet fall enrollment goal by 15%." Cp. ¶60. Plaintiffs provide no basis to conclude that the number of acceptances the College had received as of May 1, 1998, was in fact reliably predictive of actual enrollment in the fall of 1998; they do not allege, for example, by what date the College had historically received the bulk of acceptances for the upcoming term, nor do they allege that significant numbers of Bradford students had traditionally sent in their acceptances for the next term by May 1 of that year.

Plaintiffs' reliance on the number of deposits received by the College is similarly unavailing. Although they assert that "[t]he number of students who had actually placed deposits by spring 1998 was the best indicator or [sic] how many students would be enrolling," they do not specify the time in "spring 1998" by which deposits may be considered reasonably predictive of fall enrollment. Cp. ¶61. Similarly, they do not state

15

the basis for their bald assertion that deposits received by "spring 1998" are the "best indicator" of enrollment; they do not assert, for example, that the College had traditionally received a reliably predictive number of deposits for the upcoming term by May 1, 1998, nor do they provide any other basis from which likely future enrollment may be quantified with reasonable certainty based on the number of deposits received as of May 1, 1998. Although plaintiffs allege that "the number of students who had actually placed deposits at the time of the Official Statement had declined by almost 20%," their failure to identify what they are using for a comparison renders the comparison meaningless. Cp. ¶61. In short, while plaintiffs try to suggest that the College could or should have predicted on May 1, 1998, that enrollment for fall 1998 would not be as large as would appear from the indisputably increased number of applications it had received as of that date, there is simply not enough in those allegations to suggest that the optimistic statement the College made in May 1998 about its fall 1998 enrollment was false, much less materially so, even if it could be deemed actionable at all.

      6.    **The Official Statement Does Not Misstate the College's Willingness to Fund $1 Million of the Dormitory Project.**

Finally, there is no merit in plaintiffs' claim that the Official Statement made a misrepresentation in asserting that a $1 million equity contribution from the College "will be used" to finance the dormitory renovation project because the Bradford Defendants allegedly had "no present intention" of committing the College's funds to the construction project. Cp. ¶63. Contrary to plaintiffs' assertion, the minutes of the Board discussion on which plaintiffs base this allegation fail to support any inference that the defendants did not intend to make such an equity contribution. Instead, the minutes show that, on February 5, 1998, several months before the bond issue, and a day before the

Board voted to authorize the issuance of the bonds, certain of the Trustee Defendants considered various possibilities for financing the dormitory renovation project and the bond issue. *See* Exhibit 2 hereto (meeting minutes); Cp. ¶40. They discussed possible ways to minimize the College's financial outlay, either by reducing the cost of the project or by having the College contribute the $1 million "at the end in the final phase of the project." Cp. ¶63. By the time the Official Statement issued in May 1998, they had plainly decided on the equity contribution. Nothing in their discussion suggests that the trustees did not intend the College to make the contribution, nor, indeed, does the Official Statement state that the $1 million equity contribution would not be made at the end. Finally, plaintiffs offer no basis for an inference that the Official Statement was misleading to any material degree in not disclosing the intention to make the equity contribution at the end.

### 7. Conclusion

Because plaintiffs have failed to allege any specific facts that could support an inference that there were any material misstatements or omissions in the Official statement, their federal securities claims against the Bradford Defendants should be dismissed.

### B. Under the Bespeaks Caution Doctrine, the Warnings in the Official Statement Made the Alleged Misstatements and Omissions Immaterial, as a Matter of Law.

The "bespeaks caution" doctrine holds that, when misstatements or omissions with respect to forward-looking matters are accompanied by effective cautionary language warning that the projections may not come true, the purported misstatements or omissions are deemed not material, as a matter of law, and therefore not actionable under

the federal securities laws. In *Shaw*, the First Circuit explained that "[t]he 'bespeaks caution' doctrine "is essentially shorthand for the well-established principle that a <u>statement or omission must be considered in context</u>," and that, "if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law." 82 F.3d at 1213, *quoting, inter alia, In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 364 (3rd Cir. 1993) (emphasis added). The court in *Shaw* noted that the "bespeaks caution" doctrine allows the dismissal of federal securities claims under Rule 12(b)(6) "when reasonable minds could not disagree as to whether the <u>mix</u> of information in the document [containing the alleged misrepresentation or omission] is misleading." *Id.* at 1214 (emphasis in original). *See also Fitzer v. Security Dynamics Technologies, Inc.*, 119 F. Supp. 2d 12, 31 (D. Mass. 2000) (statements about a plan to integrate the company with the operations of another company could not support a securities fraud claim when the statement contained cautionary language that was "sufficient to warn the investing public about the uncertainties of the integration effort").

Courts have held that cautionary language that adequately discloses the risk that bondholders complain was omitted or misrepresented renders immaterial the asserted misrepresentations or omissions relating to the risks of purchasing the bonds. In *Moorhead v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 949 F.2d 243 (8th Cir. 1991), municipal bonds issued to fund the construction of a retirement home, and the bondholders sued under the federal securities laws after the retirement home filed bankruptcy. Plaintiffs claimed that the feasibility study in the offering memorandum

misrepresented and omitted material facts by stating that the center would generate enough revenues to repay the bond debt, and by favorably analyzing the center's economic viability based on certain financial and marketing assumptions. *Id.* at 245. The court held that the cautionary language, risk statements, and disclosures in the feasibility study about the underlying economic assumptions which could have affected the retirement center's ability to pay off the bonds sufficiently "bespoke caution" and therefore precluded the bondholders' claims of fraud. *Id.* at 245-46. Namely, the feasibility study cautioned that "some assumptions inevitably will not materialize and unanticipated events and circumstances may occur"; stated that, while a financial forecast indicated that sufficient funds would be generated to meet the center's operating requirements, including debt service requirements associated with the bonds, "the achievement of any financial forecast is dependent upon future events, the occurrence of which cannot be assured"; and warned that "[n]o representations or assurance can be made that sufficient revenues will be realized ... in amounts sufficient to pay [the bonds]," and that a number of future conditions, "including demand for the [center's] services [and] competitive facilities ... may adversely affect revenues and consequently, payment of principal and interest." 949 F.2d at 246 n.2. The Eighth Circuit agreed "that plaintiffs could not base a federal securities fraud claim on any misrepresentation or omission in the feasibility study which was addressed by the repeated, specific warnings of significant risk factors and the disclosures of underlying factual assumptions also contained therein." *Id.* at 245-46.

Likewise in *In re Donald J. Trump Casino Securities Litigation*, the Third Circuit affirmed the dismissal of securities fraud claims arising from the issuance of bonds to