fund the construction of a casino in Atlantic City. 7 F.3d at 377. Although the
prospectus stated that defendants "believe[ ] that funds generated from the operation" of
the casino "will be sufficient to cover all of its debt service (interest and principal)," the
casino in fact went into bankruptcy. *Id.* at 365, 369. Plaintiffs claimed the prospectus
was materially misleading because defendants allegedly possessed neither a genuine nor
a reasonable belief that revenues would in fact be sufficient to pay the bond amount. *Id.*
at 365. The court disagreed, holding that the alleged misrepresentations and omissions
were not material in view of the cautionary statements in the prospectus with respect to
the casino's likely success and its ability to pay the bonds. *Id.* at 369. As the court
explained, where the prospectus "contained an abundance of warnings and cautionary
language which bore directly on the prospective financial success of the [casino] and on
the Partnership's ability to repay the bonds," no reasonable factfinder could conclude that
a reasonable investor's decision would be influenced by the statement that defendants
believed that funds generated from the casino's operation would be sufficient to service
the bond debt. *Id.*[15]

Here, the alleged misrepresentations and omissions regarding the College's plans
to increase enrollment and revenues sufficient to achieve financial stability and pay the
bonds, even if actionable at all, as a matter of law are not material because the Official
Statement amply and specifically cautioned investors about the College's precarious

---

[15]     *See also In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1416 (9th Cir. 1994)
(optimistic economic projections in prospectus for public offering of "junk bond" debentures not
misleading where prospectus as a whole bespoke caution as to serious risks that manufacturer's liquidity
crisis posed to investors; statement that company expected to have enough cash to operate through March
31, 1988, was not misleading in the context of the cautionary language in the prospectus, which warned
that this might not actually be the case); *In re Number Nine Visual Technology Corp. Sec. Litig.*, 51 F.
Supp. 2d 1, 21 (D. Mass. 1999) (statement in prospectus that profit margins of company's principal
products could increase due to certain factors was not actionable due to the bespeaks caution doctrine,
where prospectus cautioned that "[t]here can be no assurance ... that the Company will be able to increase
or even maintain current margin levels").

financial position, the difficulties and uncertainties of increasing enrollment, and the

possibility that it would not be able to emerge from its obvious and serious financial

troubles and repay the bonds.  It warned, for example:

> "[i]f these goals [of enrolling 225 new students for the fall of 1998 – an
> unprecedented increase of 50% from fall 1997 enrollment, *see* OS, Appx. A at
> A-8] are in fact met and if the College can otherwise successfully implement its
> budget, it expects to achieve a small operating budget surplus for the 1998-1999
> fiscal year.  Conversely, failure to achieve this enrollment goal and future
> enrollment targets may adversely affect the College's ability to reach Financial
> Equilibrium."

OS, Appx. A, at page A-13 (emphasis added).  It also warned of the difficulties and

uncertainties of increasing enrollment, stating:  "[d]emographics for traditional college-

age students also are intensifying the competition for students by all colleges and

universities, including the [College]."  OS at page 11 (emphasis added).  In a section

titled "Bondowner's Risks," the Official Statement cautioned that, if the College could

not "attract and retain" significantly increased numbers of students, it might not be able

to repay the bonds:

> "Colleges and universities are in general highly dependent upon tuition and fee
> revenues from students and, to a lesser extent, dormitory and other auxiliary
> enterprise revenues to pay debt service….  **A failure by the [College] to attract
> and retain students in sufficient numbers to accomplish [its goal of increasing
> enrollment to at least 725 full-time students by fall 2000] could adversely
> affect the ability of the Institution to make required payments on the Series
> 1998 Bonds**."

*Id.* (emphasis added).  Yet again, it warned that "[f]uture revenues and expenses of the

Institution will be affected by events and conditions relating generally to, among other

things, demand for the Institution's educational services…, management capabilities …,

the Institution's ability to control expenses, competition, costs, [and] the amount of

financial aid awarded to students...." *Id.* (emphasis added). Leaving absolutely no doubt of the risks in the investment, the Official Statement further cautioned:

> "[n]o representation or assurance can be made that revenues will be realized by the Institution in the amount necessary to make payments at the times and in the amounts sufficient to pay the debt service on the Series 1998 Bonds."

*Id.* (emphasis added).

In short, the Official Statement contained repeated and specific warnings that directly addressed the risk factors in the bonds, and that bespoke caution with respect to the College's hopes that it could increase enrollment, and thus revenues, and emerge from the financial hole in which it was obviously stuck. Not only these warnings, but also the College's plainly disclosed financial difficulties, including continual budget deficits, revenue shortfalls, cash flow problems, slippage in enrollment during the year, history of providing financial aid to 80% of its students, not to mention the College's borderline junk-bond rating and the need to insure the bonds before issuance, all preclude any reasonable inference that any of the alleged misstatements or omissions in the Official Statement concerning the College's future prospects would have been material to a reasonable investor.[16]

---

[16] Indeed, it is hardly credible that the plaintiffs, three of which are institutional bond funds, relied on any optimistic statements in the Official Statement about the College's future when Bradford's financial troubles were so publicly known. Among other things, Bradford College was one of 12 liberal arts colleges studied in a book published in 1994, Liberal Arts Colleges: Thriving, Surviving, or Endangered? *See* Exhibit 4 (excerpts from book). In that book, author David W. Breneman noted with respect to Bradford College that "[f]inancial problems continue to plague the college," in that "[n]et spending simply increased at a much faster rate (3.8 percent a year) over the decade than did net revenue (1.4 percent annual gain), resulting in a growing gap between income and expense." *Id.* at 128. He concluded that "Bradford's dilemma is that of most colleges with such small enrollments – the college cannot achieve economies of scale operating with so few students"; that "Bradford's future will hinge on its ability to increase enrollments"; and that "[p]rospects for this college, its excellent and innovative curriculum notwithstanding, would have to be rated uncertain." *Id.* at 129.

**C.    The Complaint Does Not Sufficiently Plead that the Trustee Defendants Made Any Misstatements or Omissions of Material Fact.**

Plaintiffs seek to impose liability on all the defendants solely for alleged misrepresentations and omissions in the Official Statement.  Plaintiffs, however, provide no facts that could support a reasonable inference that any of the Trustee Defendants was specifically connected with any of the statements or omissions in the Official Statement, as they must to state a claim against them.  *See, e.g., In re Cabletron,* 311 F.3d at 41 (affirming dismissal of §10(b) claim where allegations "fail[ed] to connect [defendant] specifically to any of the materially misleading statements" in the company's SEC filings and press releases) (emphasis added).

Although the Complaint contains the conclusory allegation that the Trustee Defendants "participated in the drafting, preparation and/or approval of the Official Statement," the specific factual allegations belie any suggestion that any of the Trustee Defendants was actually responsible for anything in the Official Statement.  Cp. ¶34 (emphasis added).  The Trustee Defendants are not alleged to have played any part in the day-to-day management of the College, but are alleged only to be members of a Board that met three times a year.  Cp. ¶38.  They are not alleged to have signed the Official Statement, nor does that document bear their signatures.  The Complaint does not even allege that the Board ever voted to approve the Official Statement.  Cp. ¶40.  In the absence of any specific factual allegation suggesting any connection at all between any of the Trustee Defendants and anything in the Official Statement, the §10(b) claims against each of them should be dismissed, without more.

**D.    Plaintiffs Have Failed to Adequately Plead Scienter.**

       **1.    Plaintiffs Must Plead Specific Facts that Support a Strong Inference that Each of the Bradford Defendants Acted Intentionally or Recklessly with Respect to the Alleged Misstatements and Omissions in the Official Statement.**

To state a claim under §10(b), plaintiffs must "state with particularity facts that give rise to a 'strong inference' of scienter" with respect to each of the defendants. *See Cabletron,* 311 F.3d at 28; Private Securities Law Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b)(2); *Greebel v. FTP Software, Inc.,* 182 F.R.D. 370, 374 (D. Mass. 1998), *aff'd,* 194 F.3d 185 (1st Cir. 1999) ("each person's role in the alleged fraud must be particularized"). A complaint supports a "strong inference" of scienter only if the plaintiffs' "characterization of the events and circumstances as showing scienter is highly likely." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (emphasis added).

Scienter requires a showing "either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Id.* (emphasis added). To establish scienter by intent, the plaintiff must prove not only that each defendant knew that the statement was false, but also that he or she knew that it was made in reference to a matter of material interest to investors. *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001); *see also Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir. 1994) (defendant must know that statement was "materially false or misleading") (emphasis added). For purposes of securities fraud, recklessness is not satisfied even by "inexcusable" negligence, but is "closer to being a lesser form of intent." *Greebel*, 194 F.3d at 198-99. Accordingly, to plead scienter by recklessness, it is not sufficient to plead that the defendants "should have known"; instead, the plaintiff "must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course

of action and <u>chose not to disclose</u> those dangers to investors." *Swack v. Credit Suisse First Boston*, No. Civ. A. 02-11943-DPW (D. Mass. Sep. 21, 2004) (2004 WL 2203482 at *15), *quoting Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998) (emphasis added). The PSLRA mandates dismissal if its specificity requirements are not met. 15 U.S.C. §78u-4(b)(3)(A).

### 2. Plaintiffs Have Failed to Allege Specific Facts that Could Support a Strong Inference that Any of the Bradford Defendants Acted With Scienter.

The Complaint fails to allege specific facts that could support a strong inference of scienter as to any of the Bradford Defendants. Perhaps the most glaring defect is the Complaint's treatment of all the "Defendants" as an undifferentiated whole for the purpose of asserting scienter. Plaintiffs allege, for example, that all 19 of the "Defendants" violated §10(b) "knowingly or recklessly, directly and indirectly," but they make no attempt to specify what any particular defendant did, knew, or intended. Cp. ¶78.

Indeed, the Complaint is devoid of any specific allegation that any particular defendant had knowledge of any particular fact, but instead makes only blanket assertions that all the Bradford Defendants "knew or had access to information" about the College's financial condition "[b]ecause of their Board membership and/or their executive positions with the College." Cp. ¶75. It is well established, however, that the heightened pleading requirements for scienter are "not satisfied by a complaint in which 'defendants are clumped together in vague allegations,'" and which fails to specify the acts or omissions of each defendant. *Lesavoy v. Lane*, 304 F. Supp. 2d 520, 530 (S.D.N.Y. 2004), *quoting In re Blech Sec. Litig.,* 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996). Allegations that

"management" had "access" to internal reports that belied optimistic announcements are insufficiently specific to allow a strong inference that any of the defendants actually had knowledge of the information. *See Dalarne Partners, Ltd. v. Sync Research, Inc.,* 103 F. Supp. 2d 1209, 1213 (C.D. Cal. 2000); *see also Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 373, 377-379, 382 (5th Cir. 2004) (affirming dismissal of §10(b) claim where plaintiffs asserted that officers as a group knew of certain information, but failed to plead specific facts creating strong inference that "any individual knew, or was severely reckless in not knowing," the facts that assertedly contradicted the optimistic statements).

Nor do plaintiffs allege any other facts that might even reasonably suggest scienter. For example, none of the Bradford Defendants -- trustees and officers of a non-profit educational institution -- is alleged to have had any financial interest in the College or any other motive to defraud investors. There is no allegation of insider trading or any other action taken out of self-interest. There is no allegation of any other sort of impropriety; no allegation, for example, of "accounting shenanigans" or attempts to cook the books to distort or hide financial information, nor any allegation of bribery or payment of hush money to conceal damning information. *Compare Geffon*, 249 F.3d at 36; *Greebel,* 194 F.3d at 196. Instead, plaintiffs try to meet the scienter requirement by suggesting that the Bradford Defendants knew of facts that purportedly diverged from the matters disclosed in the Official Statement, particularly with respect to their optimistic predictions of future improvements in the College's financial condition. As discussed below, however, plaintiffs' factual allegations do not support a <u>reasonable</u> inference, let alone a <u>strong</u> one, that any of the Bradford Defendants acted with scienter.

a.   **Plaintiffs Have Failed to Allege Specific Facts Creating a Strong Inference that Any of the Bradford Defendants Had Knowledge Suggesting that the Official Statement Did Not Accurately Describe the College's Financial Condition.**

Plaintiffs allege that all of the Bradford Defendants, merely by virtue of their positions as officers and/or trustees of the College, "had access to the adverse non-public information about the College's operational and financial condition … and knew that those adverse facts rendered the positive statements [in the Official Statement] by and about the College and its operational and financial condition materially false and misleading." Cp. ¶¶33, 34. Because this allegation fails to specify the "information" purportedly known, the particular defendant who knew it, or the "positive statement" that it rendered misleading, it could not support any inference of scienter even if the Official Statement could reasonably be deemed to conceal the College's financial problems, which it cannot.

b.   **Plaintiffs Have Failed to Allege Specific Facts Suggesting a Strong Inference that Any of the Bradford Defendants Knowingly or Recklessly Misled Investors Regarding Student Attrition.**

There is similarly no merit in plaintiffs' argument that the Official Statement's presentation of the College's enrollment figures as of the fall term suggests intentional concealment of attrition problems. Cp. ¶52. Where the College's academic year begins in the fall, there is nothing remotely suspicious in presenting enrollment as of the fall, and doing so cannot support any inference of scienter, much less a strong one. *See, e.g., Greebel,* 194 F.3d at 202-203, 206 (allegation of business and accounting practices for which there could be "legitimate reasons" did not support strong inference of scienter); *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir. 1989) ("credible and wholly

27

innocent explanations for the stock sales ... are sufficient to defeat any inference of bad faith").

Any notion that any of the Bradford Defendants intended to hide attrition is also belied by the fact that the Official Statement openly disclosed significant attrition during the course of the current academic year, and also made a number of references to the need to improve student "retention." *See* Section I(A)(2); *see also Geffon*, 249 F.3d at 37, *quoting In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 186 (D. Mass. 2001) ("any indication of scienter [drawn from] overly optimistic statements ... is offset by the Company's cautionary admissions"); *In re Worlds of Wonder*, 35 F.3d at 1425 (detailed risk disclosure in debenture prospectus "negates an inference of scienter").[17]  And finally, contrary to plaintiffs' suggestion, the allegation that some of the defendants attended meetings where enrollment problems were discussed does not reasonably suggest any intent to conceal attrition, particularly where the thrust of the matters allegedly discussed at the meetings – that the College needed to increase its enrollment to avoid further budget shortfalls – was expressly disclosed in the Official Statement. *See* Cp. ¶¶49, 50 (referring to discussion at meetings of "inadequate enrollment," "enrollment shortfall," and of opinion that College had "insufficient enrollment" to assure its "financial well-being").

---

[17]    *See also Ferber v. Travelers Corp.*, 802 F. Supp. 698, 714 (D. Conn. 1992) ("defendants' provision of adverse information to the public by way of disclosures negates an inference that they acted with an inten[t] to defraud"); *U.S. ex rel. Walsh v. Eastman Kodak*, 98 F. Supp. 2d 141, 149 (D. Mass. 2000) (disclosure negated any inference of improper scienter); *Stepak v. Aetna Life & Cas. Co.*, No. 90CV00886 (D. Conn. Aug. 29, 1994) (1994 WL 858045 at *9 n.20), *aff'd*, 52 F.3d 311 (2d Cir. 1995); *Kramer v. Time-Warner, Inc.*, 937 F.2d 767, 778 (2d Cir. 1991) (finding no "hint of any intent to deceive" in light of defendants' public disclosures of the matter).

c. **Plaintiffs Have Failed to Allege Specific Facts Creating a Strong Inference that Any of the Bradford Defendants Knowingly or Recklessly Misled Investors Regarding the College's Cash-Flow Problems.**

Plaintiffs have likewise failed to allege specific facts suggesting a strong inference that any of the Bradford Defendants intended to defraud investors by concealing the opinions that defendants Ferlazzo and Kiszka allegedly voiced in February 1997 that the College could survive only two to five more years given its then-current cash flow situation. Cp. ¶¶46, 47. First, plaintiffs do not allege that even Ferlazzo or Kiszka themselves actually held the same opinions in May 1998 that they stated in February 1997, nor do plaintiffs allege any facts that could support such an inference, particularly in view of the efforts the College made in the interim to improve cash flow by increasing enrollment and revenues.[18] *See* Section I(A)(3) above. Plaintiffs do not allege that any of the other Bradford Defendants agreed with these opinions at any time, much less when the Official Statement was issued in May 1998. Indeed, plaintiffs do not even allege that six of the Trustee Defendants ever learned of Ferlazzo's or Kiszka's alleged opinions.[19] Any inference that anyone intended to hide cash-flow problems from investors is also belied by the disclosure of audited cash-flow figures that show persistent and serious cash-flow problems, and from which investors could draw their own conclusions about the College's prospects if enrollment did not improve.

---

[18] Plaintiffs allege that Ferlazzo said in February 1997 -- the same time he allegedly voiced his opinion about cash-flow problems -- that "if enrollment trends continue for 1997-98, and changes are not made in the operations of the College, there is the very real potential of a $300,000-400,000 deficit in FY 1998." Cp. ¶50 (emphasis added). Changes were made, however, and plaintiffs acknowledge that the College had received an increased number of applications for fall 1998. Cp. ¶60.

[19] Trustee Defendants Cochran, DeMoss, Fleming, Kobacker, Reid, and Sheehan are not alleged to have attended the meeting where Ferlazzo and Kiszka allegedly made the statements, nor are they alleged to have been informed of those opinions in any other way. Cp. ¶46.

**d.     Plaintiffs Have Failed to Allege Specific Facts
Supporting a Strong Inference that Any of the Bradford
Defendants Knew that the Statements About Projected
Reductions in Financial Aid Were False.**

Plaintiffs allege no specific facts that could support a strong inference that any of

the Bradford Defendants believed that the Official Statement was misleading in

projecting the amount of financial aid the College would award for the current and the

next academic years.  Indeed, plaintiffs allege only that "the defendants knew, or but for

their reckless disregard for the truth would have known, that the representations in the

Official Statement regarding financial aid were false and misleading."  Cp. ¶53 (emphasis

added).  Recklessness, however, is not established by showing that a defendant "should"

or "would" have known that statements were misleading.  Instead, the plaintiff must

plead specific facts creating a strong inference that the defendants "had full knowledge of

the dangers of their course of action and chose not to disclose those dangers to investors."

*Maldonado*, 137 F.3d at 9 n.4 (emphasis added); *Geffon*, 249 F.3d at 29 (evidence that

defendants "should have known" statements were misleading is not the same as actually

knowing, and cannot support inference of scienter).  Because plaintiffs have not alleged,

even in conclusory fashion, that any of the Bradford Defendants knew that the estimates

in the Official Statement regarding future financial aid were false, there is no basis for

any inference of scienter with respect to such estimates.

But even if plaintiffs had alleged the proper legal standard, their claim must fail

because they have failed to allege any specific facts supporting a strong inference that

any of the Bradford Defendants actually knew that the projections for financial aid were

false for either the 1997-98 or 1998-99 academic years, much less that they knew they

were misleading to a material degree.  The basis for plaintiffs' fraud claim with respect to

30

the estimate of financial aid for the 1997-98 academic year is that the "College possessed ... the data that proved that the 1997-98 'estimate' [of financial aid awards for the ongoing 1997-98 academic year] was substantially incorrect." Cp. ¶54 (emphasis added). Even if this data could be viewed as suggesting that the estimate was incorrect, which it cannot, *see* Section I(A)(4) above, plaintiffs do not allege that any of the Bradford Defendants actually knew of these matters, but merely allege that they as a group had "access to" the same data the "College" possessed. *Id.* (emphasis added). That defendants have theoretical "access" to information that plaintiffs claim "proves" an "estimate" to be "substantially incorrect" obviously cannot support an inference that any particular defendant actually had knowledge of such information, much less that any of them did the mathematical calculations and comparisons required to deduce from such information that the estimate was "substantially incorrect."

As to the projection of financial aid awards for the following academic year, which was wholly prospective in May 1998, plaintiffs claim that the Official Statement was materially misleading in asserting that "[t]he College's financial plan currently calls for a further reduction of financial aid spending for 1998-1999 academic year to 28.8% of student income." Cp. ¶55. Plaintiffs claim this assertion was misleading because the College's budget for 1998-99 – which plaintiffs acknowledge was revised after the Official Statement was issued -- "reflect[ed] that financial aid spending for the 1998-99 academic year was budgeted to be 31.3% of student income...." *Id.* Where plaintiffs do not allege that any of the defendants knew on May 1, 1998, even what the final budget numbers would be, much less that they knew what the actual revenues would be, there is no basis for any inference that they knew of any inaccuracy in the estimate of financial

31

aid as a percentage of future revenues. Nor do plaintiffs provide any basis to infer that

any of the defendants knew that the estimate of financial aid awards for either year was

misleading to a <u>material</u> degree, as they must to plead scienter; indeed, plaintiffs do not

even state the estimates they evidently believe would have been more nearly

"substantially correct" in May 1998.

**e.    Plaintiffs Have Failed to Allege Specific Facts Creating
a Strong Inference that Any of the Bradford Defendants
Knowingly or Recklessly Misled Investors Regarding
Projected Increases in Enrollment.**

Plaintiffs have also failed to allege specific facts that could support a strong

inference that any of the Bradford Defendants intentionally misled investors with respect

to the assertion in the Official Statement that the College "planned" to significantly

increase enrollment. Cp. ¶59. As to plaintiffs' claim that the statement was false because

the College purportedly had "no business plan or strategic program to meet any of the

goals articulated" in the Official Statement, including the enrollment goal, the Official

Statement shows that the College was actually taking steps to increase its enrollment by

making its physical facility and academic programs more attractive to students, including

the dormitory expansion project being financed by the bond issue. Cp. ¶57; OS, Appx. A

at A-7, A-17. Plaintiffs offer no basis to infer that it would be unreasonable to believe, or

that any of the Bradford Defendants did not in fact believe, that such measures -- which

an outside consultant had studied and recommended -- might result in increased

enrollment. In making these arguments, plaintiffs impermissibly suggest "fraud by

32

hindsight."[20] *See Shaw*, 82 F.3d at 1223, *quoting DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("fraud by hindsight" occurs when a plaintiff "contrast[s] a defendant's past optimism with less favorable actual results, and then 'contend[s] that the difference must be attributable to fraud"). *See also Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("[m]anagement's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud"; arguments of overly optimistic statements "amount to allegations of 'fraud by hindsight,'" which are insufficient to support securities fraud claim).

Nor is there any merit in plaintiffs' suggestion that the enrollment projections for the following academic year were false because they were unrealistic in light of admissions data purportedly known to the "College" when the Official Statement was issued. Cp. ¶¶59, 62. Even assuming that any such conclusion could or should have been drawn from the raw data relating to applications, acceptances, and other matters as of May 1, 1998, which it cannot, *see* Section I(A)(5) above, plaintiffs allege no specific facts showing that any of the Bradford Defendants, as opposed to the "College" or its "admission personnel," had knowledge of anything that actually led any of them to know that the projections in the Official Statement could not be met. There is therefore no basis to infer that any of the Bradford Defendants knew that the estimate was wrong or unmeetable, much less to a material degree. Additionally, any possible inference that any of the Bradford Defendants acted with scienter with respect to the enrollment predictions is precluded by the explicit warnings in the Official Statement about the possibility that

---

[20]    Plaintiffs' allegation that the College's "gutt[ing]" of its admissions program in fall 1998 "guaranteed the College's inability to recruit enough new students to survive" further undercuts any notion that the Bradford Defendants knew in May 1998, before the admissions program was "gutted," that enrollment would not increase. Cp. ¶67.

such increases in enrollment might not materialize. *See Geffon*, 249 F.3d at 37; *In re Polaroid Corp.*, 134 F. Supp. 2d at 186.

> **f.      Plaintiffs Have Failed to Allege Specific Facts Creating a Strong Inference that Any of the Bradford Defendants Knowingly or Recklessly Misled Investors Regarding the College's Intent to Make a $1 Million Contribution to the Project.**

Finally, plaintiffs have failed to plead facts that could support a strong inference that any of the Bradford Defendants acted with scienter with respect to the assertion in the Official Statement that the College would fund $1 million of the costs of the dormitory construction project. As noted above, the minutes on which plaintiffs rely for this assertion show that, in a meeting in February 1998, several months before the bonds were issued, certain of the trustees discussed ways to finance the project. Cp. ¶63, referring to minutes of meeting of February 5, 1998. They agreed at that time that they would either make cuts in the cost of the project or have the College contribute $1 million at the end of the project. They ultimately agreed to make the equity contribution. Nothing in the minutes of the meeting, or anywhere else, suggests that these trustees did not intend the College to make the contribution, and the fact that they intended the contribution to be made at the end of the project does not suggest falsity or dishonest intent in the statement that the contribution would be made. Moreover, even if plaintiffs' reasoning could suggest scienter as to any of the defendants who were at the meeting, which it cannot, there is no allegation that could support an inference that any of the Bradford Defendants who were not alleged to have attended the meeting (DeMoss, Fleming, Kobacker, Reid, Sheehan, Thomas, and Kiszka) knew anything about the meeting, the discussion at the meeting, or the purported recommendation.

34

**E.      Plaintiffs Have Failed to Adequately Plead that Their Losses Were
         Caused by the Alleged Misrepresentations or Omissions of Which
         They Complain.**

As Judge Mazzone recognized in *Miller v. New America High Income Fund*, 755
F. Supp. 1099, 1107 (D. Mass. 1991), *aff'd sub nom. Lucia v. Prospect Street High
Income Portfolio, Inc.,* 36 F.3d 170 (1st Cir. 1994), "loss causation" is a necessary
element of a claim under §10(b) and Rule 10b-5. "Plaintiffs do not demonstrate loss
causation by saying they would not have bought [defendant's] stock had they known the
truth; they must allege that they would not have suffered the loss absent the
misrepresentations in the prospectus and in the later public statements." *Id.* at 1108,
*citing Bastian v. Petren Resources Corp.,* 892 F.2d 680 (7th Cir. 1990). In other words,
plaintiffs "must allege that they were injured <u>because the risks that materialized were the
risks of which they were unaware</u> as a result of defendants' misleading statements, not
the risks of which they were fully aware." *Id.* (emphasis added). In *Miller*, where the
cause of plaintiffs' loss was the decline of the high-yield bond market, and where
plaintiffs " knew full well that their investment was subject to the vagaries of this
market," Judge Mazzone held that the purported misrepresentations as to the fund's
prospects as a matter of law were not the cause of plaintiffs' losses, and therefore rejected
the claim. *Id. See also Bastian*, 892 F.2d at 682 (dismissing §10(b) claims of plaintiffs,
whose investment in limited partnerships had been wiped out, where plaintiffs claimed
they were induced to invest by defendants' alleged misrepresentations, but did not allege
that the loss of their investments was due to the defendants' fraud).

Similarly here, the securities fraud claim should be dismissed because plaintiffs
have failed to allege facts supporting the element of loss causation. Plaintiffs allege only

that they "would not have purchased the Bonds at the prices they paid, or at all, if they

had not been so misled regarding the College's inability to service the debt that it

incurred by reason of the issuance of the Bonds, or otherwise to repay the Bonds." Cp.

¶79 (emphasis added). As *Miller* and *Bastien* make clear, however, it is not sufficient for

plaintiffs to allege that they would not have bought the bonds absent the alleged

misrepresentations; instead, they must allege that they lost the value of their investment

due to the risks that were purportedly misrepresented or not disclosed. Even if plaintiffs

had made a conclusory allegation in this regard, the facts they allege make very clear that

the College ultimately failed, and plaintiffs' investment in the bonds was injured, not

because of anything that was purportedly concealed from or misrepresented to plaintiffs,

but because of the principal risk that was highlighted in the Official Statement: namely,

the College was unable to increase its enrollment, and therefore to reach financial

stability and pay the bonds.

Moreover, plaintiffs' allegations show that what they actually claim to have

caused their losses is the alleged mismanagement of the College, particularly actions that

were taken to respond to the College's continuing financial troubles and which they

allege led to the College's demise. Specifically, plaintiffs allege that, in the fall of 1998,

after the bonds were issued, the College was "faced with an accelerating financial crisis."

Cp. ¶65. Plaintiffs further allege that, "[d]espite the College's massive revenue shortfall,

the budgeted amount of financial aid increased"; that, "[a]s part of its effort to slash

spending and reduce its operating losses, the College gutted its admissions program

through budget cuts and employee layoffs"; and that "[t]hese stop-gap measures further

guaranteed the College's inability to recruit enough new students to survive, let alone to

meet its financial obligations as they came due." Cp. ¶67 (emphasis added). Plaintiffs

also allege that the trustees "recklessly depleted the Bondholder's [sic] collateral" by

"unnecessarily continu[ing] to expend funds on new dormitories" in and after "low

enrollment in September 1998 precipitated yet another fiscal emergency," explicitly

asserting that this was a "breach of their fiduciary duties." Cp. ¶5. Thus, according to

plaintiffs' own allegations, it was management's inability to curb expenses, including

financial aid, and the evisceration of its admissions department, which "guaranteed" the

inability to increase enrollment, that drove the College into the ground. Additionally,

according to plaintiffs' own allegations, it was not only these factors, but also the

purported depletion of funds on construction, that caused the plaintiffs' losses. As such,

these allegations are merely disguised claims of breach of fiduciary duty and

mismanagement, and cannot support federal securities claims. *See, e.g., In re Number

Nine*, 51 F. Supp. 2d at 22 n.18 (to the extent plaintiff allegedly lost an opportunity to

achieve even greater increased margins due to failure to supply product on time, claim "is

one for mismanagement, not misrepresentation," which is not actionable under securities

laws); *see also Shaw*, 82 F.3d at 1206 ("allegations of mismanagement ... [are] not

cognizable under the securities laws"). Plaintiffs' claims are not actionable for the

further reason that, as alleged, these matters are intervening causes of plaintiffs' losses,

and therefore preclude a showing of loss causation. *See, e.g., Hayden v. Paul, Weiss,

Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 258 & n.12 (S.D.N.Y. 1997) (to

establish loss causation on 10b-5 claim, loss must not be due to intervening cause).

## II.    PLAINTIFFS HAVE FAILED TO PLEAD FACTS SUPPORTING THEIR CLAIM OF CONTROL LIABILITY UNDER §20.

Count II purports to assert "control person" liability against all the Bradford Defendants for violations of §20(a) of the Exchange Act.[21]  To be liable on such a theory, the defendant "must not only have the general power to control the company, but must also actually exercise control over the company." *Aldridge,* 284 F.3d at 85 (emphasis added).  Plaintiffs must therefore make "two distinct factual allegations": (1) "that the 'status' of the controlling entity gave it 'general' power over the controlled entity," i.e., the primary violator, and (2) "that the controlling entity did, in fact, exercise such power." *Swack*, 2004 WL 2614549 at *17, *citing In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 175 (D. Mass. 2002); *see also Aldridge*, 284 F.3d at 85.

Plaintiffs' §20(a) claim here should be dismissed because the Complaint does not allege the necessary elements for control person liability.  First, plaintiffs' control person claim is based entirely on the Bradford Defendants' purported power to control the College.[22]  The College, however, is not a defendant in this action, nor is it alleged to

---

[21]    Section 20(a) provides that

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. §78t(a).

[22]    Specifically, plaintiffs allege that "[b]y reason of their positions as senior officers and/or trustees, as alleged above, these Defendants had the power and authority to cause the College to engage in the wrongful conduct complained of herein"; that "[t]he Trustee Defendants and Defendants Short and Kiszka acted as controlling persons of the College within the meaning of §20"; and that, "[b]y reason of their positions as senior officers and/or trustees, these Defendants had the power and authority to cause the College to engage in the wrongful conduct complained of herein." Cp. ¶¶36, 81 (emphasis added).

have committed any violation of §10(b). For this reason, the control person claim fails against all the Bradford Defendants, without more.[23]

And even if plaintiffs had alleged a primary violation by the College, their allegations do not support a reasonable inference that any of the Bradford Defendants actually exercised control over the College sufficient to support a claim under §20(a). Instead, with a conclusory blanket allegation, plaintiffs assert only that all the Bradford Defendants as a group had the "power and influence" to control the College by reason of their positions as officers and/or trustees, respectively. Cp. ¶81. There is no allegation that any of the Bradford Defendants actually exercised the power or influence they purportedly had. In *In re Gupta Securities Litigation*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994), the court held that directors are not automatically liable as controlling persons, nor does the status of director create any presumption of control over the corporation. Rather, "[t]here must be some showing of <u>actual participation</u> in the corporation's operation or some influence before the consequences of control may be imposed." *Id.* It is also clear that the "control" must be with respect to the allegedly wrongful matters.[24]

Finally, plaintiffs' control claim fails as a matter of law because plaintiff's allegations of primary violations of securities fraud are deficient, for the reasons

---

[23] *See, e.g., In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC (N.D. Cal. Apr. 2, 2002) (2002 WL 989478 at *18) ("[t]o successfully plead control person liability, Plaintiffs must show a primary violation of the federal securities laws and that each defendant 'directly or indirectly' controlled the <u>violator</u>") (emphasis added); *In re Citisource, Inc. Sec. Litig.*, 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988) (the liability of the purportedly controlled person is an element of proof of a claim under §20(a)).
[24] *See In re Livent, Inc. Securities Litigation*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999) (outside directors could not be held liable as control persons where plaintiff failed to allege "<u>particularized facts</u> as to the [directors'] 'culpable participation' in the fraud"); *Kriendler v. Chemical Waste Management, Inc.*, 877 F. Supp. 1140, 1151 n.10 (N.D. Ill. 1995) (control person liability requires factual allegations showing that named defendant had practical ability to direct action of people "who did the dastardly deed") (emphasis added).

discussed at Section I above, and therefore cannot support a control claim. *See Suna,* 107 F.3d at 72 (§20(a) claim against "control person" must be dismissed where plaintiff has failed adequately to allege an underlying violation of securities act by primary violator); *Greebel*, 193 F.3d at 207 (§20(a) claim must be dismissed where plaintiff did not sufficiently plead a securities violation by corporation that defendant purportedly controlled). In short, Count II should be dismissed because plaintiffs have failed to plead the elements of control person liability under §20(a).

## CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim against any of the Bradford Defendants and should be dismissed against each of them in its entirety.

THE BRADFORD DEFENDANTS
By their attorneys,

Robert E. Sullivan, BBO #487820
Scott A. Roberts, BBO #550732
A. Lauren Carpenter, BBO #551258
SULLIVAN, WEINSTEIN & McQUAY, P.C.
Two Park Plaza
Boston, MA 02116
Dated:  January 20, 2005         (617) 348-4300

40

## CERTIFICATE OF SERVICE

I, A. Lauren Carpenter, hereby certify that a true and correct copy of the foregoing document was served by hand on all counsel of record on this 20th day of January, 2005.

A. Lauren Carpenter