UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| T. ROWE PRICE TAX-FREE HIGH YIELD FUND, INC., et al., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Civil Action No: 04-11667-RGS |
| KAREN M. SUGHRUE, et al., | ) ) | |
| Defendants | ) ) ) | |

# MEMORANDUM IN SUPPORT OF DEFENDANT ADVEST, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT

## Table of Contents

Page

FACTUAL BACKGROUND ................................................................................. 3

I.     BRADFORD COLLEGE AND THE BOND OFFERING. ............................... 3
II.    PLAINTIFFS' ALLEGATIONS. ............................................................... 6

ARGUMENT ....................................................................................................... 8

I.     THE STANDARD ON A MOTION TO DISMISS UNDER RULE 12(B)(6). ......... 8
II.    THE BONDHOLDERS HAVE FAILED TO STATE AN ACTIONABLE CLAIM
       UNDER SECTION 10(B) OR RULE 10B-5 OF THE SECURITIES EXCHANGE
       ACT OF 1934. ................................................................................... 8

       A.    THE HEIGHTENED PLEADING REQUIREMENTS APPLICABLE TO
             SECTION 10(B) AND RULE 10B-5 CLAIMS. ..................................... 9

       B.    THE AMENDED COMPLAINT FAILS TO ALLEGE ADEQUATELY ANY
             ACTIONABLE MISSTATEMENT OR OMISSION. ............................... 11

       1.    A Statement By Statement Analysis Demonstrates That the Amended Complaint
             Does Not Allege an Actionable Misstatement. ...................................... 11

             (a)   The College's Cash Flow ........................................................ 12

             (b)   The College's Current and Projected Enrollment ......................... 13

             (c)   The College's Financial Planning ............................................. 15

       2.    The Amended Complaint Does Not to Allege That the Official Statement
             Omitted Material Information. .......................................................... 17

       C.    THE SECTION 10(B) AND RULE 10B-5 CLAIM SHOULD BE DISMISSED
             BECAUSE THE BONDHOLDERS HAVE FAILED TO ALLEGE THAT
             ADVEST ACTED WITH SCIENTER. ............................................... 21

       1.    The Bondholders Have Not Alleged Facts Showing That Advest Knew Any of
             the Allegedly Adverse Information. ................................................... 21

       2.    The Amended Complaint Does Not Allege That Advest Did Not Fulfill its
             Duties as an Underwriter. ............................................................... 23

       D.    THE BONDHOLDERS HAVE FAILED ADEQUATELY TO ALLEGE THAT
             THEIR LOSSES WERE CAUSED BY THE ALLEGED
             MISREPRESENTATIONS OR OMISSIONS IN THE OFFICIAL
             STATEMENT. ............................................................................. 24

       E.    THE SECTION 10(B) AND RULE 10B-5 CLAIMS AGAINST ADVEST ARE
             BARRED BY THE CENTRAL BANK DOCTRINE. ............................. 27

III.   THE AMENDED COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION
       12(A)(2) OF THE SECURITIES ACT. ....................................................... 29

## Table of Authorities

**CASES**

*Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676 (D. Mass. 1993)............................... 17, 39

*Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996)................................................. 28

*Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451 (1991) ........................................... 43

*Aulson v. Blanchard*, 83 F.3d 1 (1st Cir. 1996)................................................................................ 8

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990)................................................................ 17

*Basic v. Levinson*, 485 U.S. 224 (1988)........................................................................................... 10

*Berner v. Delahanty*, 129 F.3d 20 (1st Cir. 1997) .......................................................................... 8

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) .... 27

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1999) ......................................................... 18

*Eichenholtz v. Brennan*, 52 F.3d 478 (3rd Cir. 1995) ................................................................... 23

*Endo v. Albertine*, 863 F, Supp. 708 (N.D. Ill. 1994)..................................................................... 23

*Escott v. BarChris Const. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968) ......................................... 23

*Fenoglio v. Augat, Inc.*, 50 F. Supp.2d 46 (D. Mass. 1999.......................................... 38, 39, 40

*Fitzer v. Security Dynamics Tech.*, 119 F. Supp. 2d 12 (D. Mass. 2000).............................. passim

*Garvey v. Akroosh*, No. CIV.A.04-10438-RGS, 2005 WL 273135
(D. Mass. Feb. 4, 2005) ........................................................ 9, 10, 17, 20, 44

*Geffon v. Micrion Corp.*, 249 F.3d 29 (1st. Cir. 2001) ................................................................ 11

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ................................................ 23

*Global v. Baybank Valley Trust*, 46 Mass. App. Ct. 256 (1999) ................................................ 42

*Gooley v. Mobil Oil Corp.*, 851 F.2d 513 (1st Cir. 1988)............................................................... 8

*Gorsey v. I.M. Simon & Co.*, Civ. A. No. 86-1875-Z, 1987 U.S. Dist. LEXIS 1940
(D. Mass. Feb. 23, 1987)........................................................ 31, 32, 33

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999) ................................................. passim

*Gross v. Suma four, Inc.*, 93 F.3d 987 (1st Cir. 1996)............................................................ 9, 12

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)........................................................................ 29, 34

*Haft v. Eastland Financial Corp.*, 775 F. Supp. 1123 (D.R.I. 1991)............................................. 36

*Hayduk v. Lanna*, 775 F.2d 441 (1st Cir. 1985) ...................................................................... 35, 38

*In re Bexar County Health Facility Dev. Corp. Sec. Litig.*, 125 F.R.D. 625 (E.D. Pa. 1989) 33, 34

*In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 52 (D. Mass. 1998) ..................... 10, 15, 16, 20

*In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002) ............................................................. 8

*In re Flag Telecom Holdings Ltd. Sec. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004)................. 34

*In re Galileo Corp. Sec. Litig.*, 127 F.Supp. 2d 251 (D. Mass. 2000) ......................................... 22

*In re Healthco Int'l, Inc. Sec. Litig.*, 777 F. Supp. 109 (D. Mass. 1991)...................................... 38

*In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp.2d 152 (D. Mass. 2002) ............................... 28

*In re Raytheon Sec. Litig.*, 157 F. Supp. 131, 146 (D. Mass. 2001) ....................................... 3, 22

*In re Seachange Int'l, Inc.*, No. CIV.A.02-12116-DPW, 2004 WL 240317
(D. Mass. Feb. 6, 2004)......................................................... 37

*In re Software Tools, Inc. Sec. Litig.*, 50 F.3d 615 (9th Cir. 1994) ............................................. 23

*In re Software Tools, Inc. Sec. Litig.*, 789 F. Supp. 1489 (W.D. Cal. 1992) ............................... 23

*In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399 (9th Cir. 1996).......................................................... 36

*Kafenbaum v. Gtech Holdings, Corp.*, 217 F. Supp.2d 238 (D.R.I. 2002)................................... 17

*Kaufman v. Magid*, 539 F. Supp. 1088 (D. Mass. 1982) ............................................................. 39

*Knapp Shoes v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 200 (1st Cir. 1995)............................43

**Table of Authorities**
**(continued)**

*Konstamtinakos v. FDIC*, 719 F. Supp. 35 (D. Mass. 1998) ........................................ 11

*Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498 (1979) ................................. 42

*Lieberman v. Cambridge Partners, LLC*, No. CIV.A.03-2317, 2003 WL 22999217
(E.D. Pa. Dec. 16, 2003) .................................................................................... 33, 34

*Lirette v. Shiva Corp.*, 27 F. Supp.2d 268 (D. Mass. 1998) ......................................... 11

*Loan v. FDIC*, 717 F. Supp. 964 (D. Mass. 1998) ...................................................... 11

*Madan v. Royal Indem. Co.*, 26 Mass. App. Ct. 756 (1989) ....................................... 42

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ........................................... 10, 44

*Miller v. New America High Income Fund*, 755 F. Supp. 1099 (D. Mass. 1991) ........ 24

*Orton v. Parametric Tech. Corp.*, No. CIV.A.03-10290-WGY, 2004 WL 2475330
(D. Mass. Nov. 4, 2004) ..................................................................................... 11, 15

*Resolution Trust Corp. v. Strook & Strook & Lavan*, 853 F. Supp. 1422 (S.D. Fla. 1994) ........... 4

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...................................................... 36

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,
et al.*, 75 F.3d 801 (2d Cir. 1996) ......................................................................... 18

*Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp.2d 70 (D. Mass. 1998) ................. 40, 41, 42

*Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir. 1994) ............... 9, 15, 21

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3rd Cir. 1992) ...................................... 28, 36

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ................................ passim

*Suez-Equity Investors, L.P. v. Toronto-Dominion*, 250 F.3d 87 (2d Cir. 2001) ......... 24, 25

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997) ...................................................... 10

*Tapogna v. Egan*, 141 F.R.D. 370 (D. Mass. 1992) .................................................... 23

*Twin Fires Investment, LLC v. Morgan Stanley Dean Witter & Co.*, 15 Mass. L. Rptr. 542,
2002 WL 31875204 (Mass. Super. Dec. 16, 2002) ................................. 39, 40, 41, 42

*Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731 (D. Mass. 1995) ................... 28

*Van Ormer v. Aspen Tech.*, 145 F. Supp. 2d 101 (D. Mass. 2000) ............................ 10

*Wells v. Monarch Capital Corp.*, No. 91-10575, 1996 WL 728125 (D. Mass. Oct. 22, 1996) ...... 28

*Wright v. Ernst & Young*, 152 F.3d 169 (2d Cir. 1998) .............................................. 28

*Ziemba v. Cascade Int'l*, 256 F.3d 1194 (11th Cir. 2001) ......................................... 27

*Zimmerman v. Kent*, 31 Mass. App. Ct. 72 (1991) ............................................... 40, 41

## STATUTES, REGULATIONS, AND OTHER AUTHORITY

15 U.S.C. §§ 77, 78 ..................................................................................... passim

IRC § 103(b)(3)(B) .............................................................................................. 32

Fed. R. Civ. P. 9(b) ..................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ............................................................................... passim

Mass. Gen. L. ch. 110A, §§ 101, 410 ........................................................ 38, 39, 40

Mass. Gen. L. ch. 93A, §§ 2, 9, 11 ........................................................... 38, 42, 43

17 C.F.R. § 230.131 ...................................................................................... 31, 32

Federal Register, Vol. 33, No. 174 (p. 12647) .................................................. 31

*Federal Practice and Procedure* § 1357 (2d ed. 1990) ........................................ 8

Michael C. Gilleran, *The Law of Chapter 93A* ................................................... 43

Merriam - Webster Dictionary, www.m-w.com/cgi-bin/dictionary ...................... 15

Defendant Advest, Inc. ("Advest") submits this Memorandum in support of its Motion to Dismiss the Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Advest was the underwriter of bonds issued in May 1998 by the Massachusetts Industrial Finance Agency ("MIFA") for the benefit of Bradford College ("Bradford" or "the College"). The plaintiffs allege that the defendants made material misrepresentations and omitted to state material facts in the Official Statement prepared in connection with the offering, which allegedly caused the plaintiffs either to purchase or insure the bonds. The Amended Complaint includes claims against Advest for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), Rule 10b-5 (17 C.F.R. 240, 10b-5 (Count I); Section 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77l (Count III); the Massachusetts Uniform Securities Act, Mass. Gen. L. ch. 110A, § 410 (Count IV); the Massachusetts consumer protection statute, Mass. Gen. L. ch. 93A, § 11 (Count VII); and common law claims of fraud (Count V) and negligent misrepresentation (Count VI).[1]

As set forth in detail below, the Amended Complaint should be dismissed in its entirety as to Advest. The Official Statement was not prepared by Advest and, in any event, was not misleading. Anyone reading the Official Statement and its attachments with any degree of care would have concluded that the College was in fact facing a difficult situation and that the "BBB –" rated bonds were a risky investment. Indeed, the primary purpose of the bond offering was to raise money for debt reduction and capital improvements to attract and retain students. The legal claims alleged by the plaintiffs therefore cannot be supported. They also fail to meet the stringent pleading standards for a securities fraud case.

---

[1] Plaintiffs also bring most of these same claims with the exception of the Section 12(a)(2) claim, against 19 trustees and officers of the College (the "Bradford Defendants"). In addition, plaintiffs allege that the Bradford Defendants violated Section 20(a) of the Exchange Act (Count II) and breached their fiduciary duties (Count VIII).

1

First, as to the Section 10(b) claim, plaintiffs failed to allege facts sufficient to support their allegations that Advest knowingly and/or recklessly misled them. Specifically, plaintiffs have not correctly characterized the Official Statement which on its face shows that defendants did not make material misrepresentations or omissions. They also have failed to allege that Advest acted with the required scienter. Further, the plaintiffs' own allegations demonstrate that the alleged misrepresentations and omissions identified in the Amended Complaint were not the "cause" of their loss.

Second, the Section 12(a)(2) claim should be dismissed because the issued bonds are exempt from liability because they are securities issued by a public instrumentality of the Commonwealth. *See* 15 U.S.C. §§77l and 77c(a)(2) (exempting tax-exempt bonds issued by a state from coverage under Section 12(a)(2)). Also, plaintiffs have failed to allege that any of them has standing to pursue such a claim. Further, even if Section 12(a)(2) did apply to the tax-exempt bonds, the plaintiffs have failed to state a Section 12(a)(2) claim because their allegations that the defendants made untrue statements and omitted material facts are belied by the contents of the Official Statement and its attachments.

Moreover, even if this Court were to find that plaintiffs alleged facts sufficient to sustain either federal securities fraud claim under the usual standards of Rule 12(b)(6), it would have to dismiss both claims because the plaintiffs have failed to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). Under Rule 9(b) and the PSLRA, plaintiffs must plead their federal securities fraud claims with great specificity, stating what statement they deem to be misleading and precisely "the reason or reasons why the statement is misleading." *See* 15 U.S.C. §78u-4(b)(1). Plaintiffs have failed to state the federal securities claims with the

2

required degree of particularity, and for this, and the other reasons set forth above, those claims should be dismissed.

Third, the state statutory and common law claims, like the federal securities claims, fail because the plaintiffs have not identified a materially misleading statement or omission. The claim under the Massachusetts Uniform Securities Act also should be dismissed because, as with the Section 12(a)(2) claim, none of the plaintiffs is alleged to have standing.

Under these circumstances, the Amended Complaint should be dismissed with prejudice, in its entirety, as to Advest.

## FACTUAL BACKGROUND[2]

### I.     BRADFORD COLLEGE AND THE BOND OFFERING.

Bradford College was a private, co-educational institution of higher learning located in Bradford, Massachusetts. *See* Official Statement at A-1.[3] Throughout the mid-1990s, Bradford experienced problems with cash flow and with its ability to retain students. As disclosed in the Official Statement, Bradford "incurred operating budget deficits in each year since 1989" (*see* Official Statement at A-13), and had difficulty attracting and retaining students (*see* Official Statement at A-8), despite offering some form of financial assistance to approximately 81% of the enrolled students (*see* Official Statement at A-10). In an effort to turn itself around, to improve its "competitive position . . . and its ability to retain students," (Official Statement at A-7), the College embarked on a project to obtain financing through a bond offering to fund the renovation and construction of residence halls, to establish a Debt

---

[2] The summary of certain "facts" alleged by plaintiffs for purposes of this motion in no way concedes the accuracy of the plaintiffs' factual allegations.

[3] A copy of the Official Statement is attached to the Amended Complaint. Accordingly, this Court may consider the Official Statement, in its entirety, on a motion to dismiss. *See, e.g., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (documents attached or referred to in the complaint may be considered on a motion to dismiss); *In re Raytheon Sec. Litig.*, 157 F. Supp. 131, 146 (D. Mass. 2001) (same).

Service Reserve fund, and to repay the College's Series 1995 Bonds. *See* Official Statement at A-7.

The decision to seek bond financing was made by the College's Board of Trustees and two of its officers ("the Bradford Defendants"). *See* Am. Compl., ¶ 42. In order to obtain financing, the Bradford Defendants drafted, prepared and approved the Official Statement and hired Advest to underwrite the bond offering. *See id.*, ¶¶ 34, 35, 42. Advest is an investment banking firm and is a Delaware corporation with a principal place of business in Hartford, Connecticut. *See id.*, ¶ 13.

Pursuant to the Official Statement dated May 1, 1998, MIFA issued $17.93 million in revenue bonds for the benefit of the College ("the Series 1998 Bonds" or "the Bonds"). *See* Official Statement. The Official Statement made clear that the College was facing a difficult financial situation and that the "BBB-" rated bonds[4] were a risky investment. Specifically, the Official Statement and the detailed financial statements appended to it clearly disclosed that: (1) the Bonds were "not secured by a mortgage lien or security in any real or personal property," but rather that payments were to come solely from tuition receipts (Official Statement at 4); (2) since 1989, tuition receipts had failed to meet expenses and the College had continually experienced an "operating budget deficit," (Official Statement at A-13 and B-4); (3) the College was having difficulty attracting and retaining students (Official Statement at A-7); and (4) in order to attract and retain students the College needed to provide some form of financial aid to 75% of its students (Official Statement at A-10).

---

[4] The bonds were rated by Standard & Poors. Official Statement at 14. The "BBB-" rating is the lowest "investment grade" rating for a bond. Bonds with a lower rating have significant speculative characteristics and are considered "junk." *See, e.g., Resolution Trust Corp. v. Strook & Strook & Lavan*, 853 F. Supp. 1422, 1425 (S.D. Fla. 1994) (noting expert testimony that BBB rated bonds were "the closest to junk" that could be legally purchased).

In addition to detailing the weak financial situation, the Offering Statement warned potential investors of the risks of investing. In the section entitled "Bondowners' Risks," the College specifically advised that "no representation or assurance can be made that revenues will be realized by [the College] in the amount necessary to make payments ... sufficient to pay the debt service on the Series 1998 Bonds." Official Statement at 11. It further disclosed:

> Dependence on Tuition Payments – Colleges and universities are in general highly dependent upon tuition and fee revenues from students and, to a lesser extent, dormitory and other auxiliary revenues to pay debt service. . . . A failure by [the College] to attract and retain students in sufficient numbers to accomplish such goal could aversely affect the ability of [the College] to make required payments on the Series 1998 Bonds. Demographics for traditional college-age students also are intensifying the competition for students by all colleges and universities, including [the College].

*Id.*

In its Official Statement, in addition to setting forth the dire financial situation and warnings of the risks, the College laid out its goals and its belief that the money raised through the offering could turn around its fortunes. The Official Statement expressed the College's optimistic view that despite "a substantial increase in financial aid funded by the College," it "*estimate[d]* that financial aid [during academic year 1997-1998] will be reduced to 29.9% of student income versus 30.3% the previous year." Official Statement at A-13 (emphasis added). Further, to attain the "final *goal* of a balanced budget," the College was "*planning* to increase enrollment to the level of at least 725 full-time students by fall 2000, with approximately 80% of those students living in campus facilities." Official Statement at A-13 (emphases added). The hopes of the College were summarized as follows:

> Based on this increase in applications, historic rates for conversion of applications into enrollments, the number of applications from freshmen and deposits received to date, the College *believes* that it can reach its goal of enrolling 225 new

5

> students for the fall of 1998 while increasing the quality of its
> students and reducing slightly the average amount of financial aid
> awards to such students from College funds. If these *goals* are in
> fact met and if the College can otherwise successfully implement
> its budget, it *expects* to achieve a small operating budget surplus
> for the 1998-1999 fiscal year. Conversely, failure to achieve this
> enrollment goal and future enrollment targets may adversely
> affect the College's ability to reach Financial Equilibrium.

Official Statement at A-13 (emphases added).

Unfortunately, the risks identified by the College came to fruition. It was not able to

reach its goals and in June 2000, three years after the bond offering, the College was forced to

close its doors and later filed for bankruptcy. *See* Am. Compl., ¶ 76.

## II.    PLAINTIFFS' ALLEGATIONS.

This action is brought by a group of institutional investors and two individuals who

hold the Series 1998 Bonds (the "Bondholders") as well as the company that insured a portion

of the bonds, ACA Financial Guaranty ("ACA," collectively with the Bondholders,

"plaintiffs"). The Bondholders who hold the "BBB - " rated bonds have already received

distributions from the bankruptcy estate. They now bring federal and state securities fraud

claims against the former trustees and officers of the College, along with the underwriter

Advest. Am. Compl., ¶¶ 8-11, 80-95 (the federal and state securities fraud claims are alleged

in Counts I-IV). All of the plaintiffs, including ACA, which never purchased and does not

hold any Series 1998 Bonds, also bring state common law claims and one claim for violation of

the Massachusetts consumer protection statute.[5] Am. Compl., ¶¶ 12, 96-104 (the state

common law and consumer protection act claims are alleged in Counts V-VII).

Plaintiffs' claims rest on their assertion that "the Official Statement misleadingly failed

to disclose that the College was mired in an ongoing fiscal, financial, and operational crisis."

---

[5] The two individual Bondholders are not a party to a claim for violation of the consumer protection
statute. *See* Am. Compl., ¶102.

Am. Compl., ¶ 3. Specifically, the plaintiffs allege that "the Defendants recklessly and intentionally omitted any reference to" financial and operational problems and are responsible for eight misstatements that appear in the Official Statement. Am. Compl., ¶ 46. The "statements" identified in the Amended Complaint are a series of projections and statements of belief, including: (1) the College's planned uses for the proceeds of the bonds, Official Statement at 10; (2) the College's enrollment goals, Official Statement at 11; (3) a chart of "Fall Semester Enrollment Statistics" from 1993-1997, Official Statement at A-8; (4) a chart of "Admissions Trends" that shows applications, acceptances, and enrollment for each year from 1993 through 1997, Official Statement at A-8; (5) "estimates" concerning the percentage of students that would be on financial aid during the 1997-1998 and 1998-1999 academic years, Official Statement at A-13; (6) the College's goal of balancing its budget by increasing enrollment by the fall of 2000, Official Statement at A-13; (7) the College's belief that it can reach its fall 2000 enrollment goals, Official Statement at A-13; and (8) the College's "strategic initiatives" for the next three years, Official Statement at A-17.

Plaintiffs claim that these statements were misleading because the College failed to reveal certain adverse information about, *inter alia*, its ability to supplement the funds raised in the bond offering, student attrition problems, reliance on financial aid, and lack of a strategic plan. *See* Am. Compl., ¶¶ 46, 63. As set forth below, however, the College fully disclosed all of this information in the Official Statement and accompanying documents.

7

## ARGUMENT

### I.    THE STANDARD ON A MOTION TO DISMISS UNDER RULE 12(B)(6).

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),

"a complaint must set forth 'factual allegations, either direct or inferential, respecting each

material element necessary to sustain recovery under some actionable legal theory.'" *Berner*

*v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d

513, 515 (1st Cir. 1988)).  Applying this standard, a court reviews the pleadings "accepting as

true all well-pleaded averments and indulging all reasonable inferences in plaintiffs' favor."

*Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).  The court, however, "does not have to

accept every allegation in the complaint as true in considering its sufficiency."  5A Charles

Alan Wright, et al., *Federal Practice and Procedure* § 1357 (2d ed. 1990).  As the First

Circuit has observed, "bald assertions, unsupportable conclusions, periphrastic

circumlocutions, and the like need not be credited" under the Rule 12(b)(6) standard.  *Aulson*,

83 F.3d at 3.  The Amended Complaint fails to satisfy the requirements of Rule 12(b)(6) and

should be dismissed as to Advest.

### II.    THE BONDHOLDERS HAVE FAILED TO STATE AN ACTIONABLE CLAIM UNDER SECTION 10(B) OR RULE 10B-5 OF THE SECURITIES EXCHANGE ACT OF 1934.

In Count I, the Bondholders purport to bring a claim under Section 10(b) of the

Exchange Act and Rule 10b-5.  Section 10(b) and Rule 10b-5 plaintiffs must plead that, in

connection with the purchase or sale of securities, (1) defendants made a materially false or

misleading statement or omitted to state a material fact necessary to make a statement not

misleading; (2) defendants acted with scienter, i.e., the intent to deceive, manipulate, or

defraud; (3) plaintiffs relied upon the defendants' misstatement or omission; and (4)

defendants' misstatement or omission caused the plaintiffs' loss. *See In re Cabletron Systems,*

*Inc.*, 311 F.3d 11, 27 (1ˢᵗ Cir. 2002); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1ˢᵗ Cir. 1996). The Amended Complaint fails to allege these basic elements of a Section 10(b) or Rule 10b-5 claim.

### A.     THE HEIGHTENED PLEADING REQUIREMENTS APPLICABLE TO SECTION 10(B) AND RULE 10B-5 CLAIMS.

Securities fraud is a serious allegation, and therefore special pleading rules apply. Even prior to the enactment of the Private Securities Litigation Reform Act of 1995 ("the PSLRA"), the First Circuit was "especially strict in demanding adherence to Rule 9(b) in the securities context." *Gross v. Suma Four, Inc.*, 93 F.3d 987, 991 (1ˢᵗ Cir. 1996). Rule 9(b) requires a fraud plaintiff to allege "the particular times, dates, places or other details of [the] alleged fraudulent involvement of the actors." *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1ˢᵗ Cir. 1994). As the First Circuit has recognized, the PSLRA essentially codified this "especially strict" pleading standard. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1ˢᵗ Cir. 1999) (the PSLRA essentially codified the pleading standards applied in the First Circuit); *Fitzer v. Security Dynamics Tech.*, 119 F. Supp. 2d 12, 18 (D. Mass. 2000). "The PSLRA and Rule 9(b) pleading standards are for all practical purposes identical." *Garvey v. Akroosh*, No. CIV.A.04-10438-RGS, 2005 WL 273135, at * 5 (D. Mass. Feb. 4, 2005) (citing *Greebel*, 194 F. 3d 185, 193-94)[6].

To survive a motion to dismiss, Section 10(b) and Rules 10b-5 plaintiffs must allege particular facts demonstrating that the challenged statements were materially false and misleading *when made*. *See*, e.g., *Gross*, 93 F.3d at 993-94, *Shaw*, 83 F.3d at 1223. The Amended Complaint "must specify each statement alleged to have been misleading, [and] *the reason or reasons why the statement is misleading*." *See* 15 U.S.C. § 78u-4(b)(1) (emphasis

---

[6] The unreported opinions are included in the accompanying appendix.

added); *Greebel,* 194 F.3d at 193. In other words, plaintiffs cannot rely on conclusory assertions that they were misled. Rather, they must set forth specific facts, with respect to each statement, demonstrating why the statements were not only misleading, but also "material" as only "materially misleading statements" are actionable under the securities laws. *See, e.g., Van Ormer v. Aspen Tech.,* 145 F. Supp. 2d 101 (D. Mass. 2000) (securities fraud plaintiffs must "explain and provide factual support for why the statement is fraudulent"). A statement or omission is "material" only if a reasonable investor would have viewed it as "having significantly altered the total mix of information made available" or "might have considered [it] important in the making of [the investment] decision." *In re Boston Tech., Inc. Sec. Litig.,* 8 F. Supp. 2d 52, 54 (D. Mass. 1998) (citations omitted); *see also Basic v. Levinson,* 485 U.S. 224, 232 (1988). Optimistic statements as well as statements accompanied by cautionary language are not material, as a matter of law. *In re Boston Tech.,* 8 F. Supp.2d at 54.

In addition, to state a Section 10(b) and Rule 10b-5 claim, plaintiffs in the First Circuit also must allege, with particularity, facts which give rise to "a strong inference of scienter" with respect to each defendant. *Greebel,* 194 F.3d at 196-97; *Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir. 1998); *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir. 1997). The PSLRA requires actual intent to deceive or, at a minimum, particular facts demonstrating deliberate or conscious recklessness. *Greebel,* 194 F.3d at 198; *Garvey,* 2005 WL 273135, at * 6. Negligence or mere "simple recklessness" is not enough. *See Garvey,* 2005 WL 273135, at * 6 ("a plaintiff must allege conduct from which a jury could infer intentional (or reckless) deception") (citing *Geffon v. Micrion Corp.,* 249 F.3d 29, 35 (1st. Cir. 2001)).

Thus, plaintiffs must allege sufficient facts to show that each defendant either (i) actually knew of and/or intended to mislead the plaintiffs; or (ii) engaged in "conscious or

reckless behavior" sufficient to give rise to a "strong inference of scienter." *Lirette v. Shiva Corp.*, 27 F. Supp.2d 268, 282 (D. Mass. 1998); *see also Geffon,* 249 F.3d at 35. These heightened pleading requirements are consistent with Rule 9(b)'s long-standing requirement that "each person's role in the alleged fraud must be particularized . . . ." *Loan v. FDIC*, 717 F. Supp. 964, 968 (D. Mass. 1998); *accord Konstamtinakos v. FDIC*, 719 F. Supp. 35, 38 (D. Mass. 1998).

As set forth below, the Bondholders have failed adequately to allege the essential elements of a Section 10(b) or Rule 10b-5 claim and, accordingly, have not met even the more liberal pleading requirements of Rule 12(b)(6). The Amended Complaint does not begin to satisfy the more demanding requirements of the PSLRA and Rule 9(b).

### B.    THE AMENDED COMPLAINT FAILS TO ALLEGE ADEQUATELY ANY ACTIONABLE MISSTATEMENT OR OMISSION.

#### 1.    *A Statement By Statement Analysis Demonstrates That the Amended Complaint Does Not Allege an Actionable Misstatement.*

In securities fraud actions, courts must engage in an analysis of each statement alleged to determine whether the plaintiffs have alleged facts demonstrating that each statement was misleading *and* material. *E.g., Orton v. Parametric Tech. Corp.*, No. CIV.A.03-10290-WGY, 2004 WL 2475330, at * 8-11 (D. Mass. Nov. 4, 2004); *Fitzer*, 119 F. Supp. 2d at 22. Here, that analysis establishes that the Amended Complaint does not allege any actionable statements. The eight alleged misstatements fall into three categories: one statement relates to the College's cash flow; five statements relate to the College's current and projected enrollment; and two statements relate to the College's financial planning.

11

(a)    The College's Cash Flow

The Bondholders challenge the statement that "[a] portion of the proceeds of the Series
1998 Bonds, together with an equity contribution by [the College] [identified in table form as
$1 million], will be used by [the College] for the construction or alteration of buildings." Am.
Compl., ¶ 46 (statement 1).[7] The Bondholders are challenging this statement because they
contend that, "[a]t the time the Official Statement was prepared and circulated, there was no
present intention among the Defendants to commit the College to contribute any of its own
funds toward the construction project." Am. Compl., ¶ 65. As grounds for this assertion, the
Bondholders point to a joint meeting of the Finance and Building and Grounds Committees,
held more than three months before the offering, where certain of the officers and trustees
decided that, in order to complete the construction project, "the College would make every
effort to reduce its construction costs or make an equity contribution at the end in the final
phase of the project." *Id.* That is all. There is no factual allegation that, by the time the
offering was made at the beginning of May 1998, the trustees and officers of the College had
not decided to go forward with an equity contribution from the College at the outset of the
project. Indeed, the meeting cited in the Amended Complaint *supports* the statement made in
the Official Statement – it shows that, prior to the offering, the trustees were contemplating
such a contribution. The Official Statement also makes no guarantees about when the
contribution would be made (i.e., whether it would be made at the beginning or the end of the
project). Therefore, the trustees' initial decision that such a contribution might be made at the
end of the project is of no consequence.

---

[7]    The Amended Complaint includes two paragraphs numbered "46." All of the alleged misstatements
are identified in the first of the paragraphs 46, which is found on pages 13 and 14 of the Amended Complaint.

In any event, the factual allegations in the Amended Complaint do not support the bald conclusion that, in fact, at the time the Official Statement was made, the trustees and officers had no intention of having the College make the contribution. The statement that appeared in the Official Statement is not alleged to have been false and misleading *when it was made*. *See Gross*, 93 F.3d at 993-94 (securities fraud plaintiffs must allege that allegedly misleading statements were false when made).

(b)     The College's Current and Projected Enrollment

The bulk of the alleged misstatements (five of them) concern the College's current and projected enrollment and the College's enrollment goals. Am. Compl., ¶ 46 (statements 2, 3, 4, 6, 7). Two of the alleged misstatements are charts of enrollment and admissions data that were included in Appendix A to the Official Statement: the first is a chart of "Bradford College Fall Enrollment Statistics," which shows fall enrollment for each year from 1993 through 1997, and the second is a chart of "Admissions Trends," which shows the numbers of applications, acceptances, and matriculation rate for each year from 1993 through 1997. Am. Compl., ¶ 46 (statements 3 and 4).

The Bondholders apparently contend that the chart of Fall Semester Enrollment Statistics is misleading because it does not reveal that the College often lost students during the Spring semester. Am. Compl., ¶ 54. As an initial matter, the chart was identified for precisely what it was – *Fall Semester* enrollment. Moreover, directly above the chart, *the College disclosed that it had fewer full and part time students enrolled in the Spring of 1998 than had been enrolled in the Fall of 1997*. Official Statement at A-8. In other words, the very information that the Bondholders complain was missing from the chart was fully disclosed on the very same page of the Official Statement. Likewise, the Bondholders do not allege that

13

any of the data included in the chart of Admissions Trends was doctored or wrong. In short, the chart was what it was – enrollment data that was true and accurate.

The Bondholders also challenge three statements that reiterate the College's *goal* of increasing enrollment to 725 students by fall 2000. Am. Compl., ¶ 46 (statements 2, 6, 7). Each statement uses the term "goal." Nowhere in the Amended Complaint, however, do the Bondholders allege facts demonstrating that those statements are false. They do not allege, for example, that the College did not have those enrollment goals or that the College did not in fact believe that it could reach those goals.

Moreover, none of the "enrollment goals" is materially misleading because their context "bespeaks caution." It is well established that all statements or omissions must be considered in context. *Shaw*, 82 F.3d at 1213. The bespeaks caution doctrine provides that when statements of "soft" information – forecasts, estimates, opinions, or projections – are accompanied by cautionary disclosures, those statements may not be materially misleading under the securities laws. *Id.*; *see also Fitzer*, 119 F. Supp. 2d at 31. Each of the statements regarding the College's projected enrollment for the fall of 2000, indisputably an "estimate, opinion, or goal," was accompanied by meaningful cautionary language. At the very beginning of the Official Statement, the College warned: "The information and expression of opinions set forth herein are subject to change without notice." Official Statement, Preliminary Statement. Moreover, directly following the statement about the College's goal of increasing enrollment to 725 full time students, the College stated: "A failure by [the College] to attract and retain students in sufficient numbers to accomplish such goal could adversely affect the ability of [the College] to make required payments on the Series 1998 Bonds. Demographics for traditional college-age students also are intensifying the competition for students by all colleges and universities, including [the College.]" Official Statement at 11.

14

This cautionary language, directly addressing the statements regarding projected enrollment, renders these statements inactionable, as a matter of law.

Finally, these statements regarding the College's "goals" are the type of loosely optimistic statements that are deemed immaterial under the securities laws. *In re Boston Tech.*, 8 F. Supp.2d at 54; *see also Orton*, 2004 WL 2475330, at * 8. "Optimistic predictions 'that prove to be off the mark' – even the most specific ones" are not material and, therefore, not actionable. *In re Boston Tech.*, 8 F. Supp. 2d at 54 (citing *Serabian*, 24 F.3d at 361). This loose optimism is not actionable because no reasonable investor would consider such statements in making their investment decision. *See Shaw,* 82 F.3d at 1218; *In re Boston Tech.*, 8 F. Supp. 2d at 54. Here, the Bondholders' conclusory allegations imply that they believe that the College's goal of increasing enrollment was overly optimistic. Again, the goal was what it was, and any reasonable investor would have been assumed to recognize it for what it was – a goal; "the end toward which effort is directed." Merriam-Webster Dictionary, www.m-w.com/cgi-bin/dictionary. For this additional reason, none of the five statements regarding current and projected enrollment is material and none is actionable.

(c)    The College's Financial Planning

The Bondholders also challenge two statements regarding the College's financial planning: one in which the College explained that its financial plan called for certain estimated reductions in financial aid, and a second in which the College identified several "variables" that would affect the College's ability to fulfill its strategic initiative of increasing tuition revenues over the next two to three years. Am. Compl., ¶¶ 46 (statements 5 and 8). But nowhere in the Amended Complaint do the Bondholders contend that the estimated reduction in financial aid or increase in tuition revenues were not a part of the College's "current financial plan." Likewise, the Bondholders do not allege that the College had not undertaken to

15

increase tuition revenues as one of its "strategic initiatives." Thus, the Amended Complaint contains no facts showing that either statement was false or somehow misleading.

Even if the College's "estimate" regarding its ability to reduce reliance on financial aid later proved to be off, by its very terms it was not a guarantee. Likewise, the statement regarding the College's strategic initiatives actually warned investors that the College's ability to increase tuition revenues was dependent on multiple variables. Moreover, the cautionary language throughout the Official Statement directly addressing the College's financial status — advising that estimates and opinions could change without notice, listing the potential problems with attaining enrollment goals, explaining the College's reliance on tuition payments, and noting the direct connection between enrollment targets and the College's ability to meet its budget, (Official Statement at 1, 11 and A-13) – further warned of the potential problems with the College's ability to meet its financial goals. *See Fitzer*, 119 F. Supp. 2d at 31 (finding statements in prospectus inactionable where prospectus was "replete with cautionary language concerning the prospects of the company"). Likewise, the College's optimistic estimates about the College's ability to reduce financial aid and increase tuition revenues are precisely the type of statements that a reasonable investor would recognize for what they were – optimistic – and would not rely on in making their investment decision. *See In re Boston Tech.*, 8 F. Supp. 2d at 54. Neither estimate or projection regarding the College's financial planning is materially misleading. Indeed, the very statements that the Bondholders challenge here are the ones that should have warned investors of the risks associated with investing in Bradford.

In sum, none of the statements identified in the Amended Complaint are actionable. The estimates, projections and forecasts either are not alleged to be false, are accompanied by appropriate cautionary language, and/or are the type of optimistic statements that renders them not materially misleading and therefore inactionable as a matter of law.

16

2.     *The Amended Complaint Does Not to Allege That the Official
Statement Omitted Material Information.*

Perhaps recognizing the inherent problems with their claim that the Official Statement

contained any materially misleading statement, the Bondholders include a litany of information

that they contend should have been contained in the Official Statement. Am. Compl., ¶¶ 47-

65. A securities fraud claim, however, cannot rest solely on the omission of "facts that the

Bondholders also would have liked to know." Rather, to state a claim for violation of the

securities laws based on material omissions, plaintiffs first must allege that the defendant had a

duty to disclose. *Backman v. Polaroid Corp.*, 910 F.2d 10, 13 (1st Cir. 1990) *aff'd*, 73 F.3d

1164 (1st Cir. 1996) ("Silence, absent a duty to disclose, is not misleading"). The First Circuit

has held that such a duty arises only where the defendant has omitted a material fact necessary

to make the statements  made not misleading. *See e.g., Backman*, 910 F.2d at 16-17; *Garvey,*

2005 WL 273135, at * 6 & n.10 (noting limitations on duty to disclose); *Adams v. Hyannis

Harborview, Inc.*, 838 F. Supp. 676, 687 (D. Mass. 1993) (duty to disclose only to correct

misstatements); *Kafenbaum v. Gtech Holdings, Corp.*, 217 F. Supp.2d 238, 248 (D.R.I. 2002)

(same); *see also* 15 U.S.C. § 78u-4(b). In other words, plaintiffs must link each allegedly

omitted material fact to a statement and must allege why it was necessary to disclose that fact

in order to make the statement not materially misleading. *See Garvey,* 2005 WL 273135, at *

6 ("with respect to an alleged omission, a finding of materiality is not enough. There must be

a duty to disclose"); *Kafenbaum*, 217 F. Supp.2d at 248 ("whether an omission is material and

whether a statement is misleading are interrelated" inquiries) (internal quotations omitted).

The plaintiffs here have not alleged the necessary link between the alleged omissions and the

alleged misstatements and, accordingly, have not alleged the existence of a duty to disclose.[8]

---

[8] While, in some instances, issuers may have a duty to update public statements that "become materially misleading in light of subsequent events," *see Backman*, 90 F.2d at 16-17, the loosely optimistic statements

*See Cooperman v. Individual, Inc.*, 171 F.3d 43, 47 (1st Cir. 1999). Moreover, as set forth below, the alleged "omissions" are not really omissions at all – all of the information that the Bondholders now claim was missing from the Official Statement was, in fact, disclosed.

The Bondholders purport to identify six categories of omissions, two of which relate to the same issue – enrollment – and they, therefore, are discussed together. First, the Bondholders allege that the Official Statement failed to disclose that the College was financially unstable. *See* Am. Compl., ¶¶ 48-49. That could not be farther from the truth, as literally all of the College's financial information was fully disclosed. Indeed, the financial statements for each year from 1995 through 1997 were attached to the Official Statement. Official Statement, App. B. Moreover, in Appendix A, under the section entitled "Accounting Matters," *the College disclosed that it had incurred an operating deficit in each year since 1989.* Official Statement at A-13. Nothing was hidden and, in fact, the College highlighted its financial problems on the same page of the Official Statement on which no fewer than three of the allegedly misleading statements appeared. *Id.*; *see also* Am. Compl., ¶ 46.

Second, the Bondholders complain that the Official Statement failed to disclose its student attrition problems and set unrealistic enrollment goals. *See* Am. Compl., ¶¶ 49-54, 61-63. In support of these contentions, the Bondholders cite, among other things, a statement made by a former Board member in 1999 and a report issued at the end of 1998 – *after* the Official Statement was prepared. *Id.*, ¶¶ 51, 53. These citations do not indicate that any statement in the Official Statement was false *when made*. *See Shaw*, 82 F.3d at 1223 ("under Rule 9(b) a plaintiff may not contrast a defendant's past optimism with less favorable actual results and then contend the difference is fraud"). In any event, the College's issues with

---

regarding the College's goals are not the type of statements that, as a matter of law, require updating. *See, e.g., Shaw*, 82 F.3d at 1219, n. 33 (no duty to update cautiously optimistic statements); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., et al.*, 75 F.3d 801, 811 (2d Cir. 1996) (no duty to update statements that merely reflect "hope").

18

student retention also were disclosed. As noted above, the College disclosed that it had fewer students returning in the Spring of 1998 than had started the school year in the Fall of 1997. Official Statement at A-8. Moreover, the College also disclosed that it hoped the improvements funded by the bond offering would improve the College's ability to retain students. *Id.* at 7. Contrary to the Bondholders' position, the College did not present a rosy picture regarding student retention and specifically disclosed that attrition was a problem. *See id.* Likewise, in discussing its goal to increase enrollment, the College noted that competition for students was intensifying and its inability to attract and retain students would undermine its ability to make payments on the Series 1998 Bonds. Official Statement at 11. As set forth above, the College's enrollment goals were identified as such – they were *goals* – and the potential risks associated with attaining those goals, as well as the actual enrollment statistics, were fully disclosed.

Third, the Bondholders contend that the College did not adequately disclose its significant financial aid commitments. Am. Compl., ¶¶ 55-58. The Bondholders are wrong. In Appendix A, the College disclosed that (1) more than 80% of its students for the 1997/1998 academic year were on financial aid, (2) the College needed to be able to provide an attractive financial aid package in order to attract students, and (3) the College's total financial aid packages grew every year from 1993 through 1997. Official Statement at A-10. In the face of such full disclosure, the Bondholders' claims regarding the alleged "omission" of financial aid information are disingenuous, at best.

Fourth, the Bondholders allege that the College's references to "goals," "plans," and "strategic initiatives" were misleading because the College failed to disclose that it did not have a "strategic plan." Am. Compl., ¶ 59. As an initial matter, the alleged lack of a "strategic plan" – a term that is not easily defined – is not the type of information that a

reasonable investor would view as altering the "total mix" of information available when making an investment decision. It therefore is not material. *See In re Boston Tech. Sec. Litig.*, 8 F. Supp.2d at 54. Moreover, the College never represented that it had a formal "strategic plan," regardless of what that term means. The College disclosed its "goals," "plans," and "strategic initiatives." Am. Comp., ¶ 46. Any lack of a strategic plan is not a material omission.

Fifth, relying on the first alleged misleading statement (that the College was making a $1 million equity contribution to the project funded by the offering), Am. Compl. ¶¶ 46, 65, the Bondholders assert that the College failed to disclose that it did not, in fact, intend to make such a contribution. *Id.*, ¶65. As discussed above, *supra* 12-13, the Bondholders allege no facts supporting that assertion. Rather, the meeting minutes cited by the Bondholders support the statement in the Official Statement as they establish that the appropriate Board committees were considering the equity investment more than three months before the offering. Am. Compl., ¶ 65. The Bondholders have not alleged a material omission with regard to the equity financing.

A reasonable investor reading the Official Statement would certainly conclude that an investment in these "BBB -" bonds was a risky investment. Given the disclosures and overall tone of the Official Statement, even if it had made misrepresentations or left information out, such would not be material to a reasonable investor. Here, the Official Statement did not in fact contain misrepresentations or omissions. As the Amended Complaint does not allege any materially misleading statements or omissions, the Section 10(b) and Rule 10b-5 claim against Advest (contained in Count I) should be dismissed.

C.    **THE SECTION 10(B) AND RULE 10B-5 CLAIM SHOULD BE DISMISSED BECAUSE THE BONDHOLDERS HAVE FAILED TO ALLEGE THAT ADVEST ACTED WITH SCIENTER.**

The Section 10(b) and Rule 10b-5 should be dismissed as to Advest for the additional, and independently sufficient, reason that the Bondholders have failed adequately to allege that Advest acted with scienter.  To state a claim for securities fraud, plaintiffs must allege "specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading." *Serabian*, 24 F.3d at 361 (internal citations omitted).  To satisfy this standard here with respect to Advest, the Bondholders must allege *particular facts* demonstrating either that Advest (1)  knew of the allegedly adverse information that should have been disclosed, or (2)  recklessly disregarded such facts by not fulfilling its duty as an underwriter to conduct due diligence.  *See Greebel*, 194 F.3d at 198; *Garvey*, 2005 WL 273135, at * 6; *see also* 15 U.S.C. §78u – 4(b)(2) (plaintiffs must "state with particularity facts that give rise to a strong inference that the defendant acted with the required state of mind").  The Bondholders have not alleged facts supporting either theory and, for that additional reason, the Section 10(b) and Rule 10b-5 claim should be dismissed.

> *1.    The Bondholders Have Not Alleged Facts Showing That Advest Knew Any of the Allegedly Adverse Information.*

The Amended Complaint focuses on information that was known, or should have been known, to *the College* regarding its financial situation, future enrollment, and future financial aid allocations.  Indeed, the Bondholders make a series of conclusory assertions about what the "College knew" at the time the Official Statement was prepared, including, for example:  that the "College knew that spring semester enrollment was lower than predicted in its budget," Am. Compl., ¶ 56; "the College knew that its matriculation rate for accepted students would almost certainly decline, *id.*, ¶ 61; "the College also knew the number of students who had actually placed deposits for Fall 1998 had dropped, *id.*, ¶63.  Occasionally, the Bondholders

21

lump all of the defendants together, alleging what the "Defendants knew," including, for example: "[t]he Defendants, moreover, were well aware of the College's enrollment and retention problem," *id.*, ¶ 50. These conclusory statements – which do not provide any factual basis for how either "the College" or the entire group of 19 defendants "knew" any of the allegedly adverse information – are insufficient to give rise to a "strong inference of scienter." *See* 15 U.S.C. § 78u-4(b)(2); *see also Greebel*, 82 F.2d at 196; *Fitzer*, 119 F. Supp. 2d at 18. This type of unspecific "group pleading" has been rejected by the courts. *See, e.g., In Re Raytheon Sec. Litig.*, 157 F.Supp. 2d 131,152 (D. Mass. 2001); *In re Galileo Corp. Sec. Litig.*, 127 F.Supp. 2d 251, 261 (D. Mass. 2000).

Perhaps recognizing the insufficiency of their "knowledge" allegations, the Bondholders attempt to add some specificity with regard to what the Bradford Defendants "knew." In this regard, they point to specific meetings that allegedly were attended by some or all of the Bradford Defendants where allegedly adverse information was shared. Am. Compl., ¶¶ 47-48, 51, 57, 65. Nowhere in the Amended Complaint, however, do the Bondholders allege that anyone from Advest either attended those meetings or otherwise knew about the information that was discussed. Beyond these meetings, the Bondholders point to statements that were made by former trustees and reports that were issued by an accrediting institution that disclosed allegedly adverse information. Am. Compl., ¶¶ 50, 53, 60. Again, it is not alleged that Advest either had access to or knew about the statements or reports. But even if the Amended Complaint did contain such an allegation, it would not support their conclusory scienter allegations because these statements and reports became available *after* the Official Statement was prepared. *See* Am. Compl., ¶50, 53, 56, 60 (referencing statement made in November 1999, report issued in January 1999, and audited financials compiled after offering); *see also Shaw*, 83 F.3d at 1223 (securities fraud plaintiffs cannot rely on information

available to defendants after issuing an allegedly misleading statement); *Tapogna v. Egan*, 141

F.R.D. 370, 372 (D. Mass. 1992) (scienter exists only where knowledge or reckless behavior

existed at the time of the allegedly false statement).

In sum, the Amended Complaint is replete with conclusory allegations regarding what

"the College" or "all of the Defendants" allegedly "knew." The only specifics that might

support these allegations are with regard to the Bradford Defendants, not Advest. The

Bondholders have failed to allege any facts that Advest knew any of the allegedly adverse

information.

> 2.    *The Amended Complaint Does Not Allege That Advest Did Not*
>        *Fulfill its Duties as an Underwriter.*

As an underwriter, Advest was under a duty to exercise "reasonable care" when

assisting the College with this offering. 15 U.S.C. §77l (setting forth "reasonable care"

standard); *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 629 (1st Cir. 1996).

Specifically, an underwriter is obligated to make a reasonable attempt to verify data submitted

by the issuer. *In re Software Tools, Inc. Sec. Litig.*, 50 F.3d 615, 621 (9th Cir. 1994); *see also*

*Eichenholtz v. Brennan*, 52 F.3d 478, 485 (3rd Cir. 1995); *Escott v. BarChris Const. Corp.*,

283 F. Supp. 643, 697 (S.D.N.Y. 1968). But it is only obligated to do so with regard to data

and information that is, in fact, verifiable. *In re Software Tools, Inc. Sec. Litig.*, 789 F. Supp.

1489, 1496 (N.D. Cal. 1992). Underwriters are not expected to possess the same level of

intimate knowledge of directors and officers and they are entitled to rely on management's

representations with regard to information that cannot reasonably be verified by third parties.

*Id.*; *see also Endo v. Albertine*, 863 F, Supp. 708, 732 (N.D. Ill. 1994). Underwriters are not

expected to ferret out everything that, in this case, the trustees and officers might have known

about the College. *Id.*

The Bondholders' claims here are based on omissions that, as set forth in detail above, either "the College" or certain of the trustees and officers allegedly knew. The alleged misstatements consist of, *inter alia*, estimates by the College concerning their ability to meet enrollment goals and decrease financial aid as well as statements regarding the College's "strategic initiatives." Such estimates and projections are not the type of information that could have been verified by Advest. *See Software Tools*, 789 F. Supp. at 1496. Nor do the Bondholders allege that it could or should have been. Indeed, the Amended Complaint does not contain a single reference to Advest's due diligence or purported lack thereof. The Bondholders did not challenge the due diligence because they could not. Accordingly, the Bondholders have not pled that Advest acted recklessly.

As the Bondholders have not pled specific facts demonstrating either that Advest knew of the allegedly adverse information or that it acted recklessly in not knowing, the Amended Complaint fails to contain allegations sufficient to give rise to the "strong inference of scienter" required to state a claim for violation of Section 10(b) and Rule 10b-5.

> **D.**   **THE BONDHOLDERS HAVE FAILED ADEQUATELY TO ALLEGE THAT THEIR LOSSES WERE CAUSED BY THE ALLEGED MISREPRESENTATIONS OR OMISSIONS IN THE OFFICIAL STATEMENT.**

In addition to alleging, with particularity, that the defendants made a false and misleading statement and that they acted with scienter, securities fraud plaintiffs must also allege "loss causation" – that is that the plaintiffs' alleged losses were caused by the alleged misstatements and omissions. *See* 15 U.S.C. § 78u-4(b)(4) (imposing burden of proving loss causation on the plaintiff); *Suez-Equity Investors, L.P. v. Toronto-Dominion*, 250 F.3d 87, 95 (2d Cir. 2001) (loss causation is a necessary element of a Section 10(b) claim); *Miller v. New America High Income Fund*, 755 F. Supp. 1099, 1107 (D. Mass. 1991), *aff'd sub nom, Lucia*

*v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir. 1994) (same). The Bondholders have not even attempted to plead "loss causation."

The only "causation-type" allegation in the Amended Complaint is found in paragraph 85, in which the Bondholders allege that "the Bondholders have suffered damages in that they purchased the Bonds *in reliance* on the Defendants' misrepresentations and omissions" and "they would not have purchased the Bonds at the prices they paid, or at all, if they had not been so misled regarding the College's inability to service the debt that it incurred by reason of the issuance of the Bonds, or otherwise to repay the Bonds." Am. Compl., ¶ 85 (emphasis added). But this is, in fact, an allegation regarding the Bondholders' alleged "reliance" on alleged misconduct, not loss causation. As the Second Circuit has explained, while reliance or "transaction causation" – that but for the alleged misconduct the plaintiffs would not have purchased the security – also is a necessary element of Section 10(b) and Rule 10b-5 claims, it is not the same as "loss causation." *See Suez Equity Investors*, 250 F.3d at 95 (Section 10(b) plaintiffs must plead both transaction causation and loss causation to survive a motion to dismiss). Rather, "loss causation" means, as set forth above, that the plaintiffs lost the value of their investment because of the alleged misrepresentations and omissions. *See id.*

Here, the allegations in the Amended Complaint not only do not allege "loss causation," but they establish that the Bondholders' losses were not caused by the alleged misrepresentations and omissions. Rather, the Bondholders have alleged that their losses were caused by the very risks that were emphasized in the Official Statement and by decisions made by the trustees and officers of the College *after* the offering. Specifically, the Bondholders allege that in September 1998, the College was "faced with an accelerating financial crisis" because the College had not achieved the enrollment levels necessary to reach "financial equilibrium" – a risk that was expressly disclosed in the Official Statement. *See* Am. Compl.,

25

¶¶ 68, 69; Official Statement at A-13. The Bondholders further allege that the trustees and officers increased financial aid spending and attempted to "slash spending and reduce [the College's] operating losses" by "gutt[ing] its admissions program through budget cuts and employee layoffs. *These stop-gap measures further guaranteed the College's inability to recruit enough students to survive, let alone meet its financial obligations as they came due.*" Am. Compl., ¶¶ 70, 71 (emphasis added). Finally, according to the allegations in the Amended Complaint, the decision by the trustees and officers to continue with the construction of new residential space "unnecessarily deplet[ed] the assets of the College" and "*reduc[ed] the collateral available to repay the Bonds*, all at a time when the College was insolvent or in the zone of insolvency." Am. Compl., ¶ 72 (emphasis added). In sum, the Bondholders have alleged that it was decisions made by the trustees and officers *after* the offering that caused the College to have to close its doors and default on the Series 1998 Bonds – *not* the misrepresentations and omissions alleged in the Amended Complaint, or any acts of Advest. The Bondholders have not pled loss causation, nor could they. The investment losses the Bondholders' have suffered were caused by decisions and events outside of the control of Advest. Accordingly, the Section 10(b) and Rule 10b-5 claims should be dismissed.

* * * *

In sum, the Bondholders have not alleged any of the required elements of a Section 10(b) or Rule 10b-5 claim, even under the more liberal standards applicable under Federal Rule of Civil Procedure 12(b)(6). They have not begun to satisfy the more stringent standards of Rule 9(b) and the PSLRA: they have not alleged facts demonstrating that the Official Statement contained a single, material, false or misleading statement; they have not alleged facts demonstrating the existence of an actionable omission – indeed, each of the facts that they claim were "omitted" were actually fully disclosed in the Official Statement and its

26

attachments; they have not alleged that Advest acted with scienter; and they have not alleged "loss causation" – the allegations in the Amended Complaint demonstrate that their losses were *not* caused by any act or omission by Advest. Under these circumstances, the Section 10(b) and Rule 10b-5 claim contained in Count I should be dismissed, with prejudice, as to Advest.

### E.    THE SECTION 10(B) AND RULE 10B-5 CLAIMS AGAINST ADVEST ARE BARRED BY THE CENTRAL BANK DOCTRINE.

The Bondholders have failed to allege any of the elements of a Section 10(b) or Rule 10b-5 claim against Advest because Advest was not the author of the Official Statement in which the allegedly misleading statements appeared. The Official Statement, and particularly the portions of the Official Statement that contained the allegedly misleading statements, were prepared by the College. Official Statement at 15. As set forth in both the Official Statement and the Amended Complaint, Advest's stated role was as the underwriter of the bonds. Am. Compl., ¶ 13; Official Statement at 14. This role is not enough to confer primary liability on Advest. And, under the United States Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the Bondholders' attempt to hold Advest liable for aiding and abetting a violation of Section 10(b) or Rule 10b-5 must fail.

In *Central Bank*, the Supreme Court concluded that liability for aiding and abetting a violation of Rule 10b-5 could not be squared with the plain language of Section 10(b). The Court reasoned that Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act" and that the "proscription does not include giving aid to a person who commits a manipulative or deceptive act." 511 U.S. at 177. Thus, under *Central Bank*, it is not enough to allege that a defendant assisted someone else in making a material misstatement or otherwise participated in the challenged fraud. *See, e.g., Ziemba v.*

27

*Cascade Int'l*, 256 F.3d 1194, 1205 (11ᵗʰ Cir. 2001); *Wright v. Ernst & Young*, 152 F.3d 169, 175 (2d Cir. 1998); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10ᵗʰ Cir. 1996). "'[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of that is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).'" *Wright*, 152 F.3d at 175 (quoting *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997)).

Although the First Circuit has yet to address the issue, the courts in this district generally require that the "secondary actor," such as an underwriter, play a "significant role" in drafting and revising a false and misleading document before it can be held liable as a primary violator of Section 10(b). *See, e.g., In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp.2d 152, 163 (D. Mass. 2002) (defining "significant role" requirement and noting that "most courts have construed *Central Bank* as requiring a secondary actor's actual drafting and preparation of actionable material as opposed to mere review and approval"); *Wells v. Monarch Capital Corp.*, No. 91-10575, 1996 WL 728125, at *13 (D. Mass. Oct. 22, 1996) ("[T]he record does not show that [defendant auditor] played a significant role in the making of any of the documents listed in the . . . Complaint"); *Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 738 (D. Mass. 1995) (noting absence of "well-pled allegation that Coopers directly participated in the preparation, review or approval of the . . . false and misleading statements"). Simple "review and approval" of the documents is not enough to allege a Section 10(b) or Rule 10b-5 violation. *See, e.g., In re Lernout*, 230 F. Supp.2d at 163; *Wells*, 1996 WL 728125, at *13. The allegations in the Amended Complaint do not begin to allege a primary violation against Advest. Beyond a single boilerplate allegation that Advest "was responsible for the preparation of the Official Statement" and that "Advest engaged and/or participated in the unlawful conduct alleged herein," Am. Compl., ¶13, the Amended

28

Complaint contains no facts indicating that Advest played any role – let alone a "substantial one" – in the preparation of the allegedly misleading statements. Indeed, in the Official Statement itself, the College revealed that the College bore the responsibility of preparing and supplying the information that appeared in every portion of the Official Statement that contain the allegedly misleading statements. Official Statement at 15 (noting that College certified accuracy of the information contained on pages 10 and 11 of the Official Statement and that the College "furnished Appendix A"); Am. Compl., ¶ 46 (identifying allegedly misleading statements as appearing on pages 10 and 11 of the Official Statement and in Appendix A).

As set forth above, the Bondholders have not alleged any of the elements of a primary violation with respect to Advest. At best, their allegations amount to unspecific assertions that Advest, as underwriter, aided and abetted the College's primary violations of Section 10(b) and Rule 10b-5 and, accordingly, are barred under *Central Bank*. The Section 10(b) and Rule 10b-5 claim in Count I should be dismissed for this additional, and independently sufficient, reason.

### III.     THE AMENDED COMPLAINT DOES NOT STATE A CLAIM UNDER SECTION 12(A)(2) OF THE SECURITIES ACT.

In Count III, the Bondholders purport to bring a claim against Advest for violation of Section 12(a)(2) of the Securities Act of 1993, which prohibits the offer or sale of securities by way of a false or misleading prospectus. *See* 15 U.S.C. § 77l. The tax-exempt Series 1998 Bonds, however, are specifically exempted from the provisions of Section 12(a)(2). *See* 15 U.S.C. §§ 77c(a)(2), 77l. Likewise, the United States Supreme Court has held that Section 12(a)(2) only applies to public offerings and that aftermarket purchasers lack standing to bring a claim under Section 12(a)(2). *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 571 (1995). As none of the Bondholders is alleged to have participated in the initial offering, they have failed

29

to allege that any of them has standing to pursue this claim. For these reasons, and because the Bondholders have failed to allege an actionable misstatement or omission, Count III must be dismissed.

### A.    SECTION 12(A)(2) OF THE SECURITIES ACT DOES NOT APPLY TO THE TAX-EXEMPT SERIES 1998 BONDS.

Section 12(a)(2) imposes liability on:

> Any person who . . . offers or sells a security (whether or not exempted by the provisions of section 77c of this title, *other than paragraphs (2) and (14) of subsection (a) of said section)*, . . . by means of a prospectus . . . which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements . . . not misleading. . .

15 U.S.C. § 77*l* (emphasis added). Accordingly, as noted in the highlighted section, securities described in Section 77c(a)(2) are exempt from Section 12(a)(2) liability. Among the exempted securities defined in Section 77c(a)(2) are "[a]ny securities issued or guaranteed by the United States or any territory thereof, or by the District of Columbia, or by any State of the United States, or by any political subdivision of a State or territory, or by *any public instrumentality of the one or more States or territories . . . .*" 15 U.S.C. 77c(a)(2) (emphasis added);[9] *see also Gustafson*, 513 U.S. at 570 ("By its terms, §12(2) exempts from its coverage prospectuses relating to the sales of government issued securities"). The text of the Official Statement and the Amended Complaint establish that the tax-exempt municipal bonds at issue fall squarely within this exemption. The Bondholders' Section 12(a)(2) claim thus fails.

The Series 1998 Bonds were issued by MIFA, which, according to the Amended Complaint, "is an instrumentality of the Commonwealth of Massachusetts," Am. Compl. ¶¶ 1, 2, for the benefit of Bradford College, a non-profit, educational institution. *Id.*; *see also* Official Statement at 1, 12 ("interest of Series 1998 Bonds will not be included in the gross

---

[9]    Section 77c(a)(2) is also known as § 3(a)(2).

income of holders of the Series 1998 Bonds for federal income tax purposes"). On their face, therefore, the bonds are exempt from the provisions of Section 12(a)(2) and Advest cannot be held liable under that Section. This point is confirmed by further legal analysis of Section 12(a)(2) and its exemptions.

Although the Series 1998 Bradford College bonds clearly fall within the Section 77c(a)(2) exemption, it should be noted that the exemption would not protect the defendants if part of the obligation evidenced by the bond was to be paid from payments which will be used by or for an "industrial or commercial enterprise." *See* SEC Rule 131. Rule 131 provides that, for certain securities issued by a governmental entity for the benefit of an "industrial or commercial enterprise," the bonds issued by the governmental entity remain exempt under Section 77c(a)(2), but the agreement by the "industrial or commercial enterprise" to pay back the money is a separate security subject to coverage by, *inter alia*, Section 12(a)(2). 17 C.F.R. § 230.131; *see also, Gorsey v. I.M. Simon & Co.*, Civ. A. No. 86-1875-Z, 1987 U.S. Dist. LEXIS 1940, at * 8 (D. Mass. Feb. 23, 1987). Here, Bradford College is *not* an "industrial or commercial enterprise," Rule 131 does not come into play, and the bonds remain exempted pursuant to Section 77c(a)(2).

Although the phrase "industrial or commercial enterprise" is nowhere defined, it does not include a tax-exempt, educational institution. Rather, Rule 131 "relates to industrial revenue bonds." *See* Federal Register, Vol. 33, No. 174 (p. 12647); *see also* p. 12648 ("It should be noted that the rule relates only to that part of an obligation evidenced by industrial revenue bonds which is payable from an industrial or commercial enterprise.") The Series 1998 Bonds are not industrial revenue bonds, since educational institutions were specifically

31

exempted from the definition of industrial development bonds as set out in Internal Revenue Code ("IRC") § 103(b)(3)(B) (1954).[10] Therefore, Rule 131 is not applicable to these bonds.

This conclusion is supported by case law which has held that an entity is not an applicable "industrial or commercial enterprise" if the bonds are tax-exempt. Judge Zobel so found in *Gorsey,* in which the Court addressed the same Securities Act exemption and dismissed plaintiffs' Section 12(a)(2) claim. 1987 U.S. Dist. LEXIS 1940, at * 10. The *Gorsey* plaintiffs brought a Section 12(a)(2) claim against the City of South Bend, Indiana, which had issued bonds to fund improvements to a nursing home, as well as the entity that had sold the bonds and a consulting company. *Id.* at *1. In finding that the municipality-issued bonds were an exempted security, the Court rejected plaintiffs' argument that the agreement by the nursing home to repay the bonds was a non-exempt "separate security" under SEC Rule 131. *Id.* at *8. The issue of whether or not the bonds at issue in *Gorsey* were exempt turned on whether the nursing home was an "industrial or commercial enterprise" under the Rule. *Id.*, at * 9. The Court found that it was not, since the bonds were not "industrial development bonds," and that therefore Rule 131 did not apply. *Id.* at *11-12.

In reaching this conclusion, Judge Zobel was "persuaded that the phrase 'industrial or commercial enterprise' was intended by the SEC to have the same scope as the Internal Revenue Code definition of 'industrial development bonds.'" *Gorsey*, 1987 U.S. Dist. LEXIS 1940, at *11. Thus, the Court concluded that if the bonds at issue are not "industrial development bonds," they are not covered by Rule 131. *Id.* The Court held that the term "industrial development bonds," as used in that provision, "is a technical one; it refers

---

[10] Although when Section 103 was amended in 1986 the definition of "industrial development bond" was deleted, the definition is still relevant to understanding and interpreting the language of Rule 131 when it came into effect in 1968. The version of Section 103 in effect at the time the Series 1998 Bonds were issued makes clear that the Bonds were tax-exempt. It provides that gross income does not include interest on any state or local bond, except as provided in subsection b. Subsection b makes clear that bonds issued on behalf of educational institutions are tax-exempt. *See* Sec. 103(b)(1) and 141(e)(1)(G).

specifically to the definitions in the Internal Revenue Code." *Id.*, at \*10. Relying then on a

press release issued by the SEC in response to the amendment, the Court determined that the

SEC intended the phrase "industrial or commercial enterprise" contained in Rule 131 to have

the same scope as the Internal Revenue Code definition of "industrial development bonds" and

did not intend the Rule to reach "some broader category of municipally-financed 'industrial or

commercial enterprise.'" *See Gorsey,* 1987 U.S. Dist. LEXIS 1940 at \*10-11 (citing 1970 WL

5620 SEC Release No.); *see also In re Bexar County Health Facility Dev. Corp. Sec. Litig.,*

125 F.R.D. 625, 633-35 (E.D. Pa. 1989) (holding that Rule 131 only applies to "industrial

revenue bonds" as that term is defined in the Internal Revenue Code). As the bonds at issue

did not fall within the Internal Revenue Code's technical definition of "industrial development

bonds," the *Gorsey* court concluded that they were not subject to the "separate security" rule

of Rule 131. *Gorsey,* 1987 U.S. Dist. LEXIS 1940, at \* 10-11. Accordingly, Judge Zobel

held that the municipal bonds were exempt from the provisions of Section 12(a)(2) and

dismissed that claim. *Id.* at 11. In the present case, Bradford College is an educational

institution, its bonds are specifically exempted from being industrial development bonds (*see*

IRC Sec. 103(b)(3)(B) (1954) and Sec. 501(c)(3)), and therefore the bonds are not covered by

Rule 131.

Since *Gorsey,* other courts have followed the same reasoning and reached the same

result with regard to Section 12(a)(2) claims brought based on tax-free bond offerings. *See*

*Lieberman v. Cambridge Partners,* No. CIV.A.03-2317, *LLC*, 2003 WL 22999217, at \*4

(E.D. Pa. Dec. 16, 2003) (dismissing Section 12(a)(2) claim based on sale of county-issued

tax-exempt bonds); *Bexar County Health Facility*, 125 F.R.D. at 633-35 (denying class

certification of Section 12(a)(2) claim based on the sale of tax exempt bonds issued by a public

instrumentality). In *In re Bexar County Health Facility,* the court specifically held that a

33

retirement foundation that, like Bradford College, was a non-profit corporation under § 501(c)(3), was not an "industrial or commercial enterprise" within the meaning of Rule 131, and, therefore, bonds issued for its benefit were exempt from Section 12(a)(2). *See* 125 F.R.D. at 634. Similarly, in *Lieberman*, the court found that the bonds were tax-exempt "industrial revenue bonds" and held that the tax exempt status of the bonds at issue in that case removed them from the scope of Rule 131. 2003 WL 22999217, at *3, 4.

*Gorsey* and the line of cases following it make clear that the Bondholders cannot sustain a Section 12(a)(2) claim against Advest because that Section does not apply to the Series 1998 Bonds and because the Bonds are not covered by Rule 131 as they were issued for the benefit of a non-profit educational institution (exempting them from the definition of "industrial development bonds"). The tax-exempt Series 1998 Bonds issued by MIFA for the benefit of non-profit Bradford College are exempt from Section 12(a)(2) and the Bondholders have failed to state a Section 12(a)(2) claim against Advest.

## B.   THE BONDHOLDERS ARE NOT ALLEGED TO HAVE STANDING TO PURSUE A SECTION 12(A)(2) CLAIM.

The United States Supreme Court has held that Section 12(a)(2) applies only to public offerings and therefore aftermarket purchasers lack standing to bring a claim under Section 12(a)(2). *See Gustafson*, 513 U.S. at 571. Thus, to state a claim for violation of Section 12(a)(2), and to establish that they have standing to do so, plaintiffs must allege that they purchased the securities at issue in the initial offering for which the allegedly misleading prospectus was issued. *See In re Flag Telecom Holdings Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 256 (S.D.N.Y. 2004) (dismissing Section 12(a)(2) claim where plaintiffs failed to allege that they have standing to bring such a claim). Here, none of the Bondholders is alleged to have purchased the Series 1998 Bonds in connection with the offering in May 1998. All that

34

the Bondholders allege is that they "hold[] Bonds." Am. Compl. ¶¶ 8-11. There are no allegations regarding when or how any of the Bondholders allegedly purchased the Series 1998 Bonds. Accordingly, the Section 12(a)(2) claim should be dismissed because the Bondholders have failed to allege that any of them have standing to pursue the claim.

### C.    PLAINTIFFS HAVE FAILED TO ALLEGE FACTS SUFFICIENT TO SUSTAIN A SECTION 12(A)(2) CLAIM.

Even if Section 12(a)(2) did apply to the Series 1998 Bonds and even if the Bondholders had standing, the Bondholders still have to allege that the Official Statement contained a materially misleading statement or omitted to state a fact necessary to make the statements in the Official Statement not misleading. *See* 15 U.S.C. 77l. The heightened pleading requirements of Rule 9(b) also apply to the Section 12(a)(2) claim. *See Shaw*, 82 F.3d at 1216. As the Bondholders have not adequately alleged a materially misleading statement or omission, under any standard, their Section 12(a)(2) claims fail.

> *1.    The Bondholders Must Plead The Section 12(a)(2) Claim With the Particularity Required By Federal Rule of Civil Procedure 9(b).*

It is well settled that fraud-based Section 10(b) and Rule 10b-5 claims, which are based on misleading statements or omissions, must be pled with particularity. E.g., *Greebel*, 194 F.3d at 193. Although it is not always necessary for a Section 12(a)(2) plaintiff to satisfy the strict pleading requirements of Rule 9(b), where, as here, the Section 12(a)(2) claim "sounds in fraud," plaintiffs are required to plead that claim with particularity. *Shaw*, 82 F.3d at 1216. Indeed, as the First Circuit recognized in *Shaw*, where plaintiffs, like these here, attempt to establish violations of Section 12(a)(2) as well as the anti-fraud provisions contained in Section 10(b) and Rule 10b-5 of the Exchange Act "through allegations in a single complaint of a unified course of fraudulent conduct, fraud might be said to 'lie[] at the core of the action.'" *Shaw*, 82 F.3d at 1223 (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985)); *see also*

*Haft v. Eastland Financial Corp.*, 775 F. Supp. 1123, 1133 (D.R.I. 1991) ("It is the allegation of fraud, not the 'title' of the claim that brings the policy concerns [underlying Rule 9(b)] . . . to the forefront").

Here, the Bondholders have made no effort to distinguish their allegations related to the Section 12(a)(2) claim against Advest from the allegations related to the Section 10(b) and Rule 10b-5 claims against all of the defendants, including Advest. Both claims are based on the same allegedly "affirmative misrepresentations, misleading statements, and half-truths." Am. Compl., ¶¶ 46, 84. *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (applying Rule 9(b) to Section 11 claims challenging statements in a registration statement and holding that the plaintiffs' labeling of the statements at issue as "affirmative misrepresentations" demonstrates that the claim sounds in fraud).[11] The Bondholders rely on the same allegations concerning the adverse information that allegedly should have been disclosed in the Official Statement. In boiler plate fashion, they contend that at least some of the defendants knew about the adverse information at the time of the offering and yet still failed to disclose it. The Bondholders rely on the same "unified course of conduct" for both claims. Both claims sound in fraud and both claims must meet the particularity requirements of Rule 9(b). *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 287-88 (3rd Cir. 1992) (applying Rule 9(b) to Section 12(a)(2) claims "grounded in fraud"); *see also In re Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996) (applying Rule 9(b) to Section 11 claims "grounded in fraud").

---

[11] Section 11 is similar to Section 12(a)(2) in that it allows purchasers of securities to bring a claim against a seller based on alleged misstatements that appear in a Registration Statement without alleging scienter. *Shaw*, 82 F.3d at 1201.

2.   *The Section 12(a)(2) Claim Should Be Dismissed Because The Bondholders Have Failed to Allege an Actionable Misstatement or Omission.*

As set forth above, the Bondholders rely on the same alleged "misstatements and omissions" in support of their Section 12(a)(2) claim as those referenced in their Section 10(b) and Rule 10b-5 claims. *See* Am. Compl., ¶¶ 46, 90. "Freestanding omissions," even if they are material, are not sufficient to support a Section 12(a)(2) claim. *See In re Seachange Int'l, Inc.,* No. CIV.A.02-12116-DPW, 2004 WL 240317, at *3 (D. Mass. Feb. 6, 2004). Rather, as with the Section 10(b) claim, each alleged omission must be linked to a misleading statement in the Official Statement and liability attaches only if the Official Statement contained an untrue material statement or omitted a material fact necessary to make statements therein not misleading. *Id.* For the reasons discussed *supra* 11-20, the Bondholders have failed to allege that any of the eight statements identified in the Amended Complaint were false or misleading when made and, likewise, have failed to allege a material omission that renders any of those statements misleading. Under these circumstances, even if the Bondholders could bring a Section 12(a)(2) claim based on the Bradford College bond offering, they have failed to allege facts sufficient to state such a claim.

*      *      *      *

The Section 12(a)(2) claim must be dismissed because the tax-exempt Series 1998 Bonds are exempt from the provisions of that Section, the Bondholders do not allege they have standing, and because the Bondholders have failed to plead an actionable false or misleading statement or omission.

## IV.   THE STATE STATUTORY AND COMMON LAW CLAIMS SHOULD BE DISMISSED.

The plaintiffs' Massachusetts statutory and common law claims also should be dismissed. The Bondholders allege that Advest violated the Massachusetts Uniform Securities

Act, Mass. Gen. L. ch. 110A, § 410 (Count IV). All of the plaintiffs, including ACA, also

bring claims for fraud and intentional misrepresentation (Count V) and negligent

misrepresentation (Count VI). Finally, the institutional Bondholders (all of the Bondholders

except for Lois and John Moore) along with ACA (collectively, "the Chapter 93A plaintiffs")

bring a claim for violation of the Massachusetts consumer protection statute, Mass. Gen. L.

ch. 93A (Count VII). In support of these claims, the plaintiffs rely on the same allegedly

misleading statements and omissions used to support the Bondholders' federal securities

claims. *See* Am. Compl., ¶¶ 46-67, 92-104. As set forth above, however, none of the

allegedly misleading statements or omissions are actionable and for this, and the additional

reasons discussed below, each of the state claims fail.

As an initial matter, as with the Section 12(a)(2) claim, plaintiffs' state law claims must

be plead with particularity under Federal Rule of Civil Procedure 9(b). It is well settled that

the requirements of Rule 9(b) "appl[y] to all claims where fraud lies at the core of the action."

*In re Healthco Int'l, Inc. Sec. Litig.*, 777 F. Supp. 109, 113 (D. Mass. 1991) (internal citations

and quotations omitted); *see also Hayduk*, 775 F.2d at 443. Because all of plaintiffs' state

statutory and common law claims are brought "through allegations in a single complaint of a

unified course of fraudulent conduct, fraud . . . 'lie[s] at the core of the action.'" *Shaw*, 82

F.3d at 1223 (quoting *Hayduk*, 775 F.2d at 443). Each of these claims, therefore, must meet

the particularity requirements of Rule 9(b). *See Hayduk*, 775 F.2d at 443.

### A. THE BONDHOLDERS HAVE FAILED TO STATE A CLAIM FOR VIOLATION OF THE MASSACHUSETTS SECURITIES LAWS.

The provisions of the Massachusetts securities, or "blue sky," laws are "substantially

similar to the federal securities laws and, therefore, decisions construing the federal statutory

language are applicable to the state statute as well." *Fenoglio v. Augat, Inc.*, 50 F. Supp.2d

46, 59 (D. Mass. 1999) *aff'd*, 254 F.3d 368 (1ˢᵗ Cir. 2001) (quoting *Adams*, 838 F. Supp. at

685). Section 410(a)(2), on which the Bondholders rely here, provides, in relevant part:

> Any person who . . . . offers or sells a security by means of any untrue
> statement of material fact, or any omission to state a material fact necessary in
> order to make the statements made, not misleading, the buyer not knowing of
> the untruth or omission, and who does not sustain the burden of proof that he
> did not know, in the exercise of reasonable care could not have known, of the
> untruth or omission, is liable to the person buying the security from him . . . .

Mass. Gen. L. ch. 110A, § 410.[12] Thus, as with the federal securities laws, to state a claim

for violation of the state securities laws, the Bondholders must allege that the defendants made

a materially misleading statement and/or omission. *See Fenoglio*, 50 F. Supp.2d at 59. "The

only material difference between the federal and Massachusetts statutes is that, unlike the intent

or recklessness scienter requirement of the federal law, Section 410(a)(2) requires only

negligence on the part of the defendant." *Id.*

    Indeed, Section 410 is the state equivalent to a Section 12(a)(2) claim and therefore

similar standing requirements apply – none of which is alleged in the Amended Complaint.[13]

*See Twin Fires Investment, LLC v. Morgan Stanley Dean Witter & Co.*, 15 Mass. L. Rptr.

542, 2002 WL 31875204, at *31 (Mass. Super. Dec. 16, 2002) (Section 12 of the Securities

Act is the "federal counterpart" to Mass. Gen. L. ch. 110A, § 410). Specifically, to state a

claim for violation of Section 410, plaintiffs must allege that they purchased the securities in

Massachusetts. *Kaufman v. Magid*, 539 F. Supp. 1088, 1099 (D. Mass. 1982) (dismissing

Section 410 claim based on failure to allege that disputed stock transactions occurred in

Massachusetts). As set forth above, none of the Bondholders are alleged to have purchased the

securities in the offering – all that is alleged is that they "hold" the securities. Am. Comp., ¶¶

---

[12] Even if a plaintiff prevails on a Section 410 claim, they are entitled only to restitution as a remedy.
Mass. Gen. L. ch. 110A, §410.

[13] Mass. Gen. L. ch. 110A, § 101, which does not create a private right of action, is substantially similar
to Section 10(b) and Rule 10b-5 claims.

8-11. Further, none of the Bondholders are alleged to have purchased the securities in

Massachusetts. *See id.* Indeed, all of the institutional investors are alleged to reside outside of

Massachusetts. Am. Compl., ¶ 8-10. The two individual investors, while they are alleged to

live in Massachusetts, make no allegation about where or how they came to hold the Series

1998 Bonds. *Id.*, ¶ 11. Perhaps this is because they know they purchased their bonds in the

secondary market from an Advest broker in Westport, Connecticut. In any event, the

Bondholders have failed to allege that they have standing to bring a claim for violation of the

Massachusetts securities laws.

The Section 410 claim also must be dismissed because, as set forth in detail above, the

Bondholders have not identified a single material, misleading statement or omission in the

Official Statement. *Supra* 11-20. That failure requires dismissal of their federal, and also

their state, securities claims. *See Fenoglio*, 50 F. Supp. 2d at 59. Accordingly, the

Bondholders have failed to state a claim for violation of the Massachusetts securities laws.

### B.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR FRAUD AND INTENTIONAL MISREPRESENTATION.

To state a claim for fraud and intentional misrepresentation, plaintiffs must allege that

(1) defendants made a material misrepresentation or omission; (2) defendants acted with

knowledge of the falsity and for the purpose of inducing the plaintiff to act; (3) plaintiffs

"reasonably and justifiably" relied on defendants' actions; and (4) plaintiffs' reliance on

defendants' actions caused his or her loss. *See Sebago, Inc. v. Beazer East, Inc.*, 18 F.

Supp.2d 70, 86 (D. Mass. 1998) (stating elements of fraud claim); *Twin Fires*, 2002 WL

31875204 at * 25 (same); *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991) (stating

elements of a fraud claim and, with regard to materiality element, "[a] statement on which

liability for misrepresentation may be based must be one of fact, not of expectation, estimate,

opinion, or judgment"). In other words, the allegations required to support a fraud and intentional misrepresentation claim are virtually identical to those required to sustain a fraud claim for violation of the federal securities laws. *See supra* 8-9 (laying out the requirements of federal securities fraud claims). The only difference is that, to state a claim for common law fraud and misrepresentation, plaintiffs must not only allege that they relied on the alleged misstatements, they must also allege, with particularity, that their reliance was reasonable. *See Sebago*, 18 F. Supp.2d at 86. Here, the plaintiffs have not made any allegation that they *reasonably* relied on the purported misstatements regarding the College's "goals, plans, and strategic initiatives." Nor could they, as in the face of the disclosures regarding the College's financial situation, reliance on isolated remarks about the College's goals would be unreasonable, as a matter of law. *See Zimmerman*, 31 Mass. App. Ct. at 77-79. Plaintiffs' fraud and misrepresentation claim fails, therefore, because they have not pled reasonable reliance and for those additional reasons discussed above with regard to the Section 10(b) and Rule 10b-5 claims: they have not pled a materially misleading statement or omission made by Advest, they have not pled that Advest acted knowingly, and they have not pled that any alleged misleading statement or omission caused their loss. *See supra* 11-27. The fraud and intentional misrepresentation claim should be dismissed.

### C.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION.

The elements of a negligent misrepresentation claim are similar to those applicable to intentional fraud and misrepresentation. The only difference is that, to state a claim for negligent misrepresentation, the plaintiffs must allege that the defendants made a material misstatement or omission, not with knowledge of its falsity, but rather "failed to exercise reasonable care or competence in obtaining or communicating the information." *Global v.*

41

*Baybank Valley Trust,* 46 Mass. App. Ct. 256, 257 (1999) (stating elements of negligent misrepresentation claim); *Twin Fires,* 2002 WL 31875204 at * 25 (noting that only difference between fraudulent and negligent misrepresentation claims is level of knowledge that must be alleged); *Sebago,* 18 F. Supp.2d at 95 ("Like fraud, a claim of negligent misrepresentation requires plaintiffs to plead reliance with particularity"). Again, plaintiffs' failure to allege a materially misleading statement or omission by Advest or that they reasonably relied on the alleged misstatements requires dismissal of their negligent misrepresentation claim. *See supra* 11-16, 40-41. Likewise, the Amended Complaint does not contain a single allegation regarding Advest's due diligence and, therefore, fails to allege that Advest did not act with reasonable care. *See supra* 23-24. For these reasons, the negligent misrepresentation should be dismissed.

### D. THE CHAPTER 93A PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION STATUTE.

To state a claim for violation of the Massachusetts consumer protection statute, Mass. Gen. L. ch. 93A, plaintiffs must allege that defendants engaged in "unfair or deceptive acts in the conduct of any trade or commerce." Mass. Gen. Laws, Ch. 93A, § 2. When a Chapter 93A claim is brought under Section 11, as it is here, the conduct of the defendant is judged by a higher standard of unfairness than the standard employed in claims brought under Section 9.[14] *See Madan v. Royal Indem. Co.,* 26 Mass. App. Ct. 756, 763 n.7 (1989). The higher standard of unfair or deceptive conduct under Section 11 generally is expressed as the "rascality test" established by the Massachusetts Appeals Court in *Levings v. Forbes & Wallace, Inc.,* 8

---

[14] Mass. Gen. L. ch. 93A, Section 9 creates a right of action based on unfair or deceptive acts or practices for consumers while Section 11 allows claims based on unfair or deceptive acts or practices to be brought by one business entity against another business entity. Mass. Gen. L. ch. 93A, §§ 9, 11. The Chapter 93A plaintiffs here are all business entities (i.e., the institutional bondholders and ACA) and, therefore, they have brought their Chapter 93A claim under Section 11. Am. Compl., ¶¶ 8-12, 102-04.

Mass. App. Ct. 498, 504 (1979). Specifically, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.; see also Knapp Shoes v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190 (1st Cir. 1995); *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 475-476 (1991).[15]

Here, the Chapter 93A plaintiffs base their claim on Advest's alleged participation in disseminating an allegedly false and misleading Official Statement. *See* Am. Compl., ¶ 104. As set forth above, however, the Amended Complaint does not allege any materially misleading statements or omissions; indeed, each of the facts that the Chapter 93A plaintiffs contend were "omitted" were actually fully disclosed in the Official Statement and its attachments. *See supra* 11-20. Plaintiffs also fail to allege any facts establishing that Advest was the party responsible for any alleged misstatements; that Advest knew about the falsity of any statements in the Offering Statement; or that Advest has engaged in a commercially unreasonable practice or somehow fallen far below the required conduct of an underwriter. *See supra* 21-27.

The Chapter 93A plaintiffs, therefore, have failed to allege that Advest engaged in any "unfair or deceptive act" and have failed to state a claim for violation of the Massachusetts consumer protection statute.

## V.   THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

The Amended Complaint should be dismissed with prejudice. The plaintiffs have attempted to plead their best case, and they have had plenty of time to do so. Indeed, the College defaulted on the Series 1998 Bonds in 2000. Am. Compl., ¶¶ 78-79. These same

---

[15] Additionally, although Chapter 93A applies to alleged violations with respect to securities, the remedies of consumer plaintiffs with respect to such violations are limited. Michael C. Gilleran, The Law of Chapter 93A §§ 9:26 (1989 & Supp. Dec. 2004).

43

plaintiffs filed their first complaint at that time and later withdrew it before filing the original Complaint in this action four years later. *See* Am. Compl., ¶ 79. They have already amended their Complaint once, making the operative Amended Complaint the third that has been filed. The plaintiffs have had more than enough time to pull together their best possible case, and they have failed. For that reason alone, they should not be allowed to re-plead.

Further, as set forth above, any effort to re-plead would be futile. *See, e.g., Maldonado*, 137 F.3d at 11 (affirming dismissal of securities fraud claim and denial of plaintiffs' motion to amend where amendment would be futile); *Garvey*, 2005 WL 273135, at * 10 (dismissing securities fraud claims with prejudice). The Official Statement fully disclosed that the College was in a difficult financial situation and that the "BBB - " rated bonds were a risky investment. *See supra* 3-5, 11-20. Accordingly, the plaintiffs have not pled any actionable misstatement or omission, under any theory or pleading standard, and they cannot do so. Plaintiffs knew what they were buying (or, in the case of ACA, were insuring) and the Amended Complaint should be dismissed, in its entirety, with prejudice.

## CONCLUSION

For these reasons, the Amended Complaint should be dismissed with prejudice, and in its entirety, as to Advest.

ADVEST, INC.
By its attorneys,

Jonathan L. Kotlier (BBO#545491)
Sarah E. Walters (BBO#638378)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
617-439-2000

February 28, 2005

## CERTIFICATE OF SERVICE

I, Sarah E. Walters, certify that on February 28, 2005 a copy of the foregoing Motion to Dismiss has been sent by hand delivery to all counsel of record.

Sarah E. Walters

1407282.1

45