# SEC RELEASE No. 33-7049; 34-33741 (March 9, 1994): Interpretive Guidance on the Antifraud Provisions

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 211, 231, and 241**

**(Release No. 33-7049; 34-33741; FR-42; FILE NO. S7-4-94)**

**Statement of the Commission Regarding Disclosure Obligations of Municipal**

**Securities Issuers and Others**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation; Solicitation of comments.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is publishing its views with respect to the disclosure obligations of participants in the municipal securities markets under the antifraud provisions of the federal securities laws, both in connection with primary offerings and on a continuing basis with respect to the secondary market. This interpretive guidance is intended to assist municipal securities issuers, brokers, dealers and municipal securities dealers in meeting their obligations under the antifraud provisions. The Commission is seeking comment on issues discussed in this release and possible future agency action.

**DATES:** This Interpretation is effective March 9, 1994.

Comments should be received on or before July 15, 1994.

**ADDRESSES:** Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW., Stop 6-9, Washington, DC 20549. Comment letters should refer to File No. S7-4-94. All comments received will be available for public inspection and copying at the Commission's Public Reference Room, 450 Fifth Street, NW., Washington, DC 20549.

**FOR FURTHER INFORMATION CONTACT:** Ann D. Wallace ((202) 272-7282), Amy Meltzer Starr ((202) 272-3654), Vincent W. Mathis ((202) 272-3968), Division of Corporation Finance; Janet W. Russell-Hunter (with respect to Sections III.C.6. and V.) ((202) 504-2418), Division of Market Regulation, U.S. Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:** In a companion release, the Commission is proposing rule amendments that prohibit a broker, dealer or municipal securities dealer from underwriting a municipal issue unless the issuer agrees to disseminate information to the secondary market and from recommending the purchase of a municipal security without reviewing such information.

## I. Executive Summary

The recent high volume of municipal securities offerings, as well as the growing ownership of municipal securities by individual investors, has highlighted the need for improved disclosure practices in the municipal securities market, particularly in the secondary market. To encourage and expedite the ongoing efforts by market participants to improve disclosure practices, and to assist market participants in meeting their obligations under the antifraud provisions, the Commission is publishing its views with respect to disclosures under the federal securities laws in the municipal market.

This interpretive release addresses the following:

(1) With respect to primary offering disclosure, despite the significant improvement in disclosure practices in recent years as a result of voluntary initiatives, increased attention needs to be directed at

• Disclosure of potential conflicts of interest and material financial relationships among issuers, advisers and underwriters, including those arising from political contributions;

• Disclosure regarding the terms and risks of securities being offered;

• Disclosure of the issuer's or obligor's financial condition, results of operations, and cash flows. This information should include audited financial statements (or disclosure that the financial statements were not subject to audit) and an explanation of the accounting principles followed in the preparation of the financial statements, unless the statements were prepared in accordance with generally accepted accounting principles ("GAAP") or accompanied by a quantified explanation of any deviation from GAAP;

• Disclosure of the issuer's plans regarding the provision of information to the secondary market; and

• Timely delivery of preliminary official statements to underwriters and potential investors.

(2) The Commission is renewing its recommendation for legislation to repeal the exemption for corporate obligations underlying certain conduit securities from the registration and reporting requirements of the federal securities laws.

(3) Particularly because of their public nature, issuers in the municipal market routinely make public statements and issue reports that can affect the market for their securities; without a mechanism for providing ongoing disclosures to investors, these disclosures may cause the issuer to violate the antifraud provisions.

Basic mechanisms to address potential antifraud liability include:

Case 1:04-cv-11667-RGS   Document 41-2   Filed 05/02/2005   Page 2 of 16

- Publication of financial information, including audited financial statements and other financial and operating information, on at least an annual basis;

- Timely reporting of material events reflecting upon the creditworthiness of the issuer or the obligor and the terms of its securities, including material defaults, draws on reserves, adverse rating changes and receipt of an adverse tax opinion; and

- Submission of such information to an information repository.

(4) Underwriters and municipal securities dealers are key players in maintaining the quality of disclosure in the municipal securities markets. The underwriter has a duty to review the issuer's disclosure documents before offering, selling or bidding for the securities and to have a reasonable basis for its belief as to the accuracy and completeness of the representations in the documents. Municipal dealers must have a reasonable basis for recommending the purchase of securities.

In a companion release,[1] the Commission is proposing for comment two related rule amendments, the first proposing to prohibit a broker, dealer or municipal securities dealer from underwriting a municipal issue unless the issuer makes a commitment to provide annual and event-related secondary market information to a designated repository; and the second proposing to prohibit a broker, dealer, or municipal securities dealer from recommending purchases of such issues in the secondary market if it does not review such information.

## II. Introduction

### A. The Municipal Securities Market

As detailed in the recent Staff Report on the Municipal Securities Market, the market for municipal securities is characterized by great diversity and high volume. Issuers, estimated to number approximately 50,000, include state governments, cities, towns, counties, and special subdivisions, such as special purpose districts and public authorities. It is estimated that there currently are 1.3 million municipal issues outstanding, representing approximately $1.2 trillion in securities.[2] In 1993, a record level of over $335 billion in municipal securities was sold, representing over 17,000 issues. This record financing was heavily influenced by refundings. Nevertheless, the level of long term new money financings, representing 49% of financings for the year, reflected continued growth. In 1993, there were $142 billion of new money long term financings, compared to $81 billion in 1988, a 75% increase.[3]

In recent years, the forms of securities used to meet the financing needs of these issuers have become increasingly diverse and complex. For example, conduit bonds, certificates of participation, and a variety of derivative products have joined traditional general obligation and revenue bonds as prevalent forms of municipal financing.[4]

In addition, there has been a change in the investor profile in the municipal securities market. By 1992, individual investors, including those holding through mutual funds, held 75% of the municipal debt outstanding, compared to 44% in 1983.[5]

Along with the changing investor profile, there has been a change in investor strategy. Traditionally, municipal bondholders have been buy and hold investors; however, this strategy has changed significantly with the growth and development of municipal bond funds. Many of these funds actively trade their portfolio securities to take advantage of market conditions or to meet redemption needs.

### B. SEC Oversight of the Municipal Securities Market

As the agency charged with administering the federal securities laws and overseeing this nation's securities markets, the Commission has an obligation to protect investors in the municipal markets from fraud, including misleading disclosures. As the New York City report stated nearly two decades ago:

By virtue of the large dollar volume of municipal securities issued and outstanding each year, such securities are a major factor in the Nation's economy and the national securities markets. In light of the national scope of the municipal securities markets, there is an overriding federal interest in assuring that there is adequate disclosure of all material information by issuers of municipal securities.

Although municipalities have certain unique attributes by virtue of their political nature, insofar as they are issuers of securities, they are subject to the proscription against false and misleading disclosures.[6]

The burgeoning volume and complexity of municipal securities offerings, as well as the retail nature of the market, heighten the need for market participants to seek to prevent fraud through the timely provision of material information concerning municipal issuers and securities.

---

[1] Exchange Act Release No. 33742 (March 9, 1994) ("Companion Release").

[2] See Division of Market Regulation, Securities and Exchange Commission, Staff Report on the Municipal Securities Market ("Staff Report") (Sept. 1993) at 1.

[3] "A Decade of Municipal Finance," The Bond Buyer (Jan. 6, 1994) at 24.

[4] Staff Report at 1-2.

[5] The Bond Buyer 1993 Yearbook ("Bond Buyer 1993 Yearbook") at 61-63.

[6] Staff Report on Transactions in Securities of the City of New York ("NY City Report") (Aug. 1977) Chapter III, at 1-2.

While Congress exempted offerings of municipal securities from the registration requirements and civil liability provisions of the Securities Act of 1933,[7] and a mandated system of periodic reporting under the Securities Exchange Act of 1934,[8] it did not exempt transactions in municipal securities from the coverage of the antifraud provisions of section 17(a) of the Securities Act,[9] [FN9] section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.[10] These antifraud provisions prohibit any person, including municipal issuers and brokers, dealers and municipal securities dealers, from making a false or misleading statement of material fact, or omitting any material facts necessary to make statements made by that person not misleading, in connection with the offer, purchase or sale of any security. In addition, brokers, dealers and municipal securities dealers are subject to regulations adopted by the Commission, including those regulations adopted to define and prevent fraud.[11] [FN11] Municipal securities dealers are also subject to rules promulgated by the Municipal Securities Rulemaking Board ("MSRB").[12]

*C. Disclosure Practices and Calls for Enhanced Disclosure*

In the absence of a statutory scheme for municipal securities registration and reporting, disclosure by municipal issuers has been governed by the demands of market participants and antifraud strictures. Spurred by the New York City fiscal crisis in 1975 and the Washington Public Power Supply System defaults,[13] participants in the municipal securities market have developed extensive guidance to improve the level and quality of disclosure in primary offerings of municipal securities, and to a more limited extent, continuing disclosure in the secondary market.

In 1989, the Commission adopted Rule 15c2-12 under the Exchange Act[14] to enhance the quality and timeliness of disclosure to investors in municipal securities.[15] The rule requires that underwriters (both bank and non-bank) of primary offerings of municipal securities with an aggregate principal amount of $1,000,000 or more obtain and distribute to their customers the issuers' official statements for the offerings. This mechanism provides underwriters an opportunity to review the issuer's disclosure documents before commencing sales to investors.[16]

There is a consensus that, over the last two decades, these market and regulatory efforts have improved significantly the quality of primary offering disclosure in the municipal securities markets.[17] Nonetheless, there continue to be concerns with the adequacy of municipal offering disclosure, particularly with respect to offerings of non-general obligation bonds and smaller issues.[18]

Secondary market disclosure practices present greater concerns. Recent highly publicized defaults[19] and refundings,[20] as well as the tremendous level of issuances during the past two years, have

---

[7] See section 3(a)(2) of the Securities Act (15 U.S.C. 77c(a)(2)).

[8] See section 3(a)(29) of the Exchange Act (15 U.S.C. 78c(a)(29)).

[9] 15 U.S.C. 77q(a).

[10] 15 U.S.C. 78j(b); 17 CFR 240.10b-5.

[11] Sections 15(c) (1) and (2) of the Exchange Act (15 U.S.C. 78o(c) (1) and (2)).

[12] See MSRB Manual (CCH).

[13] See Securities and Exchange Commission, Report of the Securities and Exchange Commission on Regulation of Municipal Securities (1988); Securities and Exchange Commission, Staff Report on the Investigation in the Matter of Transactions in the Washington Public Power Supply System Securities (1988); Securities Act Release No. 6021, Final Report in the Matter of Transactions in the Securities of the City of New York (Feb. 5, 1979); NY City Report.

[14] 17 CFR 240.15c2-12; see Municipal Securities Disclosure, Securities Exchange Act Release No. 26100 (Sept. 28, 1988), 53 FR 37778 ("Proposing Release"); Municipal Securities Disclosure, Securities Exchange Act Release No. 26985 (July 10, 1989), 54 FR 28799 ("Adopting Release").

[15] Proposing Release, 53 FR at 37779-37782; Staff Report at 25.

[16] Adopting Release, 54 FR at 28800.

[17] National Federation of Municipal Analysts, Membership Survey Results Fall 1992 Disclosure Survey ("NFMA Survey"); Public Securities Association, Municipal Securities Disclosure Task Force, Report: Initial Analysis of Current Disclosure Practices in the Municipal Securities Market (June 1988) ("PSA Survey") (content and completeness of primary disclosure documents and sufficiency of financial information rated satisfactory to excellent by 94% and 93% of firms responding, respectively).

[18] See Letter to Chairman Levitt from Charles Mires, Allstate Insurance Company (Nov. 4, 1993, as updated Jan. 19, 1994) ("Allstate Letter") (primary market disclosure by conduits found inadequate in 43.8% of rated issues reviewed); NFMA Survey (local housing, special district, hospitals, long term healthcare and industrial development issues were found to provide the least disclosure); PSA Survey (small issue industrial development bonds received a low rating; issues of $10 million or less received a low rating).

[19] Examples include the defaults engendered by the failures of Mutual Benefit Life, Executive Life and Tucson Electric Power, and the bankruptcies arising out of the Colorado Special Districts. See, e.g., Hinden, "Mutual Benefit Life's Collapse Shows Fragility of Bond Guarantees," The Washington Post (Jul. 22, 1991) at F 27; Levinson, "No Coverage Against Junk," Newsweek (Apr. 22, 1991) at 46; Stamas, "Rep. Dingell Asks SEC to Investigate Defaults by Special Assessment Districts in Colorado," The Bond Buyer (Jan. 25, 1991) at 1.

[20] See Gasparino, "Balancing Budgets Through Lease Deals May Pose Credit Risks, Rating Agency Warns," The Bond Buyer (Jan. 25, 1993) at 1; Herman, "Municipal-Bond Holders: Watch Out for 'Call' Shock," The Wall Street Journal (Aug. 29, 1992) at C1; Hume, "Dealer Threatens Suit Over Proposed Call for Escrowed Bonds," The Bond Buyer (Nov. 8, 1993) at 4; Hume, "Issuer in Louisiana May Run Afoul of Law if Escrowed Bonds Are Called Next Month," The Bond Buyer (Apr. 22, 1993) at 1; Hume, "Rise in Re-Refundings of Escrowed Bonds Likely to Gain Attention at Treasury, SEC," The Bond Buyer (May 12, 1992) )at 1.

heightened interest in municipal secondary market disclosure.[21] The PSA has testified that today "secondary market information is difficult to come by even for professional municipal credit analysts, to say nothing of retail investors."[22] ] Substantial issuer information, in the form of official statements, state-required reports, and other public documents, is available from the approximately 20% of municipal issuers that come to market frequently, accounting for 80% of the dollar volume of municipal securities issued.[23] However, the remaining issuers, representing 20% in dollar volume but 80% in number, which come to the market much less frequently, provide substantially less continuing information. Many of these issues are health care issues, housing issues, industrial development bonds, and other conduit financings,[24] financing sectors which have had the greatest incidence of defaults, both monetary and technical.[25]

In addition, information often is unavailable for smaller issues of securities of general purpose units of government and the securities of special purpose districts and authorities.[26]

In response to a request by Commission Chairman Arthur Levitt for a recommended "market-participant sponsored solution" to the disclosure issues in the municipal securities market, on December 20, 1993, 12 groups and associations representing a broad range of market participants submitted to the Commission a Joint Statement on Improvements in Municipal Securities Market Disclosure (the "Joint Statement").[27] The Joint Statement sets forth "a framework for improving the availability of information in the marketplace" that calls for both continued market initiatives to improve issuer disclosure and "support from the SEC and the Municipal Securities Rulemaking Board (MSRB)."[28] Among other things, its participants recommend the adoption of a rule or interpretive guidance restricting underwriting of municipal issues unless continuing information covenants are provided by the issuer.

### III. Primary Offering Disclosure

*A. Application of the Antifraud Provisions*

The antifraud provisions of the federal securities laws prohibit fraudulent or deceptive practices in the offer and sale of municipal securities.[29] Disclosure documents used by municipal issuers, such as official statements, are subject to the prohibition against false or misleading statements of material facts, including the omission of material facts necessary to make the statements made, in light of the circumstances in which they are made, not misleading. The adequacy of the disclosure provided in municipal security offering materials is tested against an objective standard: an omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual

---

[21] See generally, Testimony of Jeffrey S. Green, General Counsel, Port Authority of New York and New Jersey on behalf of Government Finance Officers Association, before the Subcommittee on Telecommunications and Finance, House Committee on Energy and Commerce, Oct. 7, 1993 ("GFOA Testimony") at 7-9; Remarks by C. Richard Lehmann, President, Bond Investors Association Before the U.S. House of Representatives Subcommittee on Telecommunications and Finance Concerning the Municipal Securities Market, Oct. 7, 1993 ("Lehmann Testimony") at 4-5; Testimony of Andrew R. Kintzinger, President-Elect, National Association of Bond Lawyers, Before the Subcommittee on Telecommunications and Finance, House Committee on Energy and Commerce, Oct. 7, 1993 ("NABL Testimony") at 8-23; Testimony of Harvey Eckert, Chairman of the Blue Ribbon Committee on Secondary Market Disclosure on Behalf of the National Association of State Auditors, Comptrollers and Treasurers Before the Subcommittee on Telecommunications and Finance, House Committee on Energy and Commerce, Oct. 7, 1993 ("NASACT Testimony") at 3-6; Testimony Relating to the Municipal Securities Market given by the National Federation of Municipal Analysts, Katherine Bateman, Chairperson, to the Subcommittee on Telecommunications and Finance, Oct. 7, 1993 ("NFMA Testimony") at 1-7; Statement of Gerald McBride, Chairman, Municipal Securities Division, Public Securities Association, Before the House Committee on Energy and Commerce, Telecommunications and Finance Subcommittee, Oct. 7, 1993 ("PSA Testimony") at 5-7; NASACT, State and Local Government Securities Markets and Secondary Market Disclosure (Oct. 1993) at 5; Stamas, "Issuers' Intentions on Secondary Market Disclosure are Starting to Appear in Official Statements," The Bond Buyer (Dec. 14, 1992) at 1; Standard & Poor's, "In Support of Secondary Market Disclosure," CreditWeek Municipal (Mar. 16, 1992).

[22] PSA Testimony at 5. See also Lehmann Testimony at 4; NASACT Testimony at 3; Nemes, "Investors' Service Steps in to Fill Void in Hospital Data Disclosure," Modern Healthcare (Feb. 3, 1992) at 46; Quint, "Credit Markets; Aiming for More Data About Municipal Bonds," The New York Times (June 28, 1993) at D5; Schifrin, "Hello, Sucker," Forbes (Feb. 1, 1993) at 40.

[23] NASACT, Report of the Blue Ribbon Committee on Secondary Market Disclosure--Improving Secondary Market Disclosure (Aug. 1993) ("NASACT Blue Ribbon Committee Report") at 1-2.

[24] See id. at 1. See also Allstate Letter.

[25] See Bond Buyer 1993 Yearbook at 3-5; Municipal Bond Defaults--The 1980's; a Decade in Review (J.J. Kenny Co., Inc. 1993)("Kenny Default Report"); Public Securities Association, An Examination of Non-Rated Municipal Defaults 1986-1991 (Jan. 8, 1993)("PSA Default Report"); Staff Report, Appendix B.

[26] See NASACT Blue Ribbon Committee Report at 1-2.

[27] Joint Statement on Improvements in Municipal Securities Market Disclosure ("Joint Statement") (Dec. 20, 1993) at 1. The Joint Statement was submitted by the American Bankers Association's Corporate Trust Committee, American Public Power Association, Association of Local Housing Finance Agencies, Council of Infrastructure Financing Authorities, Government Finance Officers Association, National Association of Bond Lawyers, National Association of Counties, National Association of State Auditors, Comptrollers and Treasurers, National Association of State Treasurers, National Council of State Housing Agencies, National Federation of Municipal Analysts, and Public Securities Association.

[28] Id.

[29] See In re Washington Public Power Supply System Securities Litigation, 623 F. Supp. 1466, 1478 (W.D. Wash. 1985). See also Brown v. City of Covington, 805 F.2d 1266, 1270 (6th Cir. 1986).

significance in the deliberations of the reasonable (investor). Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[30]

### B. Voluntary Guidelines

In the primary offering of municipal securities, the extensive voluntary guidelines issued by the Government Finance Officers Association ("GFOA") have received widespread acceptance and, among a number of larger issuers, have been viewed as "in essence obligatory rules."[31] Other groups, including the National Federation of Municipal Analysts ("NFMA"), have published voluntary disclosure guidelines covering industry specific sectors, including among others, housing, student loans, transportation and health care.[32] In connection with the offering of municipal securities, the GFOA Guidelines call for:[33]

- An introduction to serve as the guide to the official statement;

- A description of the securities being offered, including complete information regarding the purposes of the offering, the plan of financing, the security and sources of repayment, and the priority of the securities, as well as structural characteristics, such as call provisions, tender options, original issue or deep discount, variable rates, and lease purchase agreements;

- Information regarding the nature and extent of any credit enhancement and financial and business information about the issuer of the enhancement;

- A description of the government issuer or enterprise, including information about the issuer's range or level of service, capacity and demographic factors and, in the case of revenue supported offerings, information on the enterprise's organization, management, revenue structure, results of operations and operating plan;

- With respect to obligations of private profit making and nonprofit conduit issuers, information regarding the business or other activity, including the enterprise's form of organization and management, rate-making or pricing policies, and historical operations and plan of operation;

- A description of the issuer's outstanding debt, including the authority to incur debt, limitations on debt, and the prospective debt burden and rate of its retirement;

- A description of the basic documentation, such as indentures, trust agreements and resolutions authorizing the issuance and establishing the rights of the parties;

Financial information, including summary information regarding the issuer's or obligor's financial practices and results of operations, and financial statements, prepared in conformity with generally accepted accounting principles and audited in accordance with generally accepted auditing standards;

A discussion of legal matters, such as pending judicial, administrative, or regulatory proceedings that may significantly affect the securities offered, legal opinions, and tax considerations; and

A discussion of miscellaneous matters, including ratings and their description and meanings, underwriting arrangements, arrangements with financial advisors, interests of named experts, pending legislation, and the availability of additional information and documentation.

The guidelines prepared by the GFOA and the NFMA provide a generally comprehensive roadmap for disclosure in offering statements for municipal securities offerings. There are, however, areas that need further improvement in both the context of negotiated and competitively bid underwritings. In addition, implementation of these guidelines needs to be extended to the whole market. For example, while large repeat general obligation issuers usually have comprehensive disclosure documents, small issuers and conduit issuers, particularly in the health care, housing and industrial development areas, do not always provide the same quality of disclosure.[34]

### C. Areas Where Improvement Is Needed

1. Conflicts of Interest and Other Relationships or Practices

Information concerning financial and business relationships and arrangements among the parties involved in the issuance of municipal securities may be critical to an evaluation of an

---

[30] TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

[31] Letter from Harlan E. Boyles, Treasurer of North Carolina to SEC Chairman Levitt, dated December 7, 1993. See Government Finance Officers Association, Disclosure Guidelines for State and Local Government Securities (Jan. 1991) ("GFOA Guidelines").

[32] See NFMA, Disclosure Handbook for Municipal Securities 1992 Update (Nov. 1992) ("NFMA Handbook"). See also Government Accounting Standards Board, Codification of Government Accounting and Financial Reporting Standards (2d ed. 1987); PSA, Recommendations for a Consistent Presentation of Basic Bond Provisions in Official Statements (Dec. 1989).

[33] GFOA Guidelines at xv-xix (summary).

[34] See NASACT Blue Ribbon Committee Report at 1-2; Staff Report at 26. Industry participants generally agreed in testimony before the House of Representatives Subcommittee on Telecommunications and Finance on October 7, 1993, that both the greatest disclosure problems and the greatest risk of default were with unrated hospital, housing, special district and industrial development revenue bonds.

offering.[35] Recent revelations about practices used in the municipal securities offering process have highlighted the potential materiality of information concerning financial and business relationships, arrangements or practices, including political contributions, that could influence municipal securities offerings. For example, such information could indicate the existence of actual or potential conflicts of interest, breaches of duty, or less than arm's-length transactions. Similarly, these matters may reflect upon the qualifications, level of diligence, and disinterestedness of financial advisers, underwriters, experts and other participants in an offering. Failure to disclose material information concerning such relationships, arrangements or practices may render misleading statements made in connection with the process, including statements in the official statement about the use of proceeds, underwriters' compensation and other expenses of the offering. In addition, investors reasonably expect participants in municipal securities offerings to follow standards and procedures established by such participants, or other governing authorities, to safeguard the integrity of the offering process; accordingly, material deviations from those procedures warrant disclosure.

Existing rules and voluntary guidelines call for certain specific disclosures by offering participants. GFOA guidelines call for offering statement disclosure to investors of contingency fees to named experts, including counsel, and any other interest or connection those parties have with other transaction participants.[36] MSRB rules call for dealer disclosure to issuers and investors of any financial advisory relationship between an issuer and a broker, dealer, or municipal securities dealer, under certain circumstances.[37] MSRB rules also call for dealer disclosure to investors of, among other things, certain fees and expenses in negotiated transactions.[38]

Beyond existing specific disclosure requirements and guidelines, the range of financial and business relationships, arrangements and practices that need to be disclosed depends on the particular facts and circumstances of each case. If, for example, the issuer (or any person acting on its behalf) selects an underwriter, syndicate or selling group member, expert, counsel or other party who has a direct or indirect (for example, through a consultant) financial or business relationship or arrangement with persons connected with the offering process, that relationship or arrangement may be material.[39] Areas of particular concern are undisclosed payments to obtain underwriting assignments and undisclosed agreements or arrangements, including fee splitting, between financial advisers and underwriters.[40] If the adviser is hired to assist the issuer, such relationships, financial or otherwise, may divide loyalties. Similarly, affiliations between sellers of property to be used in a financed project and conduit borrowers raise questions regarding, among other things, the determination of fair market value of the property and self-dealing.

2. Terms and Risks of Securities

Evolution in the financial markets has led to increasingly complex and sophisticated derivative and other municipal products. While these new products offer investors a wide range of investment alternatives, in choosing among the alternatives, investors need a clear understanding of the terms and the particular risks arising from the nature of the products.[41]

In particular, investors need to be informed about the nature and effects of each significant term of the debt, including credit enhancements and risk modifiers, such as inverse floaters and detachable call rights. Investors in these securities should be aware of their exposure to interest rate volatility, under all possible scenarios. In addition, any legal risk concerning the issuer's authority to issue securities with unconventional features needs to be disclosed. The PSA recently has identified disclosure that should be provided in connection with the offer of financial

---

[35] See SEC v. Washington County Utility District, 676 F.2d 218, 222 (6th Cir. 1982) ("Flagrant violations" of antifraud provisions arising from failure to disclose use of proceeds to purchase options on property held by issuer's manager and financial arrangements between the manager and the underwriter).

[36] Section XII.D. of the GFOA Guidelines.

[37] MSRB rule G-23.

[38] MSRB rule G-32. See Section 15B(c)(1) of the Exchange Act (15 U.S.C. 78o-4(c)(1)) (requiring compliance with MSRB rules); MSRB rule G-17.

[39] Gasparino, "The Trouble with Consultants", The Bond Buyer (Nov. 16, 1993) at 1. In his testimony before the Subcommittee on Telecommunications and Finance, Andrew Kintzinger, on behalf of the National Association of Bond Lawyers ("NABL"), stated: "(M)embers of the municipal finance bar should work with issuers to develop procurement procedures for state and local governments to ensure that all material financial arrangements between underwriters within the syndicate and between underwriters and financial advisors and possible conflicts of interest between issuers and members of the underwriting syndicate or other participants be accurately documented and disclosed or, if appropriate, prohibited." NABL Testimony at 28. See Joint Statement at 2.

[40] Gasparino, "Several Issuers Start to Scrutinize Ties Between Advisers, Bankers," The Bond Buyer (Dec. 27, 1993) at 1. See Section XII.C. of the GFOA Guidelines; rule G-23 of the MSRB.

[41] As the NABL Testimony indicates: "Derivatives are sophisticated securities products designed for sophisticated investors and should not be sold to retail investors generally and certainly not without comprehensive disclosure. If issuers choose to undertake the financial benefits of these sophisticated and complicated transactions, they can assume the financial costs of providing * * * information." NABL Testimony at 22.

instruments that include such features as auction and swap-based inverse floaters and embedded cap bonds.[42]

Credit enhancements are used with increasing frequency in the municipal market. According to published information, over 37% of the dollar volume of new long term issues carry some form of credit enhancement.[43] The existence of bond insurance or other credit enhancement creates the need for disclosure concerning the provider of the credit enhancement and the terms of the enhancement[44] to avoid misleading investors concerning the value of the enhancements provided and the party's ability to fund the enhancement. The GFOA recommends that appropriate financial information about the assets, revenues, reserves and results of operations of credit enhancers be provided in the official statement. In determining the extent of disclosure, consideration should be given to the amount of the enhancement relative to the income and cash flows of the issuer or obligor, conditions precedent to application of the enhancement, duration of the enhancement, and other factors indicating a material relationship between the enhancement and the investor's anticipated return.

In a trend that has become increasingly common, municipal bond insurers are including in indentures provisions that appear to delegate to the bond insurer the ability to modify terms of the indenture, prior to default, without the consent of, or even prior notification to, bondholders.[45] There should be clear disclosure of any such provision that may have a material impact on the rights of bondholders or the obligations of the issuer, including the specific material rights of the bondholder that could be so altered.

3. Financial Information

a. *Financial Accounting.* Sound financial statements are critical to the integrity of the primary and secondary markets for municipal securities, just as they are for corporate securities.[46] The key to the reliability and relevancy of the information contained in the financial statements of a municipal issuer is the use of a comprehensive body of accounting principles consistently applied by the issuer.[47]

Although there continues to be some diversity in the financial reporting practices used in preparing financial statements of governmental issuers, practice in the municipal market is evolving rapidly to reliance on generally accepted accounting principles ("GAAP") as determined by the Government Accounting Standards Board ("GASB").[48] Only two years after GASB was founded in 1984, financial statements prepared in accordance with GAAP, as promulgated by GASB, were required by 75.2% of cities, 78.3% of counties and 69% of school districts responding to a research survey.[49] Forty-six states currently require, or are in the process of establishing a requirement, that state government financial statements be presented in accordance with GAAP.[50] In addition, local as well as state governments that receive significant amounts of federal aid must prepare financial statements in accordance with GAAP or provide information concerning variance from GAAP.[51]

The GFOA Guidelines call for financial statements that are either prepared in accordance with GAAP or accompanied by a quantified (if practicable) explanation of the differences.[52] To avoid misunderstanding, investors need to be informed of the basis for financial statement presentation. Accordingly, when a municipal issuer neither uses GAAP nor provides a quantified explanation of material deviations from GAAP, investors need a full explanation of the accounting principles followed.

b. *Audits.* Investors in the public securities markets have a reasonable expectation that annual financial statements contained in offering documents or periodic reports are subject to audit.[53] In the case of municipal issuers, these financial statement audits are typically conducted by either an independent certified public

---

[42] PSA, Recommendation on Dissemination of Product-Specific Terms For Municipal Derivative Products (1993).

[43] PSA, Municipal Market Developments (Aug. 1993) at 5.

[44] See Revisions to Rules Regulating Money Market Funds, Securities Act Rel. No. 7038, 58 FR 68585, 68588 (footnote omitted) ("Money Market Fund Release"); Securities and Exchange Commission, Report by the United States Securities and Exchange Commission on the Financial Guarantee Market: The Use of the Exemption in Section 3(a)(2) of the Securities Act of 1933 for Securities Guaranteed by Banks and the Use of Insurance Policies to Guarantee Debt Securities (Aug. 28, 1987) ("SEC Financial Guarantee Report") at 82; Adopting Release, 54 FR at 28812.

[45] See Allstate Letter.

[46] See NY City Report at Ch. II p. 92.

[47] See GFOA Guidelines at 50.

[48] The financial statements of corporate obligors backing conduit securities should follow GAAP for such entities, as established by the Financial Accounting Standards Board and other bodies.

[49] Ingram & Robbins, Financial Reporting Practices of Local Governments, Government Accounting Standards Board (1987) at 12 (The survey results were based on information received from 567 respondents to a survey questionnaire mailed to 1161 government units).

[50] State Comptrollers: Technical Activities and Functions (1992 Edition).

[51] Where state and local governments programs that are subject to the federal "Single Audit Act of 1984," Public Law 98-502 et seq. prepare financial statements on a basis other than GAAP, "the audit report should state the nature of the variances therefrom and follow professional guidance for reporting on financial statements which have not been prepared in accordance with GAAP." Office of Management and Budget, "Questions and Answers on the Single Audit Process of OMB Circular A-128, 'Single Audits of State and Local Governments,' " 52 FR at 43716 (Nov. 13, 1987), question 35.

[52] GFOA Guidelines at 45.

[53] See Gauthier, An Elected Official's Guide to Auditing (1992) at vii and xi.

accountant or a state auditor. Although the frequency and timeliness of audits vary, every state requires some periodic audit verification of government financial statements.[54] A prudent investor needs to be able to evaluate the extent to which he or she can rely on the second look an auditor provides.

Accordingly, the offering statement should state whether the financial statements it contains were audited in accordance with generally accepted auditing standards ("GAAS"), as established by the American Institute of Certified Public Accountants.

c. *Other Financial and Operating Information.* Financial information beyond that contained in the financial statements--provided in tabular and narrative format, footnotes, supplemental tables, schedules and discussions of operations and financial position--is essential to the fair presentation of an issuer's financial performance and position. As reflected in industry guidelines,[55] the type of information needed (e.g., tax revenue base, budget, demographics, project revenues and operations) varies depending on the type of issuer, the type of security sold, and the sources for repayment of the bond obligations.

There are a number of areas in which greater care needs to be taken to provide investors with adequate information. In a pooled financing structure, such as that used by bond banks, in addition to providing financial information concerning the issuing authority or program in the aggregate, it may be necessary to provide information on participating obligors. This will depend on diversification and risk concentration factors, such as the significance of any single obligor to the overall financing.

Conduit bond issuers need to provide operational information concerning the activities of the private enterprise that will provide the cash flows to service the debt--for example, financial reporting, legal proceedings, changes in indebtedness, defaults and other significant developments relating to the underlying corporate obligor. Where the issuing authority in a conduit financing has no remaining obligation for the repayment of the indebtedness, in providing financial information about the issuing entity (as compared to the obligor on the bonds), care must be taken to avoid misleading investors regarding the sources of repayment.[56]

Municipal issuers also must consider disclosure issues arising from their activities as end users of derivative products. For example, the use of non-exchange traded derivatives to alter interest rate risk exposes the issuer to counterparty credit risk. Disclosure documents need to discuss the market risks to which issuers are exposed, the strategies used to alter such risks and the exposure to both market risk and credit risk resulting from risk alteration strategies. The NFMA has published sector specific secondary market disclosure guidelines calling for a discussion of the issuer's use of derivative products, especially interest rate swaps.[57]

Moreover, in addition to financial and operating data, the official statement may need to include a narrative explanation to avoid misunderstanding and assist the reader in understanding the financial presentation. A numerical presentation alone may not be sufficient to permit an investor to judge financial and operating condition of the issuer or obligor.[58] For example, it may be necessary to explain the presentation of budget information and the relationship of the budget figures to the financial statements.

In addition, issuers must assess whether the future impact of currently known facts mandate disclosure. The GFOA Guidelines call for a description of known facts that would significantly affect the financial information presented or future financial operation of the issuer, as well as a discussion of its projected operations.[59] For example, in a hospital financing, a steadily declining population in the surrounding community that, in the future, would not support the size of facility to be built would be important to investors. Disclosure of such currently known conditions and their future impact is critical to informed decisionmaking.

d. Timeliness of Financial Statements. The timeliness of financial information is a major factor in its usefulness. To avoid providing investors with a stale, and therefore potentially misleading, picture of financial condition and results of operations, issuers and obligors need to release their annual financial statements as soon as practical. After extensive discussion with market participants, it appears that, for the most part, audited financial statements of municipal issuers for the most recently completed fiscal year are available within six months after fiscal year end. The six month time period is consistent with the recommendations of NASACT's Blue Ribbon Committee Report.[60]

---

[54] State Comptrollers: Technical Activities and Functions; NASACT, Municipal Task Force Report (1990) ("NASACT 1990 Task Force Report") at 12.

[55] See generally, GFOA Guidelines; NFMA Handbook. See also infra n. 84.

[56] See Letter of John Murphy, Executive Director of Association of Local Housing Finance Agencies to Chairman Levitt (Dec. 20, 1993).

[57] NFMA Handbook.

[58] See Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Securities Act Release No. 6835 (May 24, 1989), 54 FR 22427; Securities Act Release No. 6711 (April 24, 1987), 52 FR 13715.

[59] GFOA Guidelines at 55.

[60] See NASACT Blue Ribbon Committee Report at 17. While due dates for audited financial statements of government units differ, a significant majority of states currently require audited financial statements for government units to be

Unaudited financial statements should be provided when available prior to the completion of the audit.

4. Availability of Continuing Information

An investor's ability to monitor future developments affecting the issuer, as well as the likely liquidity of a security, are important to an investor's evaluation of an offering. The official statement should state clearly whether ongoing disclosure concerning the issuer or obligor will be provided, including the type, timing, and method of providing such information.[61] In deciding whether to purchase the securities or to continue to hold them, investors need to know whether the issuer has committed to provide information on an ongoing basis.[62] The absence of such a commitment can adversely affect the secondary market for the securities and increases the risks of the investment.

As discussed above, the Joint Statement recommends that the Commission adopt a rule prohibiting a municipal securities dealer from underwriting securities absent a commitment to provide ongoing information. In the Companion Release, the Commission is proposing such a rule for comment. In order to fully inform investors, an issuer needs to include in the official statement a description of the scope of its continuing disclosure commitment, the type of information that would be provided, the repositories to which the information would be sent, when annual and other periodic information would be available, and the consequences of the issuer's failure to abide by the requirements of the covenant.

5. Clarity and Conciseness

Like other disclosure documents, official statements need to be clear and concise to avoid misleading investors through confusion and obfuscation. The expanded level of disclosure in official statements and increased sophistication of municipal securities instruments have, in many cases, resulted in longer and more complex disclosure documents, with the corresponding danger of overly detailed, legalistic, and possibly obtuse disclosure.[63]

The location, emphasis, and context of the disclosure can affect the ability of a reasonable investor to understand the relationship between, and cumulative effect of, the disclosure.[64] As the U.S. Court of Appeals for the Second Circuit has stated:

(D)isclosures in a prospectus must steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment. The import of the information conveyed must be neither oversubtle nor overplayed, its meaning accurate, yet accessible.[65]

Appropriate disclosure "is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead" investors.[66] As the Commission has indicated in other contexts, legalistic, overly complex presentations and inattention to understandability can render the disclosure incomprehensible and consequently misleading.[67]

6. Delivery of Official Statements

One of the concerns leading to the adoption of Rule 15c2-12 was that underwriters were not receiving official statements within time periods that would allow them to examine the accuracy of the disclosure.[68] The Commission noted in proposing the rule that a thorough, professional review by underwriters of municipal offering documents could encourage appropriate disclosure of foreseeable risks and accurate descriptions of complex put and call features, as well as novel financing structures now employed in many municipal offerings. In addition, with the increase in novel or complex financings, there may be greater value in having investors receive disclosure documents describing fundamental aspects of their investment. Yet, underwriters are unable to perform this function effectively when offering statements are not provided to them on a timely basis.[69]

---

filed within six months after the fiscal year end. NASACT 1990 Task Force Report at 12-22.

[61] See Fall 1992 NFMA Survey. See also American Bankers Association, Corporate Trust Committee, Four Point Public 1991 Disclosure Guidelines for Corporate Trustees ("ABA 1991 Guidelines") at 2; Stamas, "Issuers' Intentions on Secondary Disclosure are Starting to Appear in Official Statements," The Bond Buyer (Dec. 14, 1992) at 1.

[62] See MSRB, Report of the Municipal Securities Rulemaking Board on Regulation of the Municipal Securities Market (Sept. 1993) at 6-7 (Board announced plan that would include requiring underwriters to recommend to issuers that they provide continuing disclosure to the market and requiring municipal securities dealers to disclose to their customers the negative impact that the lack of secondary market information may have on the value and liquidity of the securities and whether the issuer has agreed to voluntarily provide such disclosures).

[63] See GFOA Testimony at 6. See also Allstate Letter.

[64] Isquith v. Middle South Utilities, 847 F.2d 186, 201 (5th Cir.), cert. denied, 488 U.S. 926 (1988); Kas v. Financial General Bankshares, Inc., et al., 796 F.2d 508, 516 (D.C. Cir. 1986); Kennedy v. Tallant, 710 F.2d 711, 720 (11th Cir. 1983).

[65] Isquith, 847 F.2d at 202.

[66] McMahan & Company, et. al. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990).

[67] See, e.g., Limited Partnership Reorganizations and Public Offerings of Limited Partnership Interests, Securities Act Release No. 6900 (June 25, 1991) 56 FR 28979, 28980 ("Limited Partnership Release").

[68] Proposing Release, 53 FR at 37781.

[69] Proposing Release, 53 FR at 37782.

To address this concern, the rule requires any underwriter, including lead underwriters, syndicate members, and selling group members that receive in excess of the usual seller's commission, to obtain and review an official statement that is deemed final as of its date by the issuer, except for the omission of certain information, before bidding for, purchasing, offering, or selling municipal securities in a primary offering.

Since the adoption of Rule 15c2-12, however, there have been continued problems with the timeliness of receipt by underwriters of the "near final" official statement required by the Rule.[70] In addition to compromising the ability of an underwriter to make a reasonable investigation of the issuer, this problem also may limit the ability of potential customers to make informed investment decisions. In a recent NFMA survey, 59% of those responding rated the delivery of preliminary official statements in competitive sales as either not very good or poor, and 50% rated the delivery of preliminary official statements in negotiated sales as either not very good or poor.[71]

One cause of delay has been confusion as to the point at which the underwriter must have obtained and reviewed the near final official statement in a negotiated offering. The term "offer" traditionally has been defined broadly under the federal securities laws and, for purposes of Rule 15c2-12, encompasses the distribution of a preliminary official statement by the underwriter, as well as oral solicitations of indications of interest. Thus, prior to the time that the underwriter distributes the preliminary official statement to potential investors, or otherwise begins orally soliciting investors, the rule requires it to have obtained and reviewed a near final official statement. If no offers are made, the underwriter is required to obtain and review a near final official statement by the earlier of the time the underwriter agrees (whether in principle or by signing the bond purchase agreement) to purchase the bonds, or the first sale of bonds to investors.[72]

The Commission has acknowledged that the rule would require greater planning and discipline by some issuers.[73] The Commission anticipated that, in order to allow underwriters to meet their obligation to have a reasonable basis for recommending any municipal securities, issuers would have to begin drafting disclosure documents earlier, and perhaps with greater care than in the past.[74] ] This result enables underwriters to receive, and if necessary influence the content of, the final official statement before committing themselves to an offering.[75] Moreover, placing an obligation on the issuer to prepare the official statement at an earlier stage is appropriate, because it is the issuer's obligation to ensure that there is timely dissemination of disclosure documents in connection with the offer and sale of the issuer's securities.[76]

D. Conduit Financings

When financing involves a third party as the source of repayment, investors need information on that underlying borrower. The GFOA Guidelines call for description of conduit obligors, which are defined by the GFOA Guidelines to include both private profit-making and nonprofit entities.[77] The suggested information includes the nature and development of the business or other activity to be undertaken by the conduit obligor (including its form of organization and management), location of principal facilities and service area, ratemaking or pricing policies and historical operations and plan of operations.

To address disclosure issues involving conduit financings in a comprehensive fashion, however, legislation addressing the exempt status of conduit securities under the federal securities laws is necessary. Bonds used to finance a project to be used in the trade

---

[70] As a practical matter, near final official statements distributed to underwriters to satisfy Rule 15c2-12(b)(1) are often the same document as the preliminary official statement distributed to potential customers pursuant to Rule 15c2-12(b)(2). See Mudge Rose Guthrie Alexander & Ferndon (April 4, 1990) ("Mudge Rose") (rejecting the argument that in a negotiated offering, the identification of a credit enhancer and related information about the credit enhancer may be omitted on the assumption that the information depends on pricing). See also Fippinger & Pittman, Disclosure Obligations of Underwriters of Municipal Securities, 47 Business Lawyer 127, 140 (Nov. 1991). In addition, underwriters are required to deliver to potential customers, upon request, copies of the final official statement for a specified time period. Rule 15c2-12(b)(4).

[71] NFMA Survey. See also Letter from Jeffrey M. Baker, Chairperson, NFMA Industry Practices and Procedures Committee and Richard A. Ciccarone, Past Chairperson, NFMA Industry Practices and Procedures Committee to Arthur Levitt, Chairman, Securities and Exchange Commission, Christopher A. Taylor, Executive Director, MSRB and Joseph R. Hardiman, President and Chief Executive Officer, National Association of Securities Dealers, Inc. (Oct. 19, 1993) (regarding the timeliness of receipt of near final and preliminary official statements).

[72] See Mudge Rose.

[73] Adopting Release, 54 FR at 28804. The Commission also noted that the requirements of Rule 15c2-12(b)(1) could be met through the use of multiple documents. For example, a frequent issuer might be able to supply a recent official statement, together with supplementary information containing the terms of the current offering, as well as any material changes from the previous offering materials.

[74] Proposing Release, 53 FR at 37790.

[75] Id.

[76] See Adopting Release, 54 FR at 28811 N. 84 (official statement is issuer's document).

[77] GFOA Guidelines at 26. In a recent policy statement, the GFOA referred to "conduit bonds" as "municipal securities issued by a state or local government for the benefit of a private corporation or other entity that is ultimately obligated to pay such bonds * * *." GFOA, Committee on Governmental Debt and Fiscal Policy, Improvements in Municipal Securities' Market Disclosure (Feb. 1, 1994) ("GFOA Disclosure Policy Statement").

or business of a private corporation are, from an investment standpoint, equivalent to corporate debt securities issued directly by the underlying corporate obligor.[78] Payments on these types of conduit securities are derived solely from revenues received by the governmental entity under the terms of a contractual agreement, typically a lease or a note, from a private enterprise, rather than from the general credit and taxing power of the governmental issuer. The tax-exempt status of interest payments does not alter the fundamental analysis that these are private obligations, in which the investor looks, and can look, only to a private entity for repayment.

The private nature of many conduit enterprises distinguishes them from traditional municipal financings. The incidence of bond default appears to be inversely related to the degree a financed project represents an essential public service.[79] A study conducted by the PSA on non-rated issues that defaulted found that 75% were issued by local authorities in the areas of health care and industrial related sectors such as energy, chemical, pollution control and industrial development.[80]

Given the essentially private nature of non-governmental industrial development financings, investors need the same disclosure regarding the underlying non-municipal corporate obligor as they would receive regarding any corporate obligor, and the same regulatory and liability scheme should apply. Accordingly, the Commission has consistently supported legislative proposals to amend Section 3(a)(2) of the Securities Act[81] and Section 3(a)(29)[82] of the Exchange Act to remove the registration exemption for the corporate credit underlying municipal conduit securities involving non-governmental industrial development (private activity) financings.[83] The Commission today renews that legislative recommendation.

Pending amendment to the securities laws to eliminate the registration exemption, the disclosure provided by such non-governmental conduit borrowers should be substantially the same as if such conduit borrower were subject to the information requirements of the federal securities laws applicable to the particular conduit borrower. For example, financial statements prepared in accordance with generally accepted accounting principles prescribed by the Financial Accounting Standards Board should be provided.

### IV. Disclosure in the Secondary Market for Municipal Securities

While significant progress has been made in primary market disclosure practices in recent years, the same development has not taken place with respect to secondary market disclosure. The GFOA issued separate secondary market disclosure guidelines in 1979, but they have not yet achieved the broad acceptance accorded its primary offering guidance. In the last five years, the NFMA, the National Council of State Housing Agencies, and the Association of Local Housing Authorities have published sector specific guidelines for secondary market disclosure; the National Advisory Council of the National Association of State Auditors, Comptrollers and Treasurers ("NASACT") is in the process of preparing such guidelines for adoption by the states.[84] The GFOA's longstanding Certificate of Achievement program recognizes issuers that have prepared comprehensive annual financial reports meeting its guidelines. The NFMA's Award of Recognition Program likewise recognizes issuers that have committed to provide continuous disclosure.

*A. Application of Antifraud Provisions*

---

[78] See Money Market Fund Release, 58 FR at 68588 (proposal to subject tax exempt money market fund investments in conduit securities to restrictions similar to those applicable to securities of comparable obligors offered to taxable funds).

[79] Kenny Default Report at 2.

[80] PSA Default Report at 12.

[81] 15 U.S.C. 77c(a)(2).

[82] 15 U.S.C. 78c(a)(29).

[83] See Remarks of David S. Ruder, Chairman, SEC, "Disclosure in the Municipal Securities Markets," Before the Public Securities Association (Oct. 23, 1987) at 17-18; Letter from John S.R. Shad, Chairman, SEC to Representative Timothy E. Wirth, Chairman, House Subcommittee on Telecommunications, Consumer Protection, and Finance (March 12, 1985); 124 Cong. Rec. 21, 639 (1978) (letter from SEC Chairman Harold M. Williams to Senator Harrison A. Williams). There were two bills introduced, one in 1975 and one in 1978, that would have repealed the exemption from the registration requirements of the Securities Act of 1933. The 1978 bill would have subjected certain industrial development bonds to the registration requirements of the Securities Act of 1933, the filing and qualification provisions of the Trust Indenture Act and the periodic reporting requirements of the Securities Exchange Act of 1934. Neither bill was enacted. See also "Municipal Securities Full Disclosure Act of 1976," S. 2969, 94th Cong., 2d. Sess. (Feb. 17, 1976).

Governmental industrial development financings, which would have retained their exempt status under prior proposals, include those financings in which the bonds are repaid from the general revenues of the governmental unit or the project or facility is a public facility (or part of a public facility) and owned and operated by or on behalf of the governmental unit. The prior proposals to register conduit financings would not have affected the separate exemption for securities issued by non-profit charitable organizations in Section 3(a)(4) of the Securities Act (15 U.S.C. 77c(a)(4)).

[84] See Association of Local Housing Finance Agencies, Guidelines for Information Disclosure to the Secondary Market (1992) ("Local Housing Guidelines"); National Council of State Housing Agencies, Quarterly Reporting Format for State Housing Finance Agency Single Family Housing Bonds (1989) and Multi-family Disclosure Format (1991) collectively ("State Housing Guidelines"); NFMA Handbook. See also Healthcare Financial Management Association, Statement of Principles of Public Disclosure of Financial and Operating Information by Healthcare Providers (Exposure Draft dated Aug. 1, 1993) ("Healthcare Disclosure Principles").

Participants in the municipal securities market do not dispute the need for ongoing disclosure following an offering of securities, but municipal issuers reportedly resist developing a routine of ongoing disclosure to the investing market because of concerns about the costs of generating and disseminating that information and about potential liability relating to such disclosure. These issuers and obligors are at times advised by their professional advisors that there is no duty under the federal securities laws to make disclosure following the completion of the distribution.[85] At least some municipal issuers thus appear to believe that silence shields them from liability for what may later be found to be false or misleading information. As a practical matter, however, municipal issuers do not have the option of remaining silent. Given the wide range of information routinely released to the public, formally and informally, by these issuers in their day-to-day operations, the stream of information on which the market relies does not cease with the close of a municipal offering. In light of the public nature of these issuers and their accountability and governmental functions, a variety of information about issuers of municipal securities is collected by state and local governmental bodies, and routinely made publicly available.[86] [FN86] Municipal officials also make frequent public statements and issue press releases concerning the entity's fiscal affairs.

A municipal issuer may not be subject to the mandated continuous reporting requirements of the Exchange Act, but when it releases information to the public that is reasonably expected to reach investors and the trading markets, those disclosures are subject to the antifraud provisions.[87] The fact that they are not published for purposes of informing the securities markets does not alter the mandate that they not violate antifraud proscriptions.[88] Those statements are a principal source of significant, current information about the issuer of the security, and thus reasonably can be expected to reach investors and the trading market. As the U.S. Court of Appeals for the Second Circuit has said: "The securities markets are highly sensitive to press releases and to information contained in all sorts of publicly released . . . documents, and the investor is foolish who would ignore such releases."[89] Since investors obtain information concerning the fiscal health of a municipal issuer from its public statements concerning financial and other matters, "(t)he nature of these statements and the assumptions upon which they are based must be carefully and accurately communicated to the public, so that potential investors may be fully informed of all material facts relevant to their investment decision."[90]

The current process by which municipal issuers and their officials release information to market participants does not address the risk of misleading investors, because there is no mechanism for disseminating information about the municipal issuer to the market as a whole. To the contrary, in the municipal market, information released publicly frequently is disseminated only to a narrow segment of the marketplace. For example, market participants who request current information from indenture trustees are often turned away on the grounds that they are not current holders of the securities.[91] [FN91] As a result, investors purchasing municipal securities in the secondary market risk doing so on the basis of incomplete and outdated information.

Since access by market participants to current and reliable information is uneven and inefficient, municipal issuers presently face a risk of misleading investors through public statements that

---

[85] See Stamas, "Issuers' Intentions on Secondary Market Disclosure Are Starting to Appear in Official Statements," The Bond Buyer (Dec. 14, 1992) at 1; Stamas, "Why the Issue of Secondary-Market Disclosure Remains on the Back Burner: It Can Be Risky," The Bond Buyer (Sept. 20, 1991) at 1; Stamas, "Analysts Warn Issuers About Some Lawyers' Disclosure Advice," The Bond Buyer (Jan. 15, 1991) at 1.

[86] See NASACT Blue Ribbon Committee Report at 2, 24; NASACT 1990 Task Force Report at 21.

[87] See Public Statements by Corporate Representatives, Securities Act Release No. 6504 (Jan. 20, 1984) 49 FR 2468, 2469; In re Ames Dept. Stores Inc. Stock Litigation, 991 F.2d 953, 965-67 (2d Cir. 1993) (with respect to corporate information).

[88] See Fippinger, The Securities Law of Public Finance (2d ed. 1993) at 291 ("(P)ress releases, conversations with analysts, information meetings, official comments on budget negotiations, and even angry reactions by public officials to rating agency downgrades" are subject to antifraud provisions).

[89] Ames, 991 F.2d at 963 (corporate information).

[90] NY City Report at Ch. III at 2. The report found that public statements by City officials were misleading, since they were characterized by unwarranted reassurances as to the soundness and attractiveness of the City's securities, including statements that the City's budget problems, no matter how serious, had nothing to do with the City's ability to pay its debts. Id. at 110-111.

Municipal issuers should also be sensitive to whether their official statements contain forward-looking statements, such as projections of revenues, that remain alive in the market and may require updating in light of subsequent events. Guides for Disclosure of Projections of Future Economic Performance, Exchange Act Rel. No. 5992 (Nov. 7, 1978), 43 FR 53246. To the extent that the official statement in many cases remains the principal (or perhaps even the sole) source of information concerning an outstanding security, the potential for an obligation to update is of particular importance.

[91] Under notice provisions of indentures, the issuer and trustee generally are required to provide notice to existing bondholders of events of default and other significant matters, such as a draw on reserves, a failure to renew a letter of credit, or a substitution of collateral. ABA 1991 Guidelines at 10. Indeed, trustees often deny requests by market participants for information out of concern for liability arising from exceeding the authority set forth in the indenture. Fippinger at 325. This situation led the American Bankers Association Corporate Trust Committee, in cooperation with the National Association of Bond Lawyers, to develop agreed upon guidelines for indenture provisions permitting the trustee to provide public notice of specified events. See ABA 1991 Guidelines.

may not be intended to be the basis of investment decisions, but nevertheless may reasonably be expected to reach the securities markets. As market participants have urged,[92] in order to minimize the risk of misleading investors, municipal issuers should establish practices and procedures to identify and timely disclose, in a manner designed to inform the trading market, material information reflecting on the creditworthiness of the issuer and obligor and the terms of the security.[93]

*B. Secondary Market Disclosure*

There is general recognition of the need for disseminating comprehensive information on an annual basis and, on a more timely basis, information about material events that reflect on the credit quality of the security.[94]

1. Annual Information

Investors need updated comprehensive information sufficient to enable them to evaluate the financial condition, results of operations and cash flows of the issuer or underlying borrower. Although the issuance of comprehensive annual information has not yet become prevailing practice, it is recommended by industry disclosure guidelines, including those published by the GFOA in connection with its Comprehensive Annual Financial Reports ("CAFRs") award program, NFMA, and the other industry specific guidelines,[95] and is an effective means of providing the market updated information about the issuer and the issue. The GFOA Guidelines for Continuing Disclosure call for, either in an official statement or comprehensive annual report, a description of:

The issuer and its structure, management, assets and operations;

The issuer's debt structure (including changes in indebtedness);

The issuer's finances (including financial condition and results of operations and financial practices of the issuer or the enterprise);

Legal matters affecting the issuer; including litigation and legislation;

Ratings; and

Interests of certain persons.

The GFOA Guidelines also specify additional information to be provided by conduit borrowers. The eligibility criteria for a Certificate of Achievement from GFOA include audited financial statements prepared in accordance with GAAP, reported upon by an independent public auditor. The guidelines for CAFRs include both a financial section and a statistical section.[96]

For frequent issuers, current information can be disseminated in official statements for new offerings, and thus is readily available without the preparation of a separate annual financial report. Regardless of the form of document relied upon to provide the marketplace with information concerning the financial condition of the issuer or obligor, to minimize risk of misleading investors, issuers or obligors should provide, as discussed above with respect to primary offerings:

- Financial statements that are audited in accordance with GAAS (or disclosure of the absence of such an audit) and that are either prepared in accordance with GAAP, or accompanied by a quantified explanation of material deviations from GAAP or a full explanation of the accounting principles used;

- Other pertinent financial and operating information (depending on the type of issuer and security sold), as well as the sources for repayment--of course, a variety of information may be appropriate for an issuer with a range of outstanding securities with differing characteristics, from general obligation to revenue and conduit bonds; and

- A narrative discussion that analyzes the issuer's or obligor's financial condition, and results of operations, as well as facts likely to have a material impact on the issuer or obligor.

Clarity and conciseness are equally relevant concerns with respect to ongoing disclosures, as with official statements.

As discussed above with respect to offering statements, as a general matter, the annual financial information may reasonably be expected to be made available within six months of the issuer's fiscal year end.[97] For some conduit entities, annual information may not be sufficient and investors may need more frequent periodic financial information. Under guidelines developed by the National

---

[92] See GFOA Guidelines at 91-97; Joint Statement.

[93] National Association of Bond Lawyers and Section of Urban, State and Local Government Law, American Bar Association, Disclosure Roles of Counsel in State and Local Government Securities Offerings at 135 (forthcoming 1994) (Pre-publication Draft) ("ABA Disclosure Roles") (noting that many municipal issuers have concluded that post-issuance disclosure in accordance with GFOA guidelines can be more efficient and expose them to less potential liability than ad hoc disclosures).

[94] See GFOA Testimony; Mires, "An Investor's Framework for Examining Disclosure Issues and Possible Solutions," The Bond Buyer (Feb. 7, 1994) at 24; NASACT Blue Ribbon Committee Report at 7. See also PSA Testimony at 6, supporting annual financial statement filing requirements and submission of information regarding any material fact for issuers who borrow $1 million or more annually.

[95] See ABA Disclosure Roles at 134-136; ABA 1991 Guidelines; Association of Local Housing Guidelines; Healthcare Disclosure Principles. The Disclosure Task Force of the National Council of State Housing Agencies is developing standards for the issuance of audited financial and annual reports.

[96] See GFOA Certificate of Achievement for Excellence in Financial Reporting Program; GFOA Guidelines at 64.

[97] See Section III.C.3.d. above.

Council of State Housing Agencies, for example, current information on loan portfolio status is compiled and disseminated to information repositories on a quarterly basis.[98] Similar ongoing disclosure on a periodic basis appears appropriate for analogous conduit municipal financings such as structured student loan programs, housing and health care financings.

2. Event Disclosure

In addition to periodic information, to assure that participants in the secondary market base their investment decisions on current information, commentators have called for timely disclosure of events that materially reflect on the creditworthiness of municipal securities issuers and obligors and the terms of their securities. There is a general consensus among participants in the municipal securities market that investors need information about the following events, among others, where material:[99]

a. Principal and interest payment delinquencies

b. Nonpayment-related defaults

c. Unscheduled draws on reserves

d. Unscheduled draws on credit enhancements

e. Substitution of credit or liquidity providers, or their failure to perform

f. Adverse tax opinions or events affecting the tax-exempt status of the security

g. Modifications to rights of security holders

h. Bond calls

i. Defeasances

j. Matters affecting collateral

k. Rating changes

3. Dissemination

As discussed above, the municipal market today lacks an effective mechanism for dissemination of material information to investors and the marketplace. To be effective in minimizing the issuer's risk under the antifraud provisions, the annual financial information and event disclosure should be disseminated in a manner reasonably designed to inform the holders of the issuer's securities and the market for those securities.

Trustees can serve as cost effective disseminators of information to the market due to the capacity and duties of trustees under the terms of the indentures, which positions them to have knowledge of the events requiring disclosure, and the ability and authority to communicate with bondholders.[100] The Commission encourages the inclusion of provisions in trust indentures that authorize trustees to transmit information to the market, particularly in structured financings where the issuer's obligations generally are delegated to various participants. Trustees also may provide a service to other small issuers, by enabling them to notify the market in a timely manner and at a lower cost.

The common denominator for current proposals to improve secondary market disclosure for municipal securities is the establishment and designation of one or more information repositories to serve as a collection and access point for annual and current information.[101] Such repositories would serve as predetermined sources for information concerning a particular issuer, allowing participants to verify that they have the latest available information concerning the issuer before recommending, purchasing, or bidding for a security. The repositories would supplement, not substitute for, the existing access bondholders may have to issuers to obtain current information.[102]

---

[98] State Housing Guidelines.

[99] In 1990, the American Bankers Association Corporate Trust Committee drafted a proposal identifying 16 factors that it believed were important for issuers to disclose to bondholders and the marketplace. American Bankers Association Corporate Trust Committee, Proposed Disclosure Guidelines for Corporate Trustees (ABA Draft for Discussion Purposes) (June 12, 1990) ("ABA 1990 Guidelines"). As published in final form in September of 1991 ("ABA 1991 Guidelines"), the Guidelines contained a nonexclusive list of five types of events that could be disclosed by notice to a repository. Numerous market participants have referenced the ABA draft proposal, or variations of that proposal, as a starting point for identifying straightforward, nonjudgmental, categories of events that call for prompt disclosure. An addendum to the Joint Statement provided four examples of "significant information" that the participants considered appropriate for disclosure. The nonexclusive examples were (1) nontechnical defaults, (2) draws from a debt service reserve fund, (3) failure to make a regularly scheduled payment, and (4) any draws on any credit enhancement. Joint Statement, Addendum. The list set forth above is drawn from these proposals.

[100] See ABA 1991 Guidelines at 3.

[101] Consistent with the recent recommendation of the Joint Statement, the GFOA Guidelines call for lodging secondary market disclosure with a repository, as did the ABA guidelines published in 1991. GFOA Guidelines, Procedural Statement No. 8; ABA 1991 Guidelines at 3.

[102] The American Bankers Association Corporate Trust Committee and the National Association of Bond Lawyers, as well as the Joint Statement, have expressed concern that securities depositories and their participants do not retransmit notices they receive from trustees and issuers to the beneficial owners of the issuer's securities. The ABA Corporate Trust Committee sought to address the problem by calling for simultaneous dissemination of the information to the marketplace through an information repository. The National Association of Bond Lawyers has suggested that the Commission promulgate a rule mandating that all depositories and their direct and indirect participants promptly retransmit notices received from the issuer or indenture trustee. While the establishment of information repositories may address the problem to some extent, the Commission staff intends to work with the relevant

In the Companion Release, the Commission is proposing an amendment to Rule 15c2-12 to prohibit, as suggested by the Joint Statement, underwriting of a municipal securities issue unless the issuer of the municipal security has covenanted to provide annual and ongoing disclosure to a repository.

## V. Interpretive Guidance With Respect to Obligations of Municipal Securities Dealers

In the Proposing and Adopting Releases for Rule 15c2-12, the Commission set forth its interpretation of the obligation of municipal underwriters under the antifraud provisions of the federal securities laws. The interpretation discussed the duty of underwriters to the investing public to have a reasonable basis for recommending any municipal securities, and their responsibility, in fulfilling that obligation, to review in a professional manner the accuracy of statements made in connection with the offering. The interpretation was set out in the Proposing Release, and modified slightly in the Adopting Release. The Commission reaffirms its Interpretation with respect to underwriters' responsibilities under the antifraud provisions of the federal securities laws.[103]

Furthermore, the Commission believes that it is also appropriate to emphasize the responsibilities of brokers and dealers in trading municipal securities in the secondary market. The Commission historically has taken the position that a broker-dealer recommending securities to investors implies by its recommendation that it has an adequate basis for the recommendation.[104] A dealer, unlike an underwriter, ordinarily is not obligated to contact the issuer to verify information. A dealer must, however, have a reasonable basis for its recommendation.[105] If, based on publicly available information, a dealer discovers any factors that indicate the disclosure is inaccurate or incomplete, or signal the need for further inquiry, a municipal securities dealer may need to obtain additional information, or seek to verify existing information.[106]

One of the rules proposed simultaneously with the issuance of this release would require a broker, dealer or municipal securities dealer to review current information provided by the issuer prior to recommending a transaction in a municipal security. In the absence of such current information, the dealer could not recommend a transaction in the issuer's securities. That rule, which would be applicable to municipal securities issued subsequent to the effective date of the proposed rule, would reinforce the obligations of dealers under the antifraud provisions of the federal securities laws to have a reasonable basis for recommendations of outstanding municipal securities.

The Joint Statement also called for a strengthening of the suitability rules to require disclosure of ratings and whether the issuer has committed to provide annual financial reports. Today, the Commission is proposing amendments to its confirmation rules to require disclosure of the absence of a rating in confirmations. The MSRB has indicated it has under consideration a plan requiring municipal securities dealers to disclose to their customers the importance of secondary market information and whether the issuer has agreed to voluntarily provide such disclosures.[107] The Commission will defer to the MSRB's reexamination of its suitability rules in implementing those aspects of the Joint Statement.

## VI. Request for Comments

The Commission intends to continue to monitor developments in municipal securities disclosure practices. Comment is requested regarding the disclosure items discussed in this release, and in particular, items warranting event disclosure. Comment also is

---

organizations to assure that steps are taken to provide for consistent retransmission of the information.

[103] In light of the underwriter's obligation, as discussed in the prior releases, to review the official statement and to have a reasonable basis for its belief in the accuracy and completeness of the official statement's key representations, disclaimers by underwriters of responsibility for the information provided by the issuer or other parties, without further clarification regarding the underwriter's belief as to accuracy, and the basis therefor, are misleading and should not be included in official statements.

[104] See Donald T. Sheldon, Securities Exchange Act Release No. 31475 (Nov. 18, 1992); Elizabeth Bamberg, Securities Exchange Act Release No. 27672 (Feb. 5, 1990); Feeney v. SEC, 564 F.2d 260 (8th Cir. 1977); Nassar & Co., Securities Exchange Act Release No. 15347 (Nov. 22, 1978). See also Proposing Release, 53 FR at 37787, n.72-73.

[105] Richard J. Buck & Co., 43 SEC 998 (1968), aff'd sub nom. Hanley v. SEC, 416 F.2d 589 (2d Cir. 1969). See also The Obligations of Underwriters, Brokers and Dealers in Distributing and Trading Securities, Particularly of New High Risk Ventures, Securities Act Release No. 5275 (Aug. 9, 1972) 37 FR 16011, 16012-13; In Re Blumenfeld, Securities Exchange Act Release No. 16437 (Dec. 19, 1979) (broker-dealer charged unfair mark-ups and recommended transactions in municipal securities without a reasonable basis); J.A. Winston & Co., Inc., 42 S.E.C. 62 (1964) (broker-dealer recommended transactions without a reasonable basis, and made representations that were false and misleading).

[106] See Merrill, Lynch, Pierce, Fenner & Smith, Securities Exchange Act Release No. 14149 (Nov. 9, 1977) ("A recommendation by a broker-dealer is perceived by a customer as (and in fact it should be) the product of an objective analysis (which) can only be achieved when the scope of an investigation is extended beyond the company's management"); John R. Brick, Securities Exchange Act Release No. 11763 (Oct. 24, 1975) ("the professional...is not an issuer. But he is under a duty to investigate and see that his recommendations have a reasonable basis"); M.G. Davis & Co., 44 SEC 153, 157-58 (1970) (broker-dealer registration revoked because "representations and predictions" made and market letter relied on by registrant "were without reasonable basis," and "registrant could not reasonably accept all of the statements in the (market letter) without further investigation"), aff'd sub nom. Levine v. SEC, 436 F.2d 88 (2d Cir. 1971). See also Merrill, Lynch, Pierce, Fenner & Smith, Securities Exchange Act Release No. 14149 (Nov. 9, 1977) (noting that if a broker-dealer lacks sufficient information to make a recommendation, the lack of information is material and should be disclosed).

[107] See supra n. 62.

requested regarding additional action that should be taken with respect to disclosure in the municipal securities market by the Commission, the MSRB, or Congress.

**List of Subjects in 17 CFR Parts 211, 231 and 241**

Securities.

**Amendment of the Code of Federal Regulations**

For the reasons set out in the preamble, title 17 chapter II of the Code of Federal Regulations is amended as set forth below:

**PART 211—INTERPRETATIONS RELATING TO FINANCIAL REPORTING MATTERS**

1. Part 211, Subpart A, is amended by adding Release No. FR-42 and the release date of March 9, 1994, to the list of interpretive releases.

**PART 231—INTERPRETATIVE RELEASES RELATING TO THE SECURITIES ACT OF 1933 AND GENERAL RULES AND REGULATIONS THEREUNDER**

2. Part 231 is amended by adding Release No. 33-7049 and the release date of March 9, 1994, to the list of interpretive releases.

**PART 241—INTERPRETATIVE RELEASES RELATING TO THE SECURITIES EXCHANGE ACT OF 1934 AND GENERAL RULES AND REGULATIONS THEREUNDER**

3. Part 241 is amended by adding Release No. 34-33741 and the release date of March 9, 1994, to the list of interpretive releases.

By the Commission.

Dated: March 9, 1994.

**Margaret H. McFarland,**

*Deputy Secretary.*

(FR Doc. 94-5922 Filed 3-16-94; 8:45 am)

**BILLING CODE 8010-01-P**